1                     IN THE UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF CALIFORNIA
2


3       Tan Lam, as
        Successor-In-Interest to
4       decedent Sonny Lam (aka
        Son Tung Lam),                      Sacramento, California
5              Plaintiff,                    No. 2:15-cv-00531
                                             Mon., Aug. 6, 2018
6       vs.                                  9:09 a.m.


7       Jairo Acosta, et al.,
               Defendants.
8       _____/


9                         TRANSCRIPT OF JURY TRIAL
                                  VOLUME 1
10      BEFORE THE HONORABLE MORRISON C. ENGLAND, JR., DISTRICT JUDGE
                               ---oOo---
11


12      APPEARANCES:

13        For the Plaintiff:              Law Offices Of John L. Burris
                                          7677 Oakport Street
14                                        Suite 1120
                                          Oakland, California  94621
15                                        By:  Adante Pointer
                                          Melissa Catherine Nold
16                                        Attorneys at Law

17
          For the Defendants:            Allen, Glaessner, Hazelwood &
18                                        Werth, LLP
                                          180 Montgomery Street
19                                        Suite 1200
                                          San Francisco, CA  94104
20                                        By:  Dale Long Allen, Jr.
                                          Philip John Downs, Jr.
21                                        Attorneys at Law

22        Official Court Reporter:        Kimberly M. Bennett,
                                          CSR, RPR, RMR, CRR
23                                        501 I Street
                                          Sacramento, CA 95814
24
          Proceedings recorded by mechanical stenography, transcript
25        produced by computer-aided transcription

1                                   INDEX

2

   PLAINTIFF WITNESS:                                    PAGE:

3
   KRIS MOHANDIE
4  VOIR DIRE EXAMINATION BY MR. ALLEN..................125
   DIRECT EXAMINATION BY MR. POINTER...................134
5  CROSS-EXAMINATION BY MR. ALLEN......................158
   REDIRECT EXAMINATION BY MR. POINTER.................170

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Call to order of the court, 9:09 a.m.)

 2              THE CLERK:  Calling civil case 15-531; Tan Lam versus

 3     City of Los Banos, et al.  On for jury trial, day one, Your

 4     Honor.

 5              THE COURT:  Thank you.

 6         Good morning, counsel.  May I have your appearances.

 7              MR. POINTER:  Good morning, Your Honor.  Adante

 8     Pointer on behalf of plaintiffs.

 9              MS. NOLD:  Melissa Nold on behalf of plaintiffs.

10              INTERPRETER:  Good morning, Your Honor.  My name is

11     Dien Pham.  I'm a certified court interpreter for the state of

12     California.

13              THE COURT:  In what language?

14              INTERPRETER:  Vietnamese, sir.

15              THE COURT:  Thank you.  And this is the plaintiff?

16              INTERPRETER:  Yes.

17              THE COURT:  At the far end of the table.  All right.

18         From defense side, please.

19              MR. ALLEN:  Yes, Your Honor.  Dale Allen on behalf of

20     defendant.

21         My colleague, Phillip Downs, will be here shortly.  He'll

22     also be in attendance from time to time during the trial.

23         To my right is Officer Jairo Acosta.

24              THE COURT:  Very well.  Thank you.

25         We're outside the presence of the jury.

1            At this time, I understand there is an issue or two that

2    needs to be addressed; is that correct?

3                 MR. POINTER:  Yes, Your Honor.

4                 THE COURT:  What is that issue?

5                 MR. POINTER:  The first issue that I wanted to raise

6    to the Court is just to advise the Court, my client, depending

7    upon his condition, he may be at all days of trial or not.  And

8    so I wanted to first raise that with the Court to find out if

9    that was going to be an issue for the Court or a concern.

10           He's told me that he's going to -- he intends to be here

11   every day, but I did want to let the Court know that while he's

12   spry, he may have days where --

13                THE COURT:  I believe the age is 85?

14                MR. POINTER:  Yes, he is.

15                THE COURT:  Are you saying that that age is an issue

16   that might make it difficult for him to physically be present?

17                MR. POINTER:  Yes.

18                THE COURT:  Do you know how often this might occur?

19                MR. POINTER:  No, I do not, Your Honor.  And we

20   don't -- we don't -- we don't anticipate it occurring, but if

21   it does, I just wanted to apprise the Court that that might

22   become an issue.

23                THE COURT:  Under the circumstances, unless you have

24   something to say to object to that...

25                MR. ALLEN:  I don't, Your Honor.  And I will make no

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1    reference to it.

2              THE COURT:  If it occurs, please let me know.  I'd

3    like to tell the jury that there is a reason why he's not

4    present, so they're not thinking that there is some other

5    issue.

6              MR. POINTER:  Understand.

7              THE COURT:  I don't have a problem with that.

8              MR. POINTER:  Thank you, Your Honor.

9        The other issue to be raised is the parties intend to read

10   into the record two deposition testimonies for a Dr. Shuman and

11   nurse practitioner Jimenez.  The parties have met and

12   conferred, and we have identified the sections of the

13   transcript that we want read in.  There are some objections

14   that we'd like the Court to rule on.

15             THE COURT:  And why would these be read in as opposed

16   to the actual live testimony?

17             MR. POINTER:  Yes, Your Honor.  The two witnesses are

18   unavailable.  They are both employees and work for the Veterans

19   Administration.  We took their depositions, however, the

20   Veterans Administration was unwilling to produce them for

21   trial.

22       We had some back and forth with the Veterans Affairs on top

23   of that.  They cited that because they're -- these doctors

24   work, and, essentially, are more than a hundred miles away from

25   the court, their contention is the court didn't have

1    jurisdiction over them, or they didn't have to respond to the

2    subpoena, which we did send to them.

3        Once again, the parties met and conferred about this, and

4    so we managed to agree to read in their -- these witnesses'

5    depositions.

6            MR. ALLEN:  Yes, Your Honor, we did meet and confer.

7        The only other issue I was going to raise was that in doing

8    last-second reread, for the reread of what we stipulated to, I

9    found a couple of things to add, which I was going to meet and

10   confer with Mr. Pointer, I've talked to him about it over the

11   break, before it comes in, if the Court allows a little bit of

12   addition to context to what we had already submitted.  And one

13   other mention of alcohol, which is barred by MIL, number one or

14   two, I believe, and that's to be stricken, and we're just going

15   to make sure we've got the cleanest draft possible.

16           THE COURT:  How are you planning on doing it

17   procedurally?

18           MR. POINTER:  Yes, Your Honor.  We have persons or

19   people coming in to read these depositions, and they can read

20   it from the stand, or however the Court would like.  So, we'll

21   do a question/answer, just as it's in the transcript.

22           THE COURT:  That's the way I've done it in the past,

23   is simply have a person sit in the witness stand, one at the

24   podium, and just go back and forth.

25       But what I want you to do is to get to this and meet and

1    confer and try to resolve these issues so that it's not going

2    to be -- how long do you anticipate the readings to take?

3              MR. POINTER:  This is -- there is substantial

4    testimony.  I'd say, what, an hour?  Hour and a half?

5              MR. ALLEN:  Yeah.  I believe the depos went about an

6    hour each.  One was a little shorter, one was longer.  They

7    were right around the hour mark.

8              THE COURT:  You understand you have six days for this

9    entire trial to be completed, correct?

10             MR. POINTER:  Yes, Your Honor.

11             MR. ALLEN:  If I could, we've actually agreed on one,

12   two, three, four, five, six witnesses that are not going to be

13   called.  So, we can shorten the witness list for you, and I

14   have that for you.

15             THE COURT:  All right.  Because I want to show that

16   to the prospective jurors and see if anyone knows anyone on

17   there.

18             MR. ALLEN:  If I may, Your Honor, I'll give this to

19   Ms. Deutsch?

20             THE COURT:  Yes.

21       And when I say the six days, we are in session Monday,

22   Tuesday and Wednesday of each week.  We've gone over this, but

23   I want to make sure that everyone understands that.  And these

24   six days are going to have to include today's voir dire,

25   opening statements, and at some point we're going to have to

1   settle jury instructions, and you're going to have closing

2   arguments.

3        Closing arguments will not take more than one hour.  I'm

4   limiting them to one hour.  Plaintiff may reserve a period of

5   time for rebuttal, but that's completely up to you.  I'm going

6   to keep informal time, if you will, to make sure that we have

7   an even amount of time.

8        What do you believe your time will be for presentation of

9   your case-in-chief?

10            MR. POINTER:  Good question, Your Honor.  I think

11   that we're going to get it done within the timeframe laid out

12   by the Court.  I don't have a specific time.  I'm thinking

13   about 12 hours.

14            THE COURT:  So that means you can be done by this

15   week?

16            MR. POINTER:  Yes.

17            THE COURT:  All right.  And your best estimate that

18   you have?

19            MR. ALLEN:  Your Honor, if the witnesses go in in the

20   order that Mr. Pointer and I have set out, I should be able to

21   close my case on Monday.  I believe I can do my case on Monday.

22   Now, that's not taking into consideration cross-examination of

23   my client, but I put in a very efficient direct.

24            THE COURT:  Good.  Okay.  I just wanted to make sure

25   that that's understood, because if we get down to Tuesday

1  afternoon we're going to have to -- I will -- I have had to do

2  this in the past, say, okay, you're done in one hour, and

3  that's it, and we go into jury instructions, verdict forms, and

4  get everything set so that we can bring in the jury on the

5  following day, if that were to occur.  Which I'm hoping it does

6  not, because I just want it to be clear for both of you, and on

7  the record, that after that time period I will be gone for two

8  weeks on court business, so I will not -- there will be no way

9  to extend into another week.  I do not wish to have the jury

10  wait two weeks.  That's not good for them, and it's not good

11  for your cases to have to wait two weeks and come back and try

12  to get it going again.  So, I just ask that you would please

13  keep that in mind and let's keep time.

14       I'm going to generally ask you how the time is going,

15  probably at the end of each day, so that I have an idea as we

16  go along.

17       All right.  I've decided, also, that we're going to have

18  eight jurors in this case, just in case something were to

19  happen, since we are going over a weekend, and things happen.

20  And I'd rather have seven rather than get down to six, or

21  whatever the situation may be.

22       The voir dire.  The Court is going to reserve the right to

23  conduct all voir dire.  At the end of the Court's voir dire --

24  and I have taken into consideration the requested voir dire

25  questions, which the majority of them I already am going to ask

1   anyway, but you'll have ten minutes for follow-up after I've

2   completed.

3              MR. ALLEN:  Thank you, Your Honor.

4       If Mr. Pointer is completed, I have a couple issues I

5   wanted to raise.

6              THE COURT:  Are you done, sir?

7              MR. POINTER:  No, Your Honor.  Thank you.

8       I wanted to know what the Court's preference was as it

9   relates to impeachment evidence, and, particularly, deposition.

10  Some judges want to allow the witness an opportunity to be

11  presented with the deposition testimony, or whatever it is that

12  you're going to use to impeach, others will allow the attorney

13  to just, essentially, after the response, read the deposition

14  testimony.

15             THE COURT:  That's -- the latter is the practice that

16  I use.

17             MR. POINTER:  Thank you, Your Honor.

18      Finally, party depositions, once again, I was trying to

19  find out the Court's preference.  I understand some cases or

20  some trials we've been in, I've been allowed to just read in

21  the party's deposition, between live witnesses, as I see fit,

22  others want the court to be apprised when we want to do that

23  and do it in one block.

24             THE COURT:  I prefer the latter, again.

25             MR. POINTER:  One block, okay.  Thank you.  That's

1    it, Your Honor.  Thank you.

2              THE COURT:  All right.  For defense?

3              MR. ALLEN:  Yes, Your Honor.

4         There was -- I'm going to be asking for a Daubert on

5    Dr. Mohandie, their expert, a very short one, to establish that

6    I believe that he's relying on anecdotal evidence and he does

7    not have a foundation per 803.  So, I just wanted to alert the

8    Court, per your order.

9              THE COURT:  All right.  You're offering him as an

10   expert?

11             MR. POINTER:  Yes, Your Honor.

12             THE COURT:  All right.  And you're objecting to him

13   in total or part of his testimony?

14             MR. ALLEN:  Part of his testimony.

15        But I think I would -- I want to take this moment to again

16   raise with the Court that because of the Monell ruling that Los

17   Banos is not a defendant, two of the three -- I believe two of

18   the three opinions he intends -- was offering coming in were

19   against Los Banos, not on Officer Acosta.

20        The third opinion that I want to discuss, and he is

21   absolutely -- I'm not questioning his expertise, he has all the

22   requisite standing to offer testimony, but that one of his

23   opinions is not supported.  And I believe I can establish that

24   with some questioning regarding what he did to come up with

25   that opinion.

1          THE COURT:  I'm not sure I'm following why that would

2    be a Daubert issue as opposed to one that would be at the time

3    he's offered as an expert that there would be an objection to

4    it, the Court would rule on the objection at that time.

5          MR. ALLEN:  I could reserve it for then.  My concern

6    is that he is going to be offering information that's anecdotal

7    without any support and foundation to Officer Acosta's

8    condition of his PTSD at the time of the incident.  That by

9    raising this in the form I have highlighted in his depo, he's

10   getting something in front of the jury that he can't back up.

11     I agree it could be a weight issue.  I could do it by

12   Daubert.  Your order is to raise Daubert before.  Under the

13   FRE, it's highly recommended to at least raise it with the

14   Court as a request.  But I'll stand on however -- I will submit

15   to -- I'll submit.

16         THE COURT:  When this person gets ready to come in,

17   just give me a heads up and we'll go from there.

18         MR. ALLEN:  Thank you, Your Honor.

19         THE COURT:  All right.

20         MR. ALLEN:  The next thing is we have a medical

21   records hearsay issue.

22     Mr. Pointer and I have been meeting and conferring on it.

23   We may have a resolution, we may not.  It has to do with the

24   testimony of Dr. Shuman and nurse Jimenez, which will be read.

25   And one suggestion, and we tried to get a brief -- a very short

1   memo brief on file this morning, but one suggestion is that any

2   effort to enter those medical records as an exhibit be stayed

3   for the moment until we can discuss it out of the presence of

4   the jury, and after the testimony comes in of the two medical

5   practitioners.

6            THE COURT:  All right.  That's fine.

7            MR. ALLEN:  The last one is there is a witness, Sarah

8   Yoshida, she is a Department of Justice criminologist, she did

9   the scene -- her team did the scene investigation -- the crime

10  scene investigation.  In her exhibit to her deposition, which

11  both sides have, she has a station scan diagram of the floor

12  plan of the ground level, ranch-style house where this all took

13  place.

14     I spoke with her on Friday to find out if -- when she would

15  appear for me, I had her under subpoena.  I also understood

16  Mr. Pointer did.  During the conversation, I asked her if she

17  ever did a legend to show the square footage, distances.  She

18  had not.  And I said, well, I -- on the stand I may ask you to

19  do that, and she offered to provide us with those amendments to

20  her scene scan.

21     I met with Mr. Pointer -- she put both Mr. Pointer's office

22  and my office on what she prepared.  We haven't yet agreed that

23  she should be able to use this, but I wanted to present it to

24  you while we continue to meet and confer, because I would

25  otherwise ask her to do it on the stand with what she brought.

1     And if we have an agreed-upon exhibit, it would just make it

2     easier.  I have it, I can show you what I'm referring to.

3                THE COURT:  All right.

4                MR. ALLEN:  The physical examination report was an

5     exhibit to her depo, and she took that on page three and

6     actually did the distances.

7         The second stapled document is a supplemental report she

8     did.  I've provided -- again, Mr. Pointer and Ms. Nold received

9     this over the weekend when I did.  And we're still deciding

10    whether there is going to be an objection to, perhaps, using

11    this in the trial, or have her do this on the stand.

12               THE COURT:  Any response from plaintiff?

13               MR. POINTER:  Yes, Your Honor.

14        My initial reaction when I saw the e-mail come in was that

15    this was far past fact discovery.  You're asking a witness to

16    produce new evidence, we haven't had a chance to review, two

17    days before trial.

18        With that being said, counsel and I, we're still meeting

19    and conferring about this to figure out how this factors into

20    her testimony.  Fortunately, she's not testifying today.  But

21    we're all in agreement that if we can make her testimony more

22    efficient, then we'd lean that way.  However, I need to look at

23    what the ramifications is of this new data and information that

24    hadn't been solicited or produced prior to Friday or Saturday.

25               THE COURT:  The whole point in federal court is not

1   to have surprises come up on the day of trial.  And, generally

2   speaking, I'm going to deny it at this point in time.  That's

3   why you have discovery, that's why we had a final pretrial

4   order, and why it should have been done.

5       So, if you can meet and confer and figure this out, I will

6   go along with it, but otherwise, if you can't, I'm going to

7   deny it.

8           MR. ALLEN:  Your Honor, if I might ask one question,

9   one follow-up?

10          THE COURT:  Yes.

11          MR. ALLEN:  If I have her on the stand and she was

12  working off her original exhibit, and she does, then, with a

13  ruler, use her legend and comes up with distances, is that

14  going to be okay?  That's just asking her to work with the

15  materials she had versus actually doing this now and doing the

16  supplement with the exact distances.

17          MR. POINTER:  Your Honor, I would just add, you know,

18  in thinking about this a little bit further, this information

19  that's being asked of Ms. Yoshida, this is the type of stuff

20  that would have helped us, both parties, ostensibly with other

21  experts or witnesses that we have in this trial as it relates

22  to trajectory, distance, whether or not physical evidence

23  that's in dispute should be there.

24      So, you know, for counsel to now say he's going to ask a

25  fact witness more information, solicit information that wasn't

1    made available to us, it seems like it's pretty prejudicial.

2            MR. ALLEN:  Your Honor, as a fact witness I can ask

3    her, looking at the legend you prepared, and you're a

4    scientist, and you did this legend, and take a ruler...I would

5    be able to ask that.  I didn't ask it in the depo, but I can

6    ask her on the stand.  That's not new discovery, that's just

7    asking her to take it a step further.

8            THE COURT:  I understand.

9            MR. ALLEN:  Thank you.

10           THE COURT:  I don't have a problem with that.

11       Is there anything else?

12           MR. POINTER:  Your Honor, I was actually just making

13   sure that she was -- I might have misspoke when I said fact

14   witness.  She may have actually been identified as a -- as a

15   retained expert, which would then -- should limit her

16   testimony.

17           MR. ALLEN:  Your Honor, non-retained or fact witness,

18   she's not somebody that's a party witness.  This is just

19   somebody who did the science out at the scene.  And I believe

20   it would be far more helpful to the jury to understand what

21   distances are involved in this than approximations.  And she

22   was able -- she's able to do an exact distance.  Nobody thought

23   -- I didn't think of it, Mr. Pointer didn't think of it at the

24   time.  I didn't come across this until I was looking for a

25   legend.

1          So, I'll do it any way the Court prefers.

2               THE COURT:  If she's a fact witness, and it will be

3     helpful to the jury to explain what's happening, I'm going to

4     allow it.  However, I'm going to also be very cognizant that

5     this does not take us down into a rabbit hole that we don't

6     need to go into.

7               MR. ALLEN:  Thank you, Your Honor.

8               THE COURT:  Because I'm still trying to figure out

9     how all of this, distances, and what the facts are of the case,

10    why that's going to be relevant.  So I'm going to wait and see

11    what's going to happen, because it seems like we're getting

12    into some details.  If it's one foot versus two feet, using

13    that as an example, is that really going to make any difference

14    as far as the facts as they're going to be presented.

15         Is there anything else from defense?

16              MR. ALLEN:  No, Your Honor.  Thank you.

17              THE COURT:  All right.  I did note that even though

18    the Court ordered there be a joint statement of the case, you,

19    apparently, were unable to do so.

20              MR. POINTER:  Yes, Your Honor.  We met and conferred

21    considerably over this and just were not able to agree on the

22    language.

23              THE COURT:  I'm going to just read both and say one

24    is from the plaintiff, one is from the defendant, let the jury

25    understand that.

1          MR. ALLEN:  Thank you, Your Honor.

2          MR. POINTER:  Thank you, Your Honor.

3          THE COURT:  If there is nothing else, we'll go ahead

4    and call in the prospective jurors.

5          MR. POINTER:  One small issue, Your Honor.  I'm

6    sorry.

7       We have an interpreter, and so if we need to refresh his

8    recollection with video or deposition testimony, obviously, the

9    interpreter will need to do that for him.  I just need to know

10   how the Court, logistically, would prefer that to be done.

11         THE COURT:  When -- I'm sorry, explain that to me a

12   little bit more.

13         MR. POINTER:  Sure.

14      The plaintiff speaks Vietnamese.  There is a translator

15   here.  If we need to refresh his recollection with some audio

16   and/or deposition transcript, he'll need the interpreter to

17   read that to him, and I didn't know if there was a particular

18   preference the Court had as to how.

19         THE COURT:  You mean when he's seated at counsel

20   table or when he's testifying?

21         MR. POINTER:  When he's testifying, Your Honor.

22         THE COURT:  The interpreter will be next to him.

23         MR. POINTER:  Okay.

24         THE COURT:  So, generally speaking, as you can see,

25   there is a chair behind, and he can speak to him at that time.

1          MR. POINTER:  All right.  Excellent.  Thank you.

2          THE COURT:  Let's swear him in now and get that done.

3          THE CLERK:  Please stand and raise your right hand.

4      (Interpreter sworn.)

5          INTERPRETER:  Yes, I do.

6          THE CLERK:  Thank you.

7          THE COURT:  Just for the record, make sure that we're

8  clear, your name again, sir?

9          INTERPRETER:  Good morning, Your Honor.  My name is

10  Dien, D-I-E-N, last name Pham, P-H-A-M.  My badge number is

11  301631, and I'm a certified court interpreter for the state of

12  California.  My oath is on file at the Santa Ana Superior

13  Court.

14          THE COURT:  And I understand that we have checked

15  with our interpreter here in the federal courthouse, and there

16  is no problem with you, that you are certified in the state of

17  California, you are able to be a certified interpreter here in

18  federal court, and now that you've just taken the oath, you're

19  ready to proceed.

20          INTERPRETER:  Thank you, Your Honor.

21          THE COURT:  Anything else?

22          MR. POINTER:  No, Your Honor.

23          THE COURT:  Okay.  Thank you.  We'll go ahead and --

24  are they downstairs -- off the record.

25      (Recess taken, 9:30 a.m. - 9:43 a.m.)

1            THE CLERK:  Calling civil case 15-cv-531; Tan Lam

2    versus City of Los Banos, et al.  On for jury trial, day one,

3    Your Honor.

4            THE COURT:  Thank you.

5        Good morning, ladies and gentlemen, welcome to Courtroom 7

6    of the United States District Court for the Eastern District of

7    California.  Once again, my name is Morrison England, I'm the

8    judge that's going to be presiding over a case today.  You have

9    been summoned here in a civil proceeding.

10       Is there anyone who is having difficulty hearing me at this

11   point?

12       If you are, would you please raise your hand.

13       All right.  No one has raised their hand.

14       During the course of the proceedings, both today for the

15   voir dire and during the course of the trial, if you are, in

16   fact, selected as a juror, it's very important that you be able

17   to hear and see all of the items of evidence.  If you cannot,

18   please let one of us know on my staff, or myself, so we can

19   make the necessary arrangements so that you can hear and/or see

20   everything that is being presented.

21       Madam clerk, please call the role of prospective jurors.

22           THE CLERK:  Please stand and raise your right hands.

23       (Prospective jurors sworn.)

24           THE COURT:  Is there anyone that did not just take

25   the oath of prospective juror?

1      It appears that everyone has, in fact, taken that oath.

2   You can please be seated.

3              THE CLERK:  As I call your name, please answer

4   audibly.

5      Cynthia Aguilar.

6              PROSPECTIVE JUROR:  Here.

7              THE CLERK:  Ben Arikawa.

8              PROSPECTIVE JUROR:  Here.

9              THE CLERK:  Goran Bjelobrk.

10             PROSPECTIVE JUROR:  Here.

11             THE CLERK:  Amy Brady.

12             PROSPECTIVE JUROR:  Here.

13             THE CLERK:  Richard Carr.

14             PROSPECTIVE JUROR:  Here.

15             THE CLERK:  Jill Chin.

16             PROSPECTIVE JUROR:  Here.

17             THE CLERK:  Judith Croom.

18             PROSPECTIVE JUROR:  Here.

19             THE CLERK:  Victor Delrosario.

20             PROSPECTIVE JUROR:  Here.

21             THE CLERK:  John Engle.

22             PROSPECTIVE JUROR:  Here.

23             THE CLERK:  Ivilma Erwin.

24             PROSPECTIVE JUROR:  Here.

25             THE CLERK:  Nicholas Gentile.

1           PROSPECTIVE JUROR:  Here.

2           THE CLERK:  Belinda Gonzales.

3           PROSPECTIVE JUROR:  Here.

4           THE CLERK:  Hanazel Hariman.

5           PROSPECTIVE JUROR:  Here.

6           THE CLERK:  Gregory Hartwick, Jr.

7           PROSPECTIVE JUROR:  Here.

8           THE CLERK:  Darlene Hernandez.

9           PROSPECTIVE JUROR:  Here.

10          THE CLERK:  Katia Magnoli.

11          PROSPECTIVE JUROR:  Here.

12          THE CLERK:  Leslie Martinson.

13          PROSPECTIVE JUROR:  Here.

14          THE CLERK:  Cheryl Meseure.

15          PROSPECTIVE JUROR:  Here.

16          THE CLERK:  Clark Moots.

17          PROSPECTIVE JUROR:  Here.

18          THE CLERK:  Matthew Morse.

19          PROSPECTIVE JUROR:  Here.

20          THE CLERK:  Katherine Palatinus.

21          PROSPECTIVE JUROR:  Here.

22          THE CLERK:  Sara Pierre.

23          PROSPECTIVE JUROR:  Here.

24          THE CLERK:  Joshuabailey Que.

25          PROSPECTIVE JUROR:  Here.

1            THE CLERK:  Andrew Rangel.

2            PROSPECTIVE JUROR:  Here.

3            THE CLERK:  Arielle Rose.

4            PROSPECTIVE JUROR:  Here.

5            THE CLERK:  Elizabeth Ruyak.

6            PROSPECTIVE JUROR:  Here.

7            THE CLERK:  Cuca Sandoval.

8            PROSPECTIVE JUROR:  Here.

9            THE CLERK:  Elizabeth St. Goar.

10            PROSPECTIVE JUROR:  Here.

11            THE CLERK:  Powell Svendsen.

12            PROSPECTIVE JUROR:  Here.

13            THE CLERK:  Jenny Taylor.

14            PROSPECTIVE JUROR:  Here.

15            THE CLERK:  Randall Turner.

16            PROSPECTIVE JUROR:  Here.

17            THE CLERK:  Pamela Wade.

18            PROSPECTIVE JUROR:  Here.

19            THE CLERK:  Sofia Widgren.

20            PROSPECTIVE JUROR:  Here.

21            THE CLERK:  Marjorie Yohner.

22            PROSPECTIVE JUROR:  Here.

23            THE CLERK:  All present, Your Honor.

24            THE COURT:  Thank you very much.

25        Ladies and gentlemen, we're about to begin the process of

1    selecting a jury for this trial.  Let me advise you all that

2    each side, both the plaintiff and the defendant, is entitled to

3    have a fair, unbiased and unprejudiced jury.

4         Based upon the oath that you've taken to tell the truth,

5    for any question, you must disclose any reason why you might be

6    biased or prejudiced to either side, and that disclosure and

7    that obligation occurs even if it is a nonverbal question.

8    Because you will see, as I go through the process, there will

9    be times that I'm going to ask someone, for example, if any of

10   you in the top row know me, please raise your hand, versus

11   asking each individual person.  I'm going to try to move this

12   along as quickly as I possibly can.  And so by having nonverbal

13   responses, we're able to generally do so.  So, your oath still

14   does apply to raising your hand or not raising your hand.

15        Let me, at this time, introduce the participants in the

16   trial of this case.  First I will introduce my courtroom staff.

17        To my far left, the person who will be assisting us during

18   the voir dire process is my judicial assistant, Adele

19   Espana-Purpur.  The courtroom deputy is Stephanie Deutsch.  And

20   the court reporter, who is to my front and right, is Kimberly

21   Bennett.

22        Counsel, would you please introduce yourself and everyone

23   at your table.  Stand and look at the audience so they can see

24   you, please.

25             MR. POINTER:  Yes, Your Honor.  Thank you.

1        Good morning.  My name is Adante Pointer.  This is...

2            MS. NOLD:  Melissa Nold.

3            INTERPRETER:  Good morning.  My name is Dien Pham.

4    I'm the interpreter.  And this is the plaintiff, Mr. Tan Lam.

5            THE COURT:  Thank you very much.

6        From defense side, please.

7            MR. ALLEN:  Thank you, Your Honor.

8        Good morning, ladies and gentlemen of the jury.  My name is

9    Dale Allen.  This is my colleague, Phillip Downs, who will be

10   assisting me from time to time in this trial.  Standing next to

11   me is Mr. Jairo Acosta, from the Los Banos Police Department,

12   who is the defendant in this case.

13       Thank you.

14           THE COURT:  All right.  Ladies and gentlemen, this is

15   a civil case, once again.  And in this particular case, the

16   plaintiff, who you were just introduced to just now, has

17   alleged that there has been certain injuries and/or damages as

18   a result of certain action taken by defendant.  If you are, in

19   fact, chosen as a juror in this case, it will be your duty to

20   determine if the defendant is liable to the plaintiff for any

21   alleged injuries.  And, if so, set the amount of plaintiff's

22   monetary damages.

23       Prior to beginning today, I have met with counsel, and I

24   have an estimate of time.  The time that we are set for in this

25   case will be six days.

1        Now, let me explain to you how that works.  In my

2    courtroom, I have trial on Monday, Tuesday and Wednesday.

3    That's it for the week.  I have other matters that I attend to,

4    criminal caseload on Thursday and other matters on Friday.  So

5    that means that we will be in session Monday, Tuesday,

6    Wednesday of this week, and Monday, Tuesday and Wednesday of

7    next week.  Now, that is as far as being in the courtroom for

8    presentation of evidence, etc.  If you start deliberating, I

9    can't tell you how long deliberation will take.  There have

10   been times that they've taken 15 minutes, and sometimes they've

11   taken two days or longer.  It just depends on each particular

12   jury.  So, I can't give you an estimate as to that.  But I will

13   say that we will be done as far as the presenting of evidence

14   in this courtroom not later than next Wednesday.  When I say

15   done with evidence, that means all jury instructions will be

16   read to you, the closing arguments will be completed, and you

17   will be deliberating as a jury not later than that date.

18       Now, as far as the time that we're in trial, generally,

19   we're a little bit late today, I had some matters that I needed

20   to address outside of your presence, but we start each day at

21   9 o'clock a.m., we will go until 10:30 in the morning, I will

22   take a recess of 20 minutes, we'll return at ten minutes to

23   11:00 and we will go until 12 o'clock.  There will be a noon

24   recess from 12 until 1:30 p.m., we will then resume at

25   1:30 p.m. and go until 3 o'clock p.m., and we will take another

1   20-minute recess, and we'll resume at 3:20, and we will

2   terminate the proceedings each day not later than 4:30 p.m.

3        So, I want to make sure that I give you as much information

4   as I can.  And as we go along through the trial, I always like

5   to keep the jurors updated on how we are going as far as the

6   timing.  So that will be something that you can rest assured

7   of.

8        Now, given that I've told you that it's a six-day trial, as

9   far as at the max here, I'm going to ask if there is anyone

10  that wishes to declare a hardship.

11       Now -- hold on, not yet.  Not yet.

12       Hardships are not the same as an inconvenience.  There is a

13  statutory definition of what a hardship is.  And I understand

14  that most of you are probably saying, I don't want to be here,

15  for whatever reason, but that's not necessarily the grounds for

16  a hardship.

17       So, what I'm going to do is go through and start with the

18  first row on this side of the courtroom, and I'll ask, if you

19  wish to request a hardship, to please raise your hand, state

20  your name, give us a moment to find you on the list, because

21  it's all random so we'll have to go through and locate it, you

22  tell me what you believe your hardship is, and I will decide at

23  the end, after I've done everyone, if, in fact, there is a

24  hardship that I find.  If I do not find that there is a

25  hardship, that does not mean that you're going to necessarily

1   be on the jury, and you may be asked about that as we go

2   further along.

3        But, just to start right now, is there anyone on the right

4   side that wishes to declare a hardship?  If so, raise your hand

5   and we'll pass the mike down to you.

6             PROSPECTIVE JUROR:  Good morning, Your Honor.  My

7   name is Belinda Gonzales.

8             THE COURT:  Hold on one second.

9             THE CLERK:  25.

10            THE COURT:  Thank you.

11       Go ahead.

12            PROSPECTIVE JUROR:  Thank you.  So, I would be happy

13  to serve if selected.  The only consideration, if you could, is

14  at the end of the month, if it goes longer, I have class

15  starting.  And I have class registration printed out.  And

16  also, if it goes longer, my work only will pay me 30 days for

17  jury duty, after that --

18            THE COURT:  I don't think you'll have any problem

19  with that issue.  I'm not planning on it, and I'm holding the

20  attorneys -- they've been told today that's the maximum amount

21  of time.

22            PROSPECTIVE JUROR:  Thank you.  And I'm okay if I'm

23  selected.

24            THE COURT:  Very well.  Thank you for your time.

25  Anyone else in that row?

1          Next row?

2                    PROSPECTIVE JUROR:  Good morning, Your Honor.  My

3    name is Sara Pierre.

4                    THE CLERK:  24.

5                    THE COURT:  Yes.

6                    PROSPECTIVE JUROR:  I have been subpoenaed to testify

7    in a jury trial for my job on the 14th of August in Department

8    47.  That's next week, Tuesday.

9                    THE COURT:  All right.  That's Department 47,

10   Sacramento Superior Court?

11                   PROSPECTIVE JUROR:  Correct.

12                   THE COURT:  Okay.  Thank you.

13         Anyone else?

14         Pass it along.

15                   PROSPECTIVE JUROR:  My name is Sofia Widgren.

16                   THE CLERK:  30.

17                   THE COURT:  Yes.  Go ahead.

18                   PROSPECTIVE JUROR:  I am a self-employed accountant.

19   It's just me and my husband in our office, with deadlines

20   looming.  And to be out of my office for a minimum of six days

21   means I don't get paid for six days.  So, it would be a real

22   hardship financially and work wise to be here.

23                   THE COURT:  So, are you saying it's work or are you

24   saying it's financial?

25                   PROSPECTIVE JUROR:  It's financial.  If I don't work,

1    I don't get paid.

2              THE COURT:  Thank you.

3              PROSPECTIVE JUROR:  Thank you.

4              PROSPECTIVE JUROR:  Good morning, Your Honor.  I

5    work --

6              THE COURT:  Your name?

7              PROSPECTIVE JUROR:  Hanazel Hariman.

8              THE CLERK:  10.

9              THE COURT:  Okay.  Go ahead.

10             PROSPECTIVE JUROR:  I work from -- start at

11   3 o'clock, and I only get paid on the time I will be here, and

12   it will hurt me financially for not getting paid daily for the

13   whole eight hours.

14             THE COURT:  Explain to me what you said.  3 o'clock?

15   I didn't follow that.

16             PROSPECTIVE JUROR:  I work in the afternoon shift.

17             THE COURT:  And if you work the afternoon shift,

18   you're saying your employer will not pay you?

19             PROSPECTIVE JUROR:  Only the time I am here for --

20   the hours that I'm here.  While I'm -- 3 o'clock, where I start

21   to work, like, my work hours.

22             THE COURT:  But are you saying that they won't allow

23   you to be here after 3 o'clock?

24             PROSPECTIVE JUROR:  They allow me, but they won't

25   pay.  They only pay the time I'm -- from 3 to 4, and then I

1    work at 3, so they only pay the time I'm here.

2              THE COURT:  You're saying you're here, you would be

3    here from 9:00 until 4:30, so they would pay you until 4:30?

4              PROSPECTIVE JUROR:  From 3:00 to 4:30.

5              THE COURT:  So, I'm trying to figure out where the

6    hardship would be.  If you're getting paid for the full day,

7    and you're going to get paid until 4:30, why is there a

8    hardship?

9              PROSPECTIVE JUROR:  No.  I wouldn't be paid for the

10   whole day, only the time that I serve that reflect on my work

11   hours.

12             THE COURT:  But you would be here, basically, eight

13   hours, so you would be paid while you're here.

14             PROSPECTIVE JUROR:  Only the -- the time.

15             THE COURT:  All right.  Thank you.

16      Anyone in the front row on the left side?

17      Next row?

18      Last row?

19             PROSPECTIVE JUROR:  Good morning, Your Honor.

20   Darlene Hernandez.

21             THE CLERK:  21.

22             THE COURT:  Yes.  Go ahead.

23             PROSPECTIVE JUROR:  I'm an independent IT consultant,

24   so there is a financial hardship if I'm not at work for six

25   days.  I won't get paid.

1           THE COURT:  All right.  Thank you.

2      Is there anyone else?

3      Ms. Hernandez and Ms. Widgren, I'm going to find this will

4  be a financial hardship, I'm going to excuse you from further

5  service at this time.  I'd ask you to please contact the jury

6  administrator and advise them of the circumstances.

7      The remaining requests for hardships are denied.

8      At this time, ladies and gentlemen, I'm going to give you

9  some basic information on the law that's going to apply to this

10  case.  And what I'm going to say now is intended to only be an

11  introduction to this particular trial and the trial process in

12  general, and it's not intended to be a substitute for the more

13  detailed instructions on the law which you will get once the

14  jury has been selected.  My instructions, at this point, are

15  simply designed to help you understand the nature of the case

16  and your duties if you are selected as a juror.

17      First of all, the allegations against the defendant are set

18  forth in a written document known as a complaint.  That

19  complaint was filed by the plaintiff.  And I'll say that the

20  complaint which is filed is not, itself, evidence of anything.

21      Second item is that the defendant has denied all

22  allegations contained in that complaint, and, accordingly, that

23  requires that the plaintiff must prove each of the allegations

24  that are set forth in that complaint by a preponderance of the

25  evidence.

1      Let me make sure we have at least a beginning understanding

2    of what that is.  I think we've heard, generally speaking,

3    beyond a reasonable doubt.  That is a criminal standard.  We

4    are here in a civil case.  So, the civil case standard is a

5    preponderance of the evidence.  That means that the evidence

6    that you have presented to you must persuade you that the claim

7    is more probably true than not true.  If the evidence comes out

8    and you believe that each of the evidence is so evenly balanced

9    that neither side of the issues were protected or found by the

10   plaintiff or the defendant, your finding must be on the

11   issue -- must be against the party who had the burden of

12   proving it.

13      The duty of the jury.  I am the judge here that's presiding

14   over the court.  My job, as the judge, is to make sure that the

15   law that applies to this case is given to you.  The eight

16   people who will be selected as jurors in this case will be

17   judges themselves, but they'll be judges of the fact.  That

18   means that they will look to the witnesses that will be

19   presented and examined, any other evidence that may be

20   presented, and decide whether or not they believe that witness

21   or believe the evidence that's been presented, and/or what

22   weight to give to that testimony or to any evidence.

23      Basically, there will be nine judges in the courtroom.

24   One, myself, will be handling the legal side, and the eight

25   that are in the jury box will be handling all the factual

1    issues.

2        In determining what the facts are, and applying the law as

3    I give it to you, and hopefully to reach your verdict, it would

4    be a violation of your sworn duty as a juror to base any

5    verdict or to be influenced by sentiment, sympathy, pity,

6    passion, prejudice, public feeling, guesswork and/or

7    speculation.  It will be your duty to conscientiously consider

8    and weigh the evidence and reach a just verdict regardless of

9    the consequences.

10       There are certain admonitions that I'm going to give you

11   now, and that will apply throughout the course of these

12   proceedings.

13       It's very important that you abide by these admonitions,

14   and you will be reminded of them at every recess that we take.

15       The first is, in order to arrive at a fully and properly

16   considered verdict in the case, all of you must see and hear

17   the same information, and that is information that is presented

18   within this courtroom.  It would be improper for some of you to

19   have information that others do not.  So, it is important that

20   you do not receive evidence from any other source.

21       In today's world, it's very easy to go out and grab your

22   smartphone and hit Google and say, let me see what this is

23   about, or what the case is about, if it's been in the newspaper

24   or something.  You can't do that.  You just simply -- it cannot

25   happen.  Anything that you're going to hear about is going to

1    happen in this courtroom if you're going to be able to consider

2    it.

3        It's also very important that you not converse with anyone,

4    including each other, about the case.  I know that many times

5    you're going to see one another, and you can have a

6    conversation, but it cannot be about anything that's going on

7    in this courtroom.  The only time a juror can speak about the

8    case, or the facts, or anything else, is when you have been

9    sent in to deliberate, and that will be after the Court has

10   given you the law and you have heard the arguments from the

11   attorneys.

12       It's also important that you not speak to me directly, or

13   any of my staff, or any of the attorneys, or the parties here.

14   And that can be difficult because there are going to be times,

15   if you're a juror, you're going to come in the front door,

16   you're going to ride up in the elevator, you may be outside, or

17   something may happen.  The attorneys know, and they have told

18   their respective clients, that it is extremely improper to have

19   any conversations with a prospective juror or a juror.

20       So, while if you see one of them, please don't feel that

21   they're being discourteous to you because they don't speak to

22   you.  There may be an acknowledgment, or hello, but that is

23   going to be the extent of any conversation.  Anything more than

24   that and I want to have it reported to me so that I can take

25   the necessary steps to deal with what's going on.

1      It's also important that you not form or express any

2   opinions.  As I like to tell prospective jurors, many of us

3   have watched television shows, and as soon as you start

4   watching it, you're trying to figure out who is going to be the

5   one that did it.  Law and Order is a great one because that

6   always gets you off guard, you never know who is going to be

7   the one, there is always a ringer at the end.  That's TV or

8   movies.  What's going to happen here is that you don't want to

9   have an opinion until you've heard everything.

10      And one other thing about the evidence here is that I've

11   been a trial judge for 22-23 years now, and I've never once

12   heard all of the evidence come in in precisely the same

13   chronological order that the events occurred.  This might

14   happen in this trial, I don't know, but there may be times when

15   the first witness called may be the last one who heard or saw

16   something, and it may go back and forth.

17      So, rather than try to figure out what's going on, just

18   take the evidence as it comes in, and then go from there, and

19   then just keep it in your mind as you go through.

20      All right.  We're about to start, now, voir dire.  Voir

21   dire, loosely translated, means to seek or get to the truth.

22   And what I'm -- we're going to try to do at this point is to

23   find out whether this particular trial is the appropriate trial

24   for you to be on.  It may not be, and that's what we'll find

25   out.

1        So, I'm going to ask you to give us as complete responses

2    as you possibly can during the course of this procedure.  We're

3    not -- and I just want you to know that I'm not going to try to

4    question you to try to pry inappropriately into your personal

5    lives.  So, if there is something that you do not wish to have

6    stated in front of everyone here, just let me know that it's a

7    private matter, and at the break I will have you speak to me,

8    one-on-one, with none of the other prospective jurors.  I will

9    say that the staff will be present, counsel will be present,

10   and the parties will be present, but that is it.  So, you can

11   just let me know that.

12       Also, there is no right or wrong answers here.  Just give

13   as complete and open an answer as you possibly can.

14       And I do like to say, occasionally, that -- I told you I've

15   been doing this for 22 or 23 years, and I've heard, probably,

16   every excuse people can come up with how to get out of jury

17   duty.  So, if you feel like you would like to give me a new

18   excuse today, I'm more than willing to listen, but I'm just

19   giving you a heads up right now, this is how this is going to

20   work.

21       One of the other things that's important is that if you're

22   not called into the jury box right away, it's important that

23   you listen to the questions, because if you're called to

24   replace someone, I'm generally not going to start the whole

25   process over.  I'm going to ask, did you hear all the questions

1   and answers?  Was there anything that you heard that would

2   cause you to think of something that might affect your ability

3   to serve as a juror?  Or, the third question, your ability to

4   act as a fair and impartial juror.  So, that's what's

5   important, so make sure that you listen to everything.

6        Also, during the course of the voir dire, I may ask a

7   question and you will think, I have no response to that

8   question, but then, ten minutes later, while you're here in the

9   box, or maybe when you go on our first recess, you'll think,

10  oh, I just remembered, I did have something like that.  If that

11  ever happens, don't feel like you can't say anything.  In fact,

12  we want you to say it.  And I encourage you, raise your hand,

13  say, I forgot about this, because I want to know, and everyone

14  at the tables wants to know.  So, please do not feel that

15  you're causing us to go back over it.  It happens almost

16  invariably that someone will remember something later on down

17  the line.  So, please feel free to do that.

18       So, madam clerk, if you'd be willing to please call the

19  first prospective jurors, we will have you seated in the box

20  and we'll start the process.

21            THE CLERK:  Yes, Your Honor.

22       Jenny Taylor.  Andrew Rangel.  Amy Brady.  Ivilma Erwin.

23  Goran Bjelobrk.  Victor Delrosario.  Katherine Palatinus.

24  Randall Turner.  Cheryl Meseure.  Hanazel Hariman.  Arielle

25  Rose.  Elizabeth Ruyak.  Marjorie Yohner.  Pamela Wade.

1          THE COURT:  All right.  Welcome to those of you that

2    have joined us.  In order to help you get more accustomed to

3    speaking to all of your new friends here in the courtroom, I'd

4    ask that we start with you, Ms. Taylor, and answer the

5    questions on the blue card.  We'll take it down to Mr. Turner,

6    and you then pass it to Ms. Wade, and then we'll come back down

7    the front as well.

8       Go ahead.

9          PROSPECTIVE JUROR:  My name is Jenny Taylor.  I live

10   in Fiddletown, California.  I am the president of Default

11   Resolution Network, it's a division of Fidelity National Title

12   Company.  My previous occupations have all been in similar

13   field, which is commercial foreclosures.  I have my bachelor's

14   in psychology from CSUS.  I did not serve in the military.  I

15   am married.  My husband is an IT manager for the Sacramento

16   Superior Courts.  No former spouses.  My son is 7, so he's not

17   occupied.  And I've never served on a jury.

18          THE COURT:  All right.  Your husband works for Sac

19   Superior, how long has he worked there?

20          PROSPECTIVE JUROR:  20 something years.

21          THE COURT:  Okay.  Has he ever talked to you about

22   anything other than the IT department, or what goes on, or

23   trials, or the judges, or anything else?

24          PROSPECTIVE JUROR:  No.  We don't talk about -- he's

25   not really involved in cases.

1                THE COURT:  Okay.  Thank you.

2                PROSPECTIVE JUROR:  Hello.  My name is Andrew Rangel.

3    Currently I am located in Elk Grove, California.  I also work

4    for Kaiser Permanente.  My previous occupation, I used to work

5    at Togo's for about two months or so.  Educational, I only

6    finished high school.  I did some phlebotomy, drawing blood,

7    and also nursing assistant.  No military service.  I'm not

8    married, never been married.  No children.  And I've never had

9    any jury experience either.

10               THE COURT:  Thank you.

11               PROSPECTIVE JUROR:  My name is Amy Brady.  I live in

12   Sacramento, California.  I am currently employed as an

13   administrative assistant.  Prior to that I was a stay-at-home

14   mom for over ten years.  And then prior to that I worked at

15   Intel Corporation.  I have a bachelor of arts from Fresno

16   State.  I have never been in the military.  I am currently

17   married.  My husband is an HR director.  I do not have any

18   former spouses.  I have two children, 14 and 16, boys.  I

19   served -- I was called for duty -- jury duty over 20 years ago,

20   and I was in Fresno County.

21               THE COURT:  And were you selected as a juror?

22               PROSPECTIVE JUROR:  I was not.

23               THE COURT:  Was there anything about your time there,

24   going through that process, that might affect you in being fair

25   and impartial in this case?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Thank you.

3          PROSPECTIVE JUROR:  My name is Ivilma Erwin.  I live

4    at Antelope.  Currently I'm a special ed teacher for children

5    with severe disability.  My background, I am -- I have a

6    bachelor's degree and also my credential.  Military service,

7    I've never served but I've been a dependent.  Marriage status,

8    I am married.  My husband works at -- as an instructor at UTI.

9    And I have no children.  And I've participated in the selection

10   of a jury in the -- here in Sacramento.

11         THE COURT:  And were you selected on that case?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Was there anything about your going

14   through that process that might have an effect on you being

15   fair and impartial in this case?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Thank you very much.

18         PROSPECTIVE JUROR:  My name is Goran Bjelobrk.  I

19   live in Citrus Heights.  I have my own business, small

20   business.  Previous occupation, I was working mostly in

21   construction.  I finished high school.  No military service.

22   I'm not married.  No children.  And I don't know what my

23   ex-wife is doing now.  And no previous jury experience.

24         THE COURT:  Help me pronounce your name.

25         PROSPECTIVE JUROR:  Bjelobrk.  Goran Bjelobrk.

1             THE COURT:  Bjelobrk?

2             PROSPECTIVE JUROR:  Bjelobrk.

3             THE COURT:  Bjelobrk?

4             PROSPECTIVE JUROR:  Yes.

5             THE COURT:  Thank you, sir.  Appreciate it.

6             PROSPECTIVE JUROR:  My name is Victor Delrosario.  I

7    live in Lathrop, California.  I'm currently retired.  My

8    previous occupation --

9             THE COURT:  What was your previous occupation?

10            PROSPECTIVE JUROR:  I'm an emergency room nurse.

11            THE COURT:  Okay.

12            PROSPECTIVE JUROR:  Educational background, I have

13   bachelor's degree in nursing.  No military service.  My wife is

14   also a nurse, registered nurse.  We have two kids, all of them

15   are nurses as well.  I have previous experience at one point,

16   but I was disqualified because I mentioned that I might be

17   biased because of the certain case.  I work with --

18   hand-in-hand with mostly law enforcement.  They bring their

19   suspects and we medically clear them.  So, I have soft heart

20   with law enforcement.

21            THE COURT:  Do you think that your connection in

22   working in the ED, and dealing with people that come in with

23   law enforcement, might have an impact on how you look at this

24   case?

25            PROSPECTIVE JUROR:  I -- I believe so, sir.

1          THE COURT:  Well, we'll get to you.  I haven't given

2     anyone the statement of the case, so I will -- once I do that,

3     I'll come back and ask you again.  Thank you.

4          PROSPECTIVE JUROR:  I'm Katherine Palatinus.  Live in

5     Newcastle.  I am retired from teaching for 30 years in the

6     Roseville High School District.  I have a BS degree.  No

7     military service.  I'm married.  My husband is retired from

8     welding, mechanic, construction work.  I have two children.  My

9     daughter is a physical therapist and my son is unemployed

10    currently, between jobs.  I was part of a jury pool in Placer

11    County twice, the jury was selected before I was ever involved

12    in either case.

13         THE COURT:  Let me ask you, you said you had a

14    Bachelor of Science Degree, what is that in?

15         PROSPECTIVE JUROR:  Biological sciences.

16         THE COURT:  The process that you went through in

17    Placer County, and the jury selection, is there anything about

18    that process that might have an impact on you being fair and

19    impartial in this trial?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Thank you.

22       Mr. Turner.

23         PROSPECTIVE JUROR:  My name is Randy Turner.  I live

24    in Vacaville.  My -- currently I'm a senior director of claims

25    for the Doctors Company, where I've worked for the last 22

1    years.  Previous to that I was an ICU nurse, registered nurse.

2    My educational background is a law degree.  Military service, I

3    was in the Navy.  I am married.  My partner is a nurse --

4    excuse me, my spouse is a nurse.  I have two children -- two

5    adult children, one is in college and one is currently

6    unemployed.  And once, in a previous jury selection process, I

7    made it as far as the voir dire box here on the jury, and then

8    that was it.

9              THE COURT:  You said that you work for the Doctors

10   Company.  What is that, more specifically?

11             PROSPECTIVE JUROR:  We insure physicians and medical

12   groups and hospitals.  And I work as a claims investigator,

13   defending doctors.

14             THE COURT:  Okay.  You also said that you have a law

15   degree.  Have you ever practiced?

16             PROSPECTIVE JUROR:  I practiced for about nine months

17   in 1987, I think, and then I hung it up.

18             THE COURT:  Since you have the degree, I'm going to

19   give you the law in this case, would you be able to follow the

20   law as I give it to you, even though you may have heard it

21   differently in law school or sometime during your practice?

22             PROSPECTIVE JUROR:  Yes.  That was a long time ago.

23             THE COURT:  Okay.  Just so you all know, there are

24   times that I may turn and look down, and that's because I have

25   a monitor here that everything that's being taken down by the

1    court reporter, it's up, so I can read and look at this as

2    well.  So sometimes if I appear like I'm looking down, I'm

3    reading something.  I was just reading your responses.

4        That's fine.  Thank you very much.

5            PROSPECTIVE JUROR:  My name is Pam Wade.  I live in

6    Sacramento.  I'm currently a caregiver.  In the past I've been

7    a Christian Science nurse, puppeteer, and a kindergarten school

8    teacher.  I got a BA degree from Chico.  No military service.

9    I've been divorced.  I have no children.  And I have been on --

10   been called to jury duty several times and never been on a

11   case.

12           THE COURT:  All right.  Any of those times that you

13   were called but not selected, would it have an impact on you

14   here in this case?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Thank you.

17           PROSPECTIVE JUROR:  My name is Marjorie Yohner.  I

18   live in Cameron Park.  I am retired.  I owned a retail store in

19   Folsom.  My -- I only finished high school.  I've never been in

20   the military.  I'm married.  My spouse is a retired teacher.

21   And I've never been divorced.  No children.  And I've also been

22   summoned, but never went further than just coming here.

23           THE COURT:  Okay.  Any issues with that at all?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  Thank you.

1              PROSPECTIVE JUROR:  My name is Elizabeth Ruyak, Your

2    Honor.  I live outside of Sacramento.  I am a broadcast

3    journalist.  I have done that for 37 years, but in the midst of

4    that have run my own small media production company and been a

5    guest elementary school teacher.  I have a bachelor's degree.

6    I have not served in the military.  I am married.  My husband

7    owns a telecom contracting company.  My previous husband is a

8    real estate agent.  We have four children.  They range in their

9    occupations from a professional cheer instructor, who works in

10   a small medical office, to a stay-at-home dad, to a musician,

11   to one of our kids working in the company.  And I have been

12   summoned for jury duty a few times and not chosen.  And then

13   one time I did serve as an alternate in a superior court

14   shoplifting case.

15             THE COURT:  All right.  Go back to the first

16   question.  You said you have a bachelor's degree, can I ask

17   what that is in?

18             PROSPECTIVE JUROR:  Communications and theater.

19             THE COURT:  And the times that you were summoned but

20   not selected for jury, would that impact you in any way here?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Thank you.

23             PROSPECTIVE JUROR:  My name is Arielle Rose.  I am an

24   intern for the Center of Spatial Sciences at University of

25   California, Davis.  I live in Sacramento.  I previously worked

1   several positions in, like, customer service, most recent being

2   Wag Hotels.  I have a Bachelor of Science Degree in

3   environmental science and management, with a focus in

4   geospatial information systems from the California University

5   at Davis.  I have no military experience.  My husband is -- I

6   am married.  My husband is a correctional officer for the state

7   of California.  And I have no children.  And I have been called

8   for jury before, but I never served.  And I don't feel like it

9   would affect me.

10          THE COURT:  Very well.  Thank you.

11      And your husband has been a correctional officer for how

12   long?

13          PROSPECTIVE JUROR:  Less than two years.  A year and

14   a half.

15          THE COURT:  Okay.  There may be testimony from people

16   in law enforcement that come here.  Would you be able to listen

17   to their testimony as you would any other testimony, without

18   giving it any special consideration because of your husband's

19   occupation?

20          PROSPECTIVE JUROR:  I am capable, and without bias.

21          THE COURT:  Thank you, very much.

22          PROSPECTIVE JUROR:  I'm Hanazel Hariman.  I live in

23   Fairfield.  And my current occupation is I am a licensed

24   vocational nurse.  I don't have military background.  I'm

25   married.  He work as a truck driver.  And no children.  Never

1    served a jury before.

2                THE COURT:  Thank you.

3                PROSPECTIVE JUROR:  My name is Cheryl Meseure.  I

4    live in Lathrop.  And I'm currently customer service for MLS.

5    Previous occupation was customer service for a fast food chain.

6    High school background.  No military service.  I am married.

7    My husband is a carpenter -- was a carpenter and is now

8    disabled.  I haven't been married previously.  I have one

9    child, and she works as a supervisor for an association.  And

10   I've been summoned for jury but I've never even made it to the

11   questions.

12               THE COURT:  Okay.  MLS, Multiple Listing Service?

13               PROSPECTIVE JUROR:  Yes.

14               THE COURT:  Anything about your going through the

15   process of showing up for jury duty that might affect you here?

16               PROSPECTIVE JUROR:  No.

17               THE COURT:  All right.  Let me tell you what this

18   case is about.  And we generally have a joint statement of the

19   case, but the parties weren't able to come to an agreement so

20   I'm going to read, first, the plaintiff's statement of the

21   case, and then I'll read the defendant's.

22       This case arises out of the September 2, 2013 shooting

23   death of plaintiff's adult child, Sonny Lam, otherwise known as

24   the decedent, by defendant Acosta.  The shooting occurred

25   inside the plaintiff's home during the defendant's

1    investigation into an alleged assault.  The events occurring

2    within the Lam house that day are in great dispute.

3         At the time of the incident, the defendant was acting in

4    the course and scope of his duties as a police officer employed

5    by the City of Los Banos.

6         The plaintiff raises federal and state claims related to

7    the decedent's death and seeks compensatory and punitive

8    damages.

9         The defendant denies the claims of the plaintiff.

10        Now I'll now read what the defendant's statement of the

11   case is:

12        On September 2, 2013, Los Banos police officer Jairo Acosta

13   responded to a call of an assault victim at 621 Vine Street in

14   Los Banos, California.  Officer Acosta met the reportee/victim,

15   Tan Lam.  Tan Lam, the plaintiff in this action, walked Officer

16   Acosta into the house and to the room of his son, Sonny Lam.

17   During the subsequent investigation into whether an assault

18   took place, an altercation occurred and Officer Acosta shot and

19   killed Sonny Lam while acting in the course and scope of his

20   employment with the City of Los Banos.

21        Plaintiff Tan Lam alleges that defendant Jairo Acosta used

22   excessive force on Sonny Lam, in violation of the Fourth and

23   Fourteenth Amendments of the Constitution, committed a battery

24   on Sonny Lam, caused the wrongful death of Sonny Lam, and used

25   violence or the threat of violence to interfere with Sonny

1    Lam's civil rights.  Defendant Acosta denies the allegations

2    and asserts his actions were lawful because Sonny Lam allegedly

3    attacked Officer Acosta with a deadly weapon, a pair of

4    four-inch long scissors.  Tan Lam denies his son attacked

5    Officer Acosta and denies his son had scissors in his hand

6    during the altercation with Officer Acosta.

7         That is the defendant's statement of the case.

8         I think you can see that there are certain factual issues

9    that are going to come up that are going to have to be decided

10   by a jury that will be impanelled in this case.

11        All right.  We're now going to start where I'm going to ask

12   some questions, and this is where I'm going to ask you to raise

13   your hand if there is a response that needs to be given.  My

14   procedure is that I always start at the top row, then I'll come

15   to the front row.

16        And the first question that I'm going to ask is:  Do any of

17   you know me, or any of the courtroom personnel that I've

18   introduced previously, the judicial assistant, deputy clerk or

19   court reporter?

20        So, anyone in the top row recognize any of us?  Would you

21   raise your hand, please.

22        Anyone in the front row?

23             PROSPECTIVE JUROR:  I know of you, Your Honor.  I

24   don't know you personally, but having lived in the Sacramento

25   community, and doing the work that I do, you are familiar to

1   me.

2            THE COURT:  All right.  And I know that I spend time

3   at Channel 3.

4            PROSPECTIVE JUROR:  Right.

5            THE COURT:  So, I'm very much involved in that.  And,

6   again, I appreciate it, but we are not personal friends.

7            PROSPECTIVE JUROR:  No.

8            THE COURT:  So would the fact that I -- well, you

9   know me in any way affect your ability to be fair and impartial

10  in this case?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  All right.  Thank you very much.  I

13  appreciate it.

14      Next question:  Do any of you know the attorneys, the

15  plaintiff, the defendant, or any of their families or anyone

16  close to them?

17      Anyone in the top row?  Raise your hand.

18      Front row?

19      Counsel, I'm going to just continue moving through the

20  questions, and so it will be assumed that unless I stop, no one

21  has raised their hands.  I don't want to have to keep saying it

22  over and over again.

23      Now, the next question:  Do any of you know each other,

24  whether you're in the jury box or in the audience?

25      Anyone in the top row know or recognize anyone here?

 1       How about in the front row?

 2       There is a change that's been made to the witness list, and

 3   there are some witnesses who are not going to be called, so

 4   we're going to put one up.  We just found this out this

 5   morning, so it's not going to be the prettiest list compared to

 6   the other one, but this is who it is.

 7       So, for those of you in the audience who cannot see, I'm

 8   going to give the names of the potential witnesses.

 9       And one thing about this is that just because they are

10   listed here does not mean they are, in fact, going to be

11   called.  This is just a potential list.

12       Here we go.

13       Alexander Jason.  Christopher Borchardt.  Daniel O'Day.

14   Detective Parker.  Diane Sullivan Everstine.  Dr. Joseph

15   Shuman.  Dr. Kris Mohandie.  Dr. Mark Super.  Jairo Acosta.

16   Jim Norris.

17       Do any of those names sound familiar to any of you in the

18   top row?

19       Anyone in the front row?

20       Next, Justin Melden.  Mary Lupe Jimenez.  Mi Lam.  Nguyen

21   Stanford.  Roger Clark.  Sarah Yoshida.  Steve Papenfuhs.  Tan

22   Lam.  Teresa Provencio.

23       Do any of those sound familiar to any of you in the top

24   row?

25       Or to the front row?

1        Do any of you have any beliefs or feelings, as you sit here

2    today, without having heard any of the evidence that's going to

3    be presented, the only thing you've heard are the statements

4    I've read to you from the plaintiff and the defendant, do any

5    of you have any beliefs or feelings towards any of the parties,

6    attorneys or witnesses that would make it impossible or

7    difficult for you to act fairly and impartially both as to

8    plaintiff and defendant?

9        Anyone in the top row?

10       Anyone in the front row?

11       Other than what I have told you here in court today, have

12   any of you heard of, or do you have any prior knowledge of any

13   of the facts or events in this case?

14       Top row?

15       Front row?

16       Have any of you formed any opinions about this case based

17   upon what you've heard up to this point?

18       In the top row?

19       Front row?

20       And do any of you have any interest, financial or

21   otherwise, in the outcome of this case?

22       Anyone in the top row?

23       Front row?

24       Have any of you, or any member of your family, or any close

25   friends, to your knowledge, ever sued anyone, presented a claim

1   against anyone, in connection with a matter similar to this

2   case?  If so, would you please raise your hand.

3        In the top row?

4        Front row?

5        Have any -- has anyone ever sued any of you, or presented a

6   claim against any of you, or, to your knowledge, against any

7   member of your family or close friend in connection with a

8   matter similar to this case?

9        Top row?

10       Front row?

11       All right.  Are any of you, or any member of your family,

12  or close friend, to your knowledge presently involved in a

13  lawsuit of any kind?

14       Top?

15       Front?

16       Yes?

17            PROSPECTIVE JUROR:  It's not against me, but I'm the

18  person most knowledgeable that's being called in a case.  It's

19  a civil case against my company -- or, my company is involved.

20  We're the plaintiffs.

21            THE COURT:  Is there anything about the fact that

22  you're involved in this case with your company that might

23  affect you being fair and impartial here?

24            PROSPECTIVE JUROR:  No.

25            THE COURT:  Very well.  Thank you.

1         Have any of you ever been a plaintiff or defendant in any

2    type of case?

3         Just the one.  The same one or different?

4              PROSPECTIVE JUROR:  Similar.  I've been involved in

5    multiple litigations.  I process commercial foreclosures for a

6    living, so it's mostly been foreclosure related.  And then I

7    had a wrongful termination from one of my employees, who made a

8    claim for wrongful termination.

9              THE COURT:  Against the company?

10             PROSPECTIVE JUROR:  Against the company, yeah.

11             THE COURT:  Anything about any of that that would

12   affect you here?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Anyone else in that row?

15        Front row?

16        Yes?

17             PROSPECTIVE JUROR:  It was a small claims case, and I

18   was a plaintiff.  I don't think it will affect.

19             THE COURT:  Very well.  Thank you very much.

20        Have any of you, or any member of your family, or close

21   friend, ever been involved in a profession -- I think we may

22   have a positive answer on this -- that might touch upon the

23   subject matter of this case?

24        Obviously, we've got a wrongful death action that's being

25   claimed, and it does involve a law enforcement officer.  Is

1    there anyone that has any type of background or experience in

2    any of these areas?

3        I'm trying to be as broad as I possibly can.  If you have,

4    let me know, please.  Thank you.

5            PROSPECTIVE JUROR:  I just have an older brother, he

6    worked as a correctional officer for about four years.

7            THE COURT:  So, would that have any effect on you

8    being fair and impartial in this case?

9            PROSPECTIVE JUROR:  It shouldn't.

10           THE COURT:  Thank you.  Anyone else in that row?

11       Yes.  Please, pass it down.

12           PROSPECTIVE JUROR:  My brother-in-law is a

13   correctional officer.  And we have a very good friend, he works

14   for the Department of Corrections as an investigator.

15           THE COURT:  And would that cause you to look at one

16   side or the other any differently here in this particular case?

17           PROSPECTIVE JUROR:  No.

18           THE COURT:  Thank you.

19       Anyone else?

20       Yes?

21           PROSPECTIVE JUROR:  My eldest brother is a cop as

22   well.

23           THE COURT:  All right.  And you also mentioned that

24   you, in your profession, deal with law enforcement, and people

25   are brought in as well.

1          PROSPECTIVE JUROR:  Yeah.  Usually CHP, Stockton PD,

2     and also correctional officers.

3          THE COURT:  Okay.  Once again, the question is, do

4     you think that your experiences with those agencies would have

5     an impact on how you would view the evidence in this case, or

6     would you be able to listen to the evidence and make your own

7     decision?

8          PROSPECTIVE JUROR:  I'm not so sure.  But, like I

9     said, I have soft heart with law enforcement.  I know how they

10    work.  I know how hard they work.

11         THE COURT:  Okay.  But my question is -- I understand

12    that that's your feeling, but would you be able to listen to

13    the facts of this case?  Because you don't have the facts of

14    this case.

15         PROSPECTIVE JUROR:  I don't -- I don't mind, sir.

16         THE COURT:  Anyone else in that row?

17       How about in the front row?

18       Go ahead, pass it down.

19         PROSPECTIVE JUROR:  In my work, Your Honor, I have

20    reported on a number of stories over the years that have some

21    similar components to what it sounds like this case might have.

22    And if I didn't acknowledge that, it wouldn't be fully

23    disclosing.

24         THE COURT:  Exactly.  That being said, I'm sure

25    you've covered on both sides of what's happened?

1              PROSPECTIVE JUROR:  Correct.

2              THE COURT:  So, my question would be, would you be

3    able to listen to all the evidence that's here and just weigh

4    it as you think it should be weighed here, without taking into

5    consideration the past stories that you've done?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Very well.  Thank you.

8              PROSPECTIVE JUROR:  You know about my husband, but I

9    also have two uncles who are correctional officers.  And, also,

10   my aunt is a medical malpractice lawyer.  I don't know if -- I

11   don't think that will relate.  But I feel that I can still

12   listen to the evidence without having a bias.

13             THE COURT:  Very well.  Thank you.

14        Anyone else?

15        Sometimes -- this is kind of off the record here -- not off

16   the record, but off point, and that is, you never know what

17   you're going to get as a prospective jury pool.  I don't think

18   I've seen so many nurses on one prospective jury pool,

19   correctional officers, and people from Lathrop.  This is

20   interesting.  But I will tell you that there was one time that

21   I had four jurors that were here, and this is random selection,

22   and all four of them were next door neighbors, and they all

23   lived in that order.  The odds of that I don't know, but it

24   happened.  But this is interesting here.

25        Back on target with the voir dire.  This is a civil case,

1    and the way that we deal with civil cases is that damages are

2    awarded, whether it be for personal injury, pain and/or

3    suffering.  When I say "damages," I'm talking monetary damages;

4    that is the way that they are handled.

5        Do any of you have any religious or other belief that pain

6    and/or suffering are not real, or any belief that may prevent

7    you from awarding monetary damages for pain and suffering if

8    liability for them is established?

9        Any one of you in the top row?

10       Front row?

11       Are there any of you that would not employ a medical

12   doctor?

13       Anyone in the top row?

14       Front row?

15       Yes?  Go ahead.

16           PROSPECTIVE JUROR:  If I have medical needs, I call a

17   Christian Science practitioner.

18           THE COURT:  All right.  And in this particular case

19   there -- I'm going to say there will probably be two or three

20   doctors that will testify.  Would you be able to listen to

21   their testimony and give it what weight you think it deserves,

22   or do you believe that your beliefs would not allow that to

23   take place?

24           PROSPECTIVE JUROR:  No.  My beliefs are just for me.

25   I would listen fairly to whatever evidence is given.

1            THE COURT:  Very well.  Thank you very much.

2       Anyone else in the front row?  Okay.

3       This is a claim, as I've told you, involving excessive

4  force, and it's a wrongful death.  Have any of you had any

5  personal or family knowledge of any situation that would

6  involve -- again, I'm trying to be as broad as possible -- do

7  you have a person who is dealing with a wrongful death of a

8  child?

9       You have a law enforcement officer acting within the course

10 and scope.  There are a lot of issues here that will be coming

11 out.  Are there any of you that have any personal experience in

12 anything such as this yourself, or anyone in your family or

13 friends?

14      Anyone in the top row?

15      Anyone in the front row?

16           PROSPECTIVE JUROR:  This is kind of broad and

17 general, but, just for the record, I did help my husband study

18 for the exams and he did go over, like, what is included in

19 excessive force, and where on the body that would be included.

20 So, I do have some knowledge and experience of just the general

21 for a correctional officer.

22           THE COURT:  Okay.  And this one is involving law

23 enforcement, it's a police officer, and it's -- it's pretty

24 specific as to what happened.  Do you believe that you'd be

25 able to listen to the evidence that comes in and make your

1    decisions based on the evidence and law that I give to you?

2         PROSPECTIVE JUROR:  Yes, Your Honor.

3         THE COURT:  Thank you.  And I know I've already had

4    this response given, but I just want to specifically ask it:

5    Do any of you have any members of your family, or close friends

6    -- and if you've already told me you don't have to answer again

7    -- who have had law enforcement training or experience, or been

8    employed by any law enforcement agency?

9         And by "law enforcement agency," I'm referring to a police

10   department, a sheriff's department, Highway Patrol, district

11   attorney's office, Department of Corrections, Attorney

12   General's Office, Bureau of Narcotics Enforcement, FBI, or any

13   other type of agencies, whether it be local, state and/or

14   federal.

15        Anyone in the top row?

16        Yes?

17        PROSPECTIVE JUROR:  I had a nephew who worked for the

18   Amador County Sheriff's Department for a couple of years.

19        THE COURT:  Does he still work there?

20        PROSPECTIVE JUROR:  He's deceased.

21        THE COURT:  I'm sorry.  Was there anything about --

22   was that -- when you say "he's deceased," was that part of --

23        PROSPECTIVE JUROR:  He committed suicide.

24        THE COURT:  It wasn't part of his official duties?

25        PROSPECTIVE JUROR:  No.

1             THE COURT:  All right.  Would any of that affect you

2   here in this case?

3             PROSPECTIVE JUROR:  No.

4             THE COURT:  Thank you.

5       Anyone in the top row?

6       Pass it down.

7             PROSPECTIVE JUROR:  My husband's cousin, she's an FBI

8   agent, but we do not have close communication with her.

9             THE COURT:  Okay.  So, that wouldn't have an effect

10  on you here?

11            PROSPECTIVE JUROR:  No.  No.

12            THE COURT:  Thank you.

13      Anyone else in that row?

14            PROSPECTIVE JUROR:  Like I mentioned earlier, my

15  eldest brother is a retired police officer.

16            THE COURT:  Okay.  And, again, would you give law

17  enforcement officers' testimony any greater weight because of

18  your relationship with your brother?

19            PROSPECTIVE JUROR:  I -- you know, because of my 20

20  plus experience in emergency department, and working with them,

21  hand-in-hand, I'm afraid I'm not -- I'm not -- I'm not going to

22  be fair.  I don't believe so.

23            THE COURT:  Okay.  I'll still come back to you again.

24      Anyone else in the front row?

25      Yes?

1           PROSPECTIVE JUROR:  I have some family members who

2     have worked for the federal government.  I have many friends

3     who work for many levels of local and state government, both

4     city and county.

5           THE COURT:  Same question, would that have an impact

6     on you being fair and impartial in this case?

7           PROSPECTIVE JUROR:  No.

8           THE COURT:  Thank you.

9        Anyone else in that row?

10          PROSPECTIVE JUROR:  My nephew was -- worked for the

11    Solano County Sheriff's Department.  He no longer works there.

12          THE COURT:  Any effect on you here?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  All right.  It does appear to me that one

15    or more of the parties, attorneys, and/or witnesses may come

16    from a particular national, racial or religious group that's

17    different from those of you that are here as prospective

18    jurors.  Would that in any way affect your judgment, or the

19    weight or credibility you would give to that testimony?

20       Anyone in the top row?

21       Front row?

22       Has anyone filed a claim or lawsuit specifically against

23    the City of Los Banos or any other government entity?

24       Top row?

25       Front row?

1          Do any of you, or anyone in your household, belong now or

2     ever belong to a neighborhood or citizens organization

3     concerning crime prevention, law enforcement behavior,

4     community relations or neighborhood safety?

5          Anyone in the top row?

6          Front row?

7               PROSPECTIVE JUROR:  I was on an institutional

8     committee with my church, and we sent chaplains into the

9     institutions to give services and talk with anybody who was

10    interested in talking to them.

11              THE COURT:  All right.

12              PROSPECTIVE JUROR:  It wouldn't have any effect on

13    this case.

14              THE COURT:  Very well.  Thank you.

15         Let me be a little bit more specific:  Have any of you, or

16    any member of your family, any friends, made a specific

17    complaint against a police officer or against a police

18    department?

19         Anyone in the top row?

20         The front row?

21         Do any of you have a medical condition, or is anyone taking

22    any medication that would make it difficult for you to

23    concentrate or otherwise serve as a juror?

24         Anyone in the top row?

25         Yes?

1          PROSPECTIVE JUROR:  I take four kinds of medications

2    for blood pressure, and side effects of that usually make you

3    go to the bathroom, urinate, at least every 20-25 minutes.

4          THE COURT:  Okay.  If we have that situation arise,

5    and if you are selected as a juror, you let me know and we'll

6    have -- give you the opportunity.

7         One of the things that we have in the federal court is the

8    second door you see against the wall is the jury room, and

9    there are two restrooms inside the jury room.  And if you are

10   selected as a juror, that is where you will come in.  You will

11   not -- those of you that stood out in superior court in

12   Sacramento in the hallway, that doesn't happen here.  You're

13   going to have your own room, with a keycard that gets you in

14   and out so you're not stuck outside.

15        So, anything like that, just let me know and I'll take care

16   of it.

17        Anyone else in that row?

18        How about the front row?

19        All right.  My last question, and this is my catchall

20   question, and we're going to start with Ms. Taylor and go down

21   and back across again, is:  Do you know of any reason, or has

22   anything occurred during the course of my questions, that might

23   make you doubt that you could be a completely fair and

24   impartial juror in this case?  Or is there any other reason why

25   you should not sit on this jury?  If there is such a reason, it

1    is your duty now to disclose them at this time.

2        Ms. Taylor, is there any reason?

3            PROSPECTIVE JUROR:  No.  I did want to mention, I

4    have been called for jury duty before.  I didn't mention it

5    because I've never been voir dired [sic].  And that would not

6    have any effect on my abilities.

7            THE COURT:  Thank you very much.

8            PROSPECTIVE JUROR:  No, Your Honor.

9            THE COURT:  Thank you.

10           PROSPECTIVE JUROR:  No.  But I did remember my cousin

11   Andrea is also a police officer.

12           THE COURT:  And where?

13           PROSPECTIVE JUROR:  It's either the City of Turlock

14   or Oakdale.

15           THE COURT:  And do you speak to your --

16           PROSPECTIVE JUROR:  She's a second cousin.  I see her

17   at family reunions.

18           THE COURT:  Nothing about her work or what she does?

19           PROSPECTIVE JUROR:  No.

20           THE COURT:  Thank you.

21           PROSPECTIVE JUROR:  I just remembered something.

22   Working with special kids, I deal with a lot of violence, and

23   so I've been trained to work with the kids in minimizing the --

24   how do I say -- getting the student to calm down without really

25   hurting the student.  So, I've been in situations where the

1    student throws a chair at me, and because of the disability.

2    But that will not influence on my thinking.

3              THE COURT:  All right.  Thank you for letting us know

4    that.  Appreciate it.

5              PROSPECTIVE JUROR:  No, Your Honor.

6              THE COURT:  Thank you.

7              PROSPECTIVE JUROR:  Like I have mentioned earlier,

8    because of my previous experience as an emergency department

9    nurse, I believe my personal opinion might affect my decision

10   making.

11             THE COURT:  Thank you.

12             PROSPECTIVE JUROR:  No, Your Honor.

13             THE COURT:  Thank you.

14             PROSPECTIVE JUROR:  Your Honor, I noticed that you

15   hadn't asked any questions regarding our thoughts on law

16   enforcement in general.  I just felt obligated to say, while I

17   have the utmost respect for law enforcement in general, I think

18   that they lie when necessary.

19             THE COURT:  But you'd be able to listen to the

20   evidence presented in this trial and make --

21             PROSPECTIVE JUROR:  I believe I would.  I just wanted

22   to get that off my chest.

23             THE COURT:  Very well.  Thank you.

24             PROSPECTIVE JUROR:  No, Your Honor.

25             THE COURT:  Thank you.

1            PROSPECTIVE JUROR:  No, Your Honor.

2            THE COURT:  Thank you.

3            PROSPECTIVE JUROR:  No, Your Honor.

4            PROSPECTIVE JUROR:  No, Your Honor.

5            PROSPECTIVE JUROR:  For me, it would be more the

6    emotional part of being a jury in the first time.  While I'm

7    willing to listen, but it's more on my chest, me being the

8    jury, and to decide based on what I see and listen in this

9    court.

10           THE COURT:  But you would be able to do that?  That's

11   what -- you understand that's your job, is to listen and see

12   what is brought up and make your own decision?  Is that yes?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Thank you.  Next?

15           PROSPECTIVE JUROR:  No, Your Honor.

16           THE COURT:  All right.  Counsel for the plaintiff,

17   I'm going to give you your max of ten minutes for any follow-up

18   voir dire.

19           MR. POINTER:  Thank you, Your Honor.

20           THE COURT:  Okay.

21           MR. POINTER:  Good morning, ladies and gentlemen of

22   the jury.

23      Folks, I know it's been -- I mean, we don't know each

24   other, and it's tough being asked questions and then answering

25   those questions in a room full of strangers.  So, I appreciate

1    you participating in the process.

2        And given that you've heard Your Honor read to you what

3    this case is about, I think we all can agree that both my

4    client, as well as the defendant, deserve a fair shot at

5    justice.  But that requires each one of you, and for us, to

6    have brutal honesty so that we can make sure that we have the

7    right jurors for the case, and anyone that is not appropriate

8    for this particular case, for whatever reason, doesn't sit in

9    judgment.

10       I think we all can agree to that, right?

11       So, you heard Your Honor mention to you the burden of proof

12   in this case.  This is a civil case.  And we're all familiar

13   with the burden of proof in a criminal case, right?  Beyond a

14   reasonable doubt.  That's something that we're familiar with,

15   we've heard.

16       Now, that standard is a difficult one.  In that particular

17   type of case, you have a situation where, in a criminal case,

18   it's almost black and white.  You may feel as if the defendant

19   did something, but because a defendant muddies the water, or

20   hires experts, you may feel like the defendant gets to walk

21   free without being accountable.

22       But can you, in this civil case, follow Your Honor's

23   directions and jury instructions and use your common sense to

24   listen to the evidence that's in the court, that comes through

25   the witness stand, and make your decision based upon that?

1        Does anybody have an issue with following the judge's

2   instructions in this civil case?

3        Now, I also understand, in listening to your answers and

4   replies, once again, with brutal honesty, that many of you have

5   either friends, loved ones, spouses that work in law

6   enforcement whom you respect.

7        My question to you is:  In a case like this, does my client

8   start off behind?  Meaning, do you think that because my client

9   is bringing a case against a police officer, that the police

10  officer's credibility starts beyond where my client starts, so

11  that my client has to -- the plaintiff, Mr. Lam, has to

12  overcome being behind where the defendant police officer is at

13  in order for you to believe him?

14       For example, Ms. Rose, I understand your husband is a

15  correctional officer.  Do you hear -- does he tell you stories

16  about his job?

17            PROSPECTIVE JUROR:  I do hear stories about the job.

18            MR. POINTER:  Does he tell you about some of the

19  difficulties and challenges he faces as a correctional officer?

20            PROSPECTIVE JUROR:  In general, yes.

21            MR. POINTER:  And I understand that you assisted him

22  with, essentially, learning the rules of being a correctional

23  officer?

24            PROSPECTIVE JUROR:  A little bit.  He's not relying

25  on me for anything.

1          MR. POINTER:  Understand.  Understand.

2      Given that you're familiar with the difficulties, and the

3  challenges, and that you hear the stories about his job, do you

4  think that that would make it difficult for you to sit here and

5  listen to the evidence and make a decision based upon the

6  evidence in this case?

7          PROSPECTIVE JUROR:  I feel that I can think

8  independently and unbiasedly, and take in all the evidence

9  independently of any -- anything that my husband does.

10          MR. POINTER:  So you're going to weigh the evidence

11  independent of your husband?

12          PROSPECTIVE JUROR:  Completely independent.

13          MR. POINTER:  Thank you.  Please pass the mike up to

14  Ms. Brady.

15      Ms. Brady, I understand that you have a number of family

16  members, I believe at least two, that work in law enforcement;

17  is that right?

18          PROSPECTIVE JUROR:  My brother-in-law is a

19  correctional officer.  We have a very, very good friend who

20  works for the Department of Corrections as an investigator.

21  And my cousin is also a police officer.

22          MR. POINTER:  Would you find it difficult -- if you

23  were to listen to the evidence that comes in through the course

24  of this trial, and in this courtroom, and you find that the

25  defendant violated the law, would you find it difficult to go

1   back to your family members, to your loved ones, and tell them

2   that you found for the plaintiff versus the defendant?

3                PROSPECTIVE JUROR:  No.

4                MR. POINTER:  Do you have any concern as to the way

5   in which they may feel about you telling them such information?

6                PROSPECTIVE JUROR:  No.

7                MR. POINTER:  Thank you.  I ask that you -- can you

8   pass the mike down to Mr. Rosario [sic].

9       Mr. Rosario [sic], I understand, in listening to your

10  responses, and I appreciate what I term to be your brutal

11  honesty, I can tell that you were really listening to the

12  questions Your Honor was asking you in determining whether --

13  where you sat in terms of fairness.

14      Is it fair to say that given the close relationship you

15  have with law enforcement, be it your family, and also that you

16  work with them every day, that a police officer's word starts

17  off ahead or carries more weight than a non-police officer?

18               PROSPECTIVE JUROR:  Because I -- I have -- I am in

19  contact with them pretty much every day, and I usually talk to

20  them, I got their opinion, we -- we basically work hand-in-hand

21  every single day I'm at work.  Like I mentioned, it's probably

22  hard for me to be really, really fair, but I'm willing to

23  listen and see what the Court will show us.  But in reference

24  to my opinion, I -- I do believe it carries a lot of weight.  I

25  apologize, but that is my opinion.

1                   MR. POINTER:  No apologies necessary.  Thank you.

2           So, you would find it difficult, then, to be fair?

3                   PROSPECTIVE JUROR:  Yes, sir.

4                   MR. POINTER:  You can -- this might not be the right

5       case for you?

6                   PROSPECTIVE JUROR:  I believe so.  It's going to be

7       hard.

8                   MR. POINTER:  Thank you.

9           Does anyone else, any other jurors, think that this is not

10      the right case for them, given the description of the case that

11      Your Honor has read to you and some of the questions that have

12      been asked?

13          Finally, can you pass that mike to Ms. -- I don't want to

14      get your name wrong -- Ms. Ruyak.

15          Did I pronounce that right?

16                  PROSPECTIVE JUROR:  Yes.

17                  MR. POINTER:  Thank you.  Try to do it again.

18      Ms. Ruyak.  Okay.

19          I understand that you're -- it sounds -- you cover stories?

20      Are you a journalist?  Is that correct?

21                  PROSPECTIVE JUROR:  Yes.

22                  MR. POINTER:  And you've covered stories concerning

23      law enforcement?

24                  PROSPECTIVE JUROR:  Yes.

25                  MR. POINTER:  I take it, as a journalist, you try to

1    be as fair and balanced as possible?

2             PROSPECTIVE JUROR:  Correct.

3             MR. POINTER:  Have you covered stories where -- well,

4    you investigate those stories, or the facts of the stories?

5             PROSPECTIVE JUROR:  Investigation is a broad term.

6    So, to the extent that we report and cultivate sources, yes.

7             MR. POINTER:  Do you reserve judgment, if you will,

8    as it relates to weighing the credibility of the people

9    involved in your stories until you receive the facts?

10            PROSPECTIVE JUROR:  My job for most of my career has

11   not been about passing judgment.  So, it's about translating

12   information, explaining stories, and allowing people to present

13   their story or their side.

14            MR. POINTER:  I take it, in the course of the career,

15   I believe you said you covered stories that are similar to

16   this?

17            PROSPECTIVE JUROR:  Yes.

18            MR. POINTER:  In the case of covering those stories,

19   have you had occasion to cover a story where a person is

20   claiming that law enforcement did something to them that they

21   felt was wrong?

22            MR. ALLEN:  Objection.  Argumentative.

23   Preconditioning.

24            THE COURT:  Overruled.  But, counsel, I'd like you to

25   stand closer to the microphone, you're starting to fade and I'm

1    having a hard time hearing.

2              MR. POINTER:  Sorry, Your Honor.

3              THE COURT:  Go ahead.

4              PROSPECTIVE JUROR:  Could you repeat?

5              MR. POINTER:  No problem.

6       I just wanted to find out, in the course of covering your

7    stories, have you had an occasion where you covered a story

8    where someone is claiming that law enforcement did something to

9    them?

10             PROSPECTIVE JUROR:  Yes.

11             MR. POINTER:  And in the course of the, loose term,

12   investigating that story, or gathering the facts, were you able

13   to reserve judgment until you heard all the facts?

14             PROSPECTIVE JUROR:  I don't pass judgment.  My job is

15   about trying to hear from both sides.  So, the work would be in

16   hearing from different aspects of the story, being able to

17   broadcast that information.  It's not my job and my role to

18   pass the judgment.

19             MR. POINTER:  So, would you have a difficult time

20   here, sitting on a jury in this case, passing judgment after

21   you've listened to all the facts and the testimony that comes

22   in through this case?

23             PROSPECTIVE JUROR:  I don't think I'm here as a

24   broadcast journalist.  As a person, I would listen, and I

25   believe I'd be able to make a decision, as a person, about what

1    happened.

2          MR. POINTER:  Do any other -- thank you.

3      Do any other members of the jury feel like they could --

4    they would have difficulty doing that?  Meaning reserving their

5    judgment until they've heard all of the evidence?

6          THE COURT:  Counsel, time.

7          MR. POINTER:  Thank you.

8          THE COURT:  Defense.

9          MR. ALLEN:  Thank you, Your Honor.

10     I'm going to keep this short because we've gone a long time

11   this morning.  So, that's a promise I'm going to make to you

12   right now.  I do have --

13         THE COURT:  Counsel, stay back by the microphone.

14         MR. ALLEN:  Mr. Delrosario, in your occupation -- let

15   me back up.

16     Ms. Erwin, in your occupation, you mentioned that you are

17   working with special ed children, and a focus of -- if I heard

18   this correctly, a focus of your work is to treat or teach

19   nonviolent reaction toward the children?

20         PROSPECTIVE JUROR:  No.  No.  I -- I am a regular

21   teacher, but some of the students, they tend sometimes, due to

22   their disability, to react violently.  And so in this violence,

23   sometimes it's pretty -- pretty violent.  And I have to deal

24   with it, and I have to do it in a way that I will not harm

25   the -- hurt that kid.

1           MR. ALLEN:  Thank you for that.  Because, tragically,

2    we're involved in a case where a police officer, as he was --

3    believed he was trained in this process to fire his weapon, he

4    had to use lethal force in his decision making --

5           MR. POINTER:  Objection, Your Honor.

6           THE COURT:  Sustained.

7           MR. ALLEN:  The fact that lethal force was used in

8    this case, is that going to start you off bothering you, or

9    putting Jairo in a position where that will overwhelm hearing

10   the rest of the evidence?

11          PROSPECTIVE JUROR:  I believe not, because I will

12   look at it as -- as what happened.  Not look -- I will not look

13   at it as because he -- I will look at the situation and analyze

14   the situation, because I have to do that with my children.  I

15   cannot say that a kid threw a chair on me because he -- he

16   meant to do that, and take to the principal's office and have

17   that kid suspended, because that's a different case.  He's

18   reacting to a need of communication, or a need of telling me

19   that he's hungry, or he -- he needs something from me.  Since

20   he cannot respond that way, he respond differently, with

21   violence.  So, in case -- in that case I would look

22   differently.

23      Am I clear?

24          MR. ALLEN:  I think so.  I'm going to frame it to

25   everyone this way:  There is a bias in this case from the very

1   beginning.  We're here because someone died.  So, that's

2   something that you know now from the opening remarks by His

3   Honor.

4       Does the fact that somebody died in this case at the hands

5   of a law enforcement officer leave anybody uneasy here, or

6   already thinking, boy, somebody's life was taken, that officer

7   has to really, really explain what happened to make it work for

8   me?  That's a bias.  It doesn't mean you can't be fair, but is

9   anybody in that position?  That is, Jairo Acosta has to do more

10  than meet his burden of proof, or Mr. Pointer has to do less to

11  meet his burden of proof?  Is there anybody that feels that way

12  right now?

13      No hands.  Thank you.

14      Thank you.  No further questions, Your Honor.

15          THE COURT:  All right.  Thank you.

16      At this time, counsel, do you pass for cause?

17          MR. ALLEN:  Pass for cause, Your Honor.

18          THE COURT:  Plaintiff?

19          MR. POINTER:  No, Your Honor.  I do have a cause

20  challenge.

21          THE COURT:  All right.  Ladies and gentlemen, on a

22  rare occasion I will have to have counsel come to sidebar.  And

23  when that does occur, we'll have white noise that will play

24  over the jury box and I will take counsel at sidebar.  The

25  court reporter will take down our discussion, and I will try to

1    keep it as short as possible.  Thank you.

2       (Bench conference.)

3              THE COURT:  Go ahead, counsel.

4              MR. POINTER:  Yes, Your Honor.  Mr. Delrosario --

5              THE COURT:  You can speak up.

6              MR. POINTER:  I wasn't sure.  Sorry.

7       Mr. Delrosario, in response to Your Honor's questions, and

8    even mine, he said he's going to struggle with giving --

9    without giving the officer increased weight.  And he,

10   essentially, said he's not going to be fair.

11      He also mentioned that he has another connection with

12   police officers, and he has such a respect for how hard they

13   work they're going to start off ahead with credibility, and

14   he'd have difficulty, essentially, weighing the evidence and

15   being fair.

16             THE COURT:  Counsel, your response?

17             MR. ALLEN:  Your Honor, you asked him several times,

18   and I finished my questions with a bias one way or the other

19   toward law enforcement or the burden of proof, and each and

20   every time Mr. Delrosario was being very frank, very honest,

21   that, yes, I can -- you know, my family is in there, and I -- I

22   have an empathy, I guess is the best way to put it.  But you

23   then would ask him if he would listen to the evidence, and I'm

24   paraphrasing, I don't capture exactly, but he did reply he'd

25   wait for all the evidence to come in, he wanted to hear what

1    the evidence was.

2        I'll leave it at that.

3            THE CLERK:  Mr. Delrosario needs to use the restroom.

4            THE COURT:  Tell him to go.

5        My issue -- he did say that he deals with law enforcement

6    extensively in his work, and he did say it was going to be

7    difficult for him.  But, he did say he'd be willing to listen

8    to the evidence that was going to be presented.  And so,

9    frankly, it would be an absolute -- he would be a challenge for

10   cause.  He kept rehabilitating himself to a certain extent by

11   saying he's willing to listen.  And the fact that he says it's

12   going to be difficult doesn't mean he can't be fair.  So, the

13   challenge for cause is denied.

14       So we'll go with peremptory challenges.  We'll start with

15   the plaintiff.  You each have three.

16           MR. ALLEN:  Just to get clarification from our

17   pretrial, the way the microphone was handed down to Ms. Wade,

18   Ms. Wade is number fourteen, is she not?  When we were going

19   through, it got handed -- instead of going from Mr. Turner back

20   to --

21           THE COURT:  She's fourteen.

22           MR. ALLEN:  Good.  The way -- and this will be the

23   entire box, we can strike anybody in the box?

24           THE COURT:  No.  Strike the top eight.

25           MR. ALLEN:  Thank you.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1          THE COURT:  Number nine, will take that place.  And

2     you have three, so one way or another, your jury is there.

3          MR. ALLEN:  Just wanted to clarify.  Thank you.

4          THE COURT:  Very good.  Thank you.

5       (Bench conference concluded.)

6          THE COURT:  All right.  Ladies and gentlemen, we're

7     going to begin the peremptory challenge process.  And for those

8     of you that have not been in federal court before, it's much

9     more abbreviated than being in the state court.

10         And because I have determined that there are going to be

11    eight jurors on this trial, I will note that there are eight of

12    you in the top row.  In the federal system, each side has three

13    peremptory challenges, which means it's six, and there are six

14    of you in the front row.  So, what happens is, if someone in

15    the top row, and that's where the challenge will be, will be

16    challenged, I will excuse them and then I will go to juror

17    number nine, Ms. Meseure, and then you will take that place,

18    and we'll alternate.  So, there will be movement from the front

19    row, potentially, to the back row.

20         One of two things will happen.  Both sides will pass, then

21    we have a jury, or they use all three of their peremptory

22    challenges, each side, and once that's done, then we're going

23    to swear in whoever is left in the eight.

24         Now, if you are excused, you are permitted to leave today

25    without checking in at the jury administrator's office on the

 1    fourth floor.  That said, you must still call the jury line on

 2    Friday after 5:00 p.m. to see if further service would be

 3    needed in the future.

 4        If you are excused at this point in time, I want to thank

 5    you all very much for taking your time to be here today.  I

 6    understand that it is an inconvenience for many of you, and we

 7    respect that, but it does allow us to have fairness and justice

 8    within the Eastern District of California.  So, I do thank you

 9    and appreciate it.  That goes for everyone who is in the

10    audience who has not been selected as well.

11        So, we will start with the plaintiff first.

12        Counsel, would you like to exercise a peremptory challenge?

13              MR. POINTER:  Yes, Your Honor.

14              THE COURT:  Go ahead.

15              MR. POINTER:  Yes.  Plaintiff would like to thank and

16    excuse juror number six, Mr. Delrosario.

17              THE COURT:  Mr. Delrosario, thank you very much for

18    your time, sir.  We do appreciate it.  Appreciate your candor

19    as well.

20              PROSPECTIVE JUROR:  Thank you.

21              THE COURT:  Thank you.

22        For defense.

23              MR. ALLEN:  Yes, Your Honor.  The defense would like

24    to thank and excuse juror number eight, Mr. Turner.

25              THE COURT:  Mr. Turner, thank you very much for your

 1   time, sir.

 2       Back to the plaintiff.

 3           MR. POINTER:  Yes, Your Honor.  The plaintiff would

 4   like to thank and excuse juror number one, Ms. Taylor.

 5           THE COURT:  Thank you, Ms. Taylor.

 6       Defense.

 7           MR. ALLEN:  Defense will pass, Your Honor.

 8           THE COURT:  Defense pass.

 9       Plaintiff.

10           MR. POINTER:  Yes, Your Honor.  We'd like to exercise

11   our last peremptory.  The plaintiff would like to thank and

12   excuse juror number one, Ms. Rose.

13           THE COURT:  Ms. Rose, thank you very much.

14       Ms. Ruyak, if you'll take chair number one.

15       Defense.

16           MR. ALLEN:  Defense would like to thank and excuse

17   juror number one, Ms. Ruyak.

18           THE COURT:  Ms. Ruyak, thank you very much.

19       Plaintiff has exercised all of their peremptory challenges.

20   Defendant has exercised two with one pass.  Is there a request

21   for a further --

22           MR. ALLEN:  If I could have just one moment, Your

23   Honor?

24           THE COURT:  Yes.

25       (Pause in proceedings.)

1          MR. ALLEN:  Your Honor, the defense accepts this

2    jury.

3          THE COURT:  Thank you.

4       Madam clerk, please swear in the jury.

5       (Jurors sworn.)

6          THE COURT:  Thank you very much.  You may be seated.

7       Ms. Wade, thank you.  And for everyone else that's here in

8    the audience, thank you, again.  I believe you have my

9    instructions that I was given from the jury administrator's

10   office, but, again, thank you very much for your time today,

11   and you are now excused.

12      Counsel, what are the length of your opening statements,

13   roughly?

14         MR. POINTER:  Your Honor, I don't anticipate my

15   opening statement taking longer than 20 minutes.

16         MR. ALLEN:  Likewise, Your Honor.

17         THE COURT:  Right now, ladies and gentlemen, you're

18   going to go into the jury room and the courtroom deputy will

19   give you your keycards, notepads, pens, other things for you to

20   be prepared when we come back.

21      We're going to have you seated, I think we're going to go

22   four and four, so you'll be in the middle and you can see the

23   monitors a little more clearly.

24      We'll just take a recess until 11:35, and then we'll bring

25   you back out.

1          And, counsel, you can start your close -- pardon me,

2     opening statement at that time, and that should give you the 20

3     minutes that you need.  We will then take our noon recess and

4     we'll come back at 1:30.

5          Counsel, you will start your opening statement as well.

6          And then we have witnesses that are ready to go this

7     afternoon, correct?

8               MR. POINTER:  Yes, Your Honor.

9               THE COURT:  Very well.  Thank you.

10         Ladies and gentlemen, the first of many admonitions:

11    Please don't discuss the case or form any opinions.

12         All right.  We are in recess for ten minutes, or until

13    11:35.

14         (Recess taken, 11:24 a.m. - 11:49 a.m.)

15              THE COURT:  For the record, unless the Court

16    indicates otherwise, when we come back into session, all eight

17    jurors are seated and present.  Thank you.

18         Counsel, your opening statement, please.

19              MR. POINTER:  Thank you, Your Honor.

20                   OPENING STATEMENT BY MR. POINTER

21              MR. POINTER:  Ladies and gentlemen of the jury, we

22    are here today because there is a dispute.  We are here today

23    because defendant, Jairo Acosta, violated his duty to the

24    public, to his employer, and his duty to the Lam family when he

25    shot and killed Tan Lam's son, Sonny Lam, on September 3rd of

1    2013.

2         You will hear testimony through the course of this trial

3    that prior to the shooting, defendant, Police Officer Acosta,

4    was diagnosed with a mental health issue, a condition which

5    interfered with his ability to do his job.  He had a

6    responsibility to perform his duties of his job as a police

7    officer for the City of Los Banos reasonably, fairly, and

8    professionally.  Instead of letting his employer know about his

9    mental health condition, he concealed it.  He did not let

10   anyone know that he had these symptoms that he was dealing

11   with.  He ignored the treatment advice and the recommendations

12   of his doctor, Dr. Joseph Shuman.

13        And, tragically, on September 2nd of 2013, defendant Acosta

14   was dispatched to the Lam family home to do the very things

15   that he had told his doctors that he was problem -- that he had

16   problems doing in terms of performing his job as a police

17   officer, searching homes and pulling his gun out.  The result

18   of that was that he ignored his training and shot my client's

19   mentally ill son in their own home.

20        The testimony that you will hear during the course of this

21   trial will show that the defendant's reckless disregard for the

22   public safety and his unreasonable use of force cost my client

23   his son, his quality of life, and his peace of mind, as Sonny

24   Lam was my client's caretaker, caregiver and guardian.

25        Now, you will hear testimony during the course of this

1   trial, and the evidence is going to show, that the defendant

2   knew his mental health problems were causing him difficulty

3   performing his job.  His basic job duties, that is.  Despite

4   knowing the danger that these mental health conditions and

5   these symptoms that he was dealing with were causing, he kept

6   it to himself.  He didn't tell his employer that he posed a

7   danger.  Instead, despite knowing the danger that he posed, he

8   continued performing these job duties.  And despite Sonny Lam

9   not posing an imminent threat to him, he shot him twice.  The

10  evidence is going to show he shot him once in the leg, and the

11  fatal shot was to his abdomen.

12       The evidence that you will hear is going to tell you that

13  the police officers are trained to be mentally fit,

14  responsible, and reasonable.  You will hear evidence in this

15  trial that when a police officer is not mentally fit,

16  responsible or reasonable, people can be hurt, people can be

17  killed.

18       Now, right here on this witness stand you're going to hear

19  witnesses come into this court and they're going to testify and

20  provide evidence that -- from the defendant himself, he's going

21  to testify about his time that he served our country, bravely,

22  in Iraq.  He's going to tell you about how while he was serving

23  our country in Iraq, he took on enemy fire, he survived

24  improvised explosive devices and bombs and mortar fire.  He's

25  also going to tell you that in 2006 he was honorably

1  discharged.  And when he came home, he pursued his goal of

2  becoming a police officer.  Shortly thereafter, he was hired by

3  the City of Los Banos Police Department.

4      You're also going to hear testimony that he had these

5  issues that he was dealing with, these ongoing issues that he

6  was dealing with.  These issues that, as they began to manifest

7  themself, he, himself, thought they stemmed from his time

8  overseas.

9      In the following years, while he was a police officer for

10  the City of Los Banos, there were incidents that took place

11  concerning Officer Acosta, incidents which let him know that

12  the symptoms that he was experiencing were causing difficulties

13  in him performing his job as a police officer.

14      In fact, in 2011, he ultimately sought out to get and

15  receive disability benefits for these conditions that he was

16  experiencing.  And it was during the course of being evaluated

17  for traumatic brain injury that he told his medical providers

18  that he was experiencing a whole host of symptoms, symptoms

19  that were so troubling that they were interfering with his

20  ability to exercise good judgment.

21      The evidence is going to show, and the testimony that you

22  will hear, is that Dr. Shuman told Officer Acosta that he

23  needed to have additional psychotherapy appointments in order

24  to manage and deal with this condition, with his PTSD,

25  post-traumatic stress disorder.  Instead of following his

1   doctor's advice, he never returned, and he went back to

2   performing his duties as a police officer.

3        Now, on September 2nd of 2013, my client, Tan Lam, was home

4   with his son Sonny Lam.  You'll hear evidence from Mr. Lam,

5   he's going to testify, that Sonny Lam lived with he and his

6   wife, who is now deceased.  That Sonny Lam and this family,

7   they had lived in a home that Sonny had purchased with the

8   income that he earned when he was working in tech.  Sonny Lam

9   was 43 years old on the date of the incident when he was shot

10  and killed.

11       You're going to hear from Mr. Lam that, essentially, about

12  a year or so prior to Mr. Acosta coming to the Lam home that

13  Sonny had stopped taking his medication.  You see, you're going

14  to hear from Mr. Lam that Sonny was diabetic and schizophrenic.

15       During the course of that year, and those months, he

16  started to act out of character, he started to act bizarrely.

17  The Lam family, as you will hear, were trying to figure out

18  what to do, how to get Sonny back on track with his

19  medications.  They ultimately decided, after discussing amongst

20  themselves and consulting with other people, that if the day

21  came when Sonny either acted out and destroyed property,

22  threatened his father, that that would be a day that they

23  would -- that Sonny would be forced to take his medication by

24  way of the police, because they would be able to call the

25  police to come out and give him the help that he needed by

1   taking him to a hospital where he could be forced to take

2   medicine.

3        So, on September 2nd of 2013, Sonny acted out.  Mr. Lam and

4   Sonny got into an argument.  During the course of that

5   argument, Sonny slapped at his father.  During the course of

6   this day, Sonny cursed at his father.  This was out of

7   character for Sonny.  And Mr. Lam thought, this is the day I'm

8   going to call the police and they're going to get my family and

9   my son the help he needs.

10       Mr. Lam, as you may know, and you will hear during the

11   course of this trial, speaks limited English.  He can

12   understand some, and he can speak some as well.  Because of

13   that, he drove to a neighbor's house and he asked her to call

14   the police for his son.  Once again, in his mind, he's seeking

15   help.

16       You're going to hear the testimony that the neighbor called

17   the police and told dispatch about the confrontation that Sonny

18   and his father had had.

19       You're going to hear further testimony that it was at that

20   time that Officer Acosta, who was on patrol in the City of Los

21   Banos, was dispatched to this call.

22       Witnesses are going to tell you that Officer Acosta arrived

23   at the scene with Mr. Lam outside of the home.  Officer Acosta

24   got there and asked Mr. Lam, essentially, what was going on.

25   Mr. Lam communicated as best he could.  He said words to the

1   effect, and he's going to tell you, my son, he's lost his mind.

2   What are you going to do about this?

3       Officer Acosta went with Mr. Lam into the family home.

4   They went to Sonny's bedroom and opened the door.  You're going

5   to hear from Mr. Lam, as well as Officer Acosta, that when they

6   opened that door, Sonny was sitting there, at his desk, clothed

7   in just basketball shorts, no shirt on, no shoes either.  And

8   that when the door opened, Sonny looked at them, and Officer

9   Acosta tried to get Sonny to come outside to the car.  You're

10  going to hear how, at that point in time, Sonny wanted them to

11  just get out of the room, tried to shoo them out of the room.

12  Officer Acosta touched Sonny and tried to take him out of the

13  room, and when that happened, there was a struggle.

14      You're going to hear that during the course of the struggle

15  they moved from this bedroom, Sonny's bedroom, out into the

16  hallway, and that it's at that time that Officer Acosta told

17  Mr. Lam to back away.

18      You're going to hear that Mr. Lam complied with the

19  officer's orders and gave Officer Acosta and his son space.  In

20  fact, he walked -- in fact, he walked around the corner of a

21  hallway -- he walked around the corner of the hallway, and at

22  that time he heard the first gunshot.  And as he heard this

23  gunshot, he came back around the corner to see what had taken

24  place.  Officer Acosta told him to back away again.  And it was

25  as he was backing around -- backing away, with his back turned

1   to Officer Acosta and his son, that he heard the second

2   gunshot.

3        Now, Mr. Lam is going to tell you the last time he saw his

4   son, his son didn't have anything in his hands.  He's going to

5   admit that there was a tussle, but that his son had nothing in

6   his hands.  And that when he came back around, after hearing

7   these two gunshots, he saw Officer Acosta with his gun out, his

8   son on the ground bleeding, moaning in pain.  You're going to

9   hear the testimony of Mr. Lam as he describes what took place

10  during those moments.

11       You're also going to hear the testimony, and the defendants

12  are going to tell you, that what took place was lawful, and

13  that Officer Acosta was following his training.

14       See, there is a dispute, and you're going to hear from the

15  defendant himself, he's going to tell you that Sonny grabbed a

16  pair of scissors, tried to stab him with those scissors, and

17  was holding onto Officer Acosta's gun, and that is when the

18  first gunshot went off.  The defendant is also going to tell

19  you that Sonny did not stop his attack.  He continued coming at

20  Officer Acosta, and then Officer Acosta fired the second shot,

21  which struck Sonny in his abdomen.

22       Now, they may also play, the defendants, other -- give you

23  other evidence, such as the radio dispatch, where Officer

24  Acosta tells the 911 dispatcher that he shot Sonny, that he

25  dropped some scissors.  However, the defendants have also hired

1    experts that are going to come in here, you'll hear them on the

2    stand, we expect their police practice expert to say that the

3    officer's use of deadly force was okay, that it was in policy,

4    and it was justified due to Sonny attacking Officer Acosta with

5    the scissors.

6        We also expect the defendant's other expert, Alexander

7    Jason, to come to court, and he's going to testify right there

8    on the stand that the medical examiner, who examined Sonny's

9    body after the shooting, had it all wrong.  You're going to

10   hear the defendant's expert say that the angles, the trajectory

11   of the bullets that the medical examiner examined the body and

12   determined, that he just had it all wrong, that the medical

13   examiner has the incorrect angles, and that that proves that

14   Officer Acosta, what he did was correct.

15       You also may hear from the defendant's psychologist,

16   Dr. Everstine, who is going to say that despite the symptoms

17   Officer Acosta admittedly was suffering from, that,

18   essentially, there is nothing wrong.  That it's okay.  That

19   there was no indication that Officer Acosta was going to become

20   violent, or that these symptoms were going to interfere with

21   his ability to do his job.

22       However, you will also hear testimony about how Officer

23   Acosta has changed this story each time he tells it.  You're

24   going to hear evidence that each time Officer Acosta tells the

25   story about what took place, there is additional facts that are

1  added; that he never mentioned to anyone at the scene that

2  there was a struggle for the gun.

3      You're also going to hear evidence from the Department of

4  Justice, who is going to say that much of the physical evidence

5  that they would expect to be present, that would corroborate

6  Officer Acosta's testimony, wasn't processed and it's just not

7  there.

8      You will hear conclusions from our experts, where they're

9  going to tell you that given Officer Acosta's story --

10              MR. ALLEN:  Objection.  Argument.

11              THE COURT:  Overruled.

12              MR. POINTER:  -- given Officer Acosta's version of

13  events, the experts are going to give their conclusions, their

14  opinions, that the evidence doesn't match up.

15      Now, keep in mind, this case is going to come down, and

16  you're sitting there, weighing credibility, there is only two

17  people who know exactly what took place, Sonny Lam, who is

18  passed away, and Officer Acosta, who you will hear has much to

19  lose as well as much to gain.

20      You will also hear from our police practice expert, who is

21  going to tell you about the procedures, and how those

22  procedures -- the proper procedures weren't followed.

23      You're going to hear from Mr. Lam that the last image he

24  had of his son alive is him bleeding profusely on the floor of

25  their family home, of the home that Sonny bought and was taking

1  care of both of his parents in until his mother became ill.

2      You're going to hear that Mr. Lam was taken to the police

3  department, stayed there a number of hours, and it wasn't until

4  sometime around midnight that he was told that his son was

5  dead.  And once he was told that, Mr. Lam was driven back to

6  his home and he was alone.  When he made it back to his home,

7  he couldn't even go in because they were still processing it.

8      You're going to hear the evidence and testimony that once

9  Mr. Lam made it back into his home, he was forced to walk down

10  that very hallway where his son lay bleeding --

11          MR. ALLEN:  Objection.  Irrelevant.

12          THE COURT:  Sustained.

13          MR. POINTER:  You're going to hear evidence about

14  Mr. Lam's damages as it relates to what he saw and what he

15  endured once his caretaker, once his son, once his child was

16  taken from him by Officer Acosta.

17      Thank you.

18          THE COURT:  All right.  Thank you, counsel.

19      It is now 12:10.  I'm going to go ahead and take our noon

20  recess at this point in time, as I told you we would.  Because

21  we've run over ten minutes, I'll have you come back at 1:40

22  p.m.  1:40.  At that time, defense will give their opening

23  statement, it should be about the same length of time, I will

24  give what is called a pre-instruction, to give you some more

25  basic understanding of what's going to happen during the course

1    of the case, and then once that is completed, we'll go into the

2    first witness.

3          Any questions at all at this point in time?

4          Please remember your admonitions regarding discussing the

5    case and forming opinions.  We'll see you back at 1:40.

6          We are in recess until that time.

7          (Recess taken, 12:11 p.m.  - 1:56 p.m.)

8              THE COURT:  Counsel, sidebar.

9          (Bench conference.)

10             THE COURT:  According to the clock I looked at, it is

11   now 1:52.  I told them to be here at 1:40.  Come in late again,

12   I'm going to tell them it's your fault and you didn't have

13   enough respect to be here on time.

14         Is that clear for all of you?

15             MR. POINTER:  Yes, Your Honor.

16             MR. ALLEN:  Yes, Your Honor.

17             THE COURT:  Don't mess with me on that one.

18         (Bench conference concluded.)

19             THE COURT:  For the record, all eight jurors are

20   seated, present in the courtroom.  And I apologize for the

21   delay in starting, I told you 1:40, and it's not going to

22   happen again, I promise you.

23         Go ahead.

24             MR. ALLEN:  Thank you, Your Honor.

25                     OPENING STATEMENT BY MR. ALLEN

1            MR. ALLEN:  Ladies and gentlemen of the jury, thank

2     you for your service.  The Seventh Amendment of the

3     Constitution, in many respects, for me, and I think for all

4     attorneys, is it's a right to a jury by trial [sic].  And the

5     idea of the right to a jury by trial [sic] is that we have

6     differences, and one of the greatest things this country offers

7     is we get to settle these differences in a civil manner, in a

8     civil lawsuit, when we have a dispute that we can't resolve

9     outside the courtroom.  And it means that both sides get to

10    come in and talk to their peers.

11         You are the peers of Jairo Acosta and Tan Lam.  And, in

12    that respect, it's our obligation, Mr. Pointer and I, his

13    colleague, Melissa Nold, to bring you the evidence.  We will

14    present the evidence, His Honor will present the law.  We will

15    argue what the evidence and the law should mean at the end of

16    this trial.  And you, the peers of the parties, will make that

17    decision.  I want to thank you on behalf of Mr. Pointer,

18    Ms. Nold, their client, my client and this Court.

19         We know a tragic event occurred.  We have to rewind that

20    tragic event to understand why, and I'm going to tell you how

21    this evidence will present; the forensic evidence, as well as

22    the very limited eyewitness evidence, because there are only

23    two eyewitnesses to this case, Jairo Acosta and Tan Lam.

24         But I do have to start with Jairo Acosta.  Jairo Acosta

25    joined the Army, was assigned to the artillery, and served in

1    Iraq.  And during this time in Iraq, where he went voluntarily,

2    he was involved in patrol duties at a very volatile time in

3    Iraq.  He and his squad experienced IEDs, improvised explosive

4    devices, that would go off.  They were in fire fights.  They

5    did building searches.  They were under mortar attack.

6        When he came back, he didn't experience any problems with

7    anything, or so he thought.  He was a young man who believed

8    that, as many believe, they are invulnerable.  And when he

9    comes back and he takes the job with the Los Banos Police

10   Department, he did so after going through an exhaustive

11   background examination, both physical and mental examinations,

12   as well as, then, an approximately 30-week course work in an

13   academy where he was taught police skill sets.  Police skill

14   sets that included what the law is, how you are empowered to

15   enforce the law if you develop reasonable belief in probable

16   cause, and, because of the nature of the job, how to defend

17   themselves in tense and uncertain situations where things can

18   get -- go from unpredictable to dangerous in a split second.

19   And he was taught those skill sets and he went to the street.

20       For four years prior to the incident, he patrolled the

21   streets of Los Banos.  He experienced what many police officers

22   do, and over a period of time he started getting nightmares and

23   he had insomnia.

24       But, you know, he worked -- as you're going to hear him

25   tell you, he worked with many other combat vets.  It's a

1    profession that draws combat vets.  You'll hear from

2    plaintiff's own expert, Mr. Mohandie, that he has been treating

3    law enforcement officers with PTSD from service in Vietnam, the

4    Grenada, to the first Iraq war, to the second Iraq war, who go

5    on and perform their jobs on the street.  They learn coping

6    skills for their PTSD.  It's not uncommon.

7         And Jairo Acosta, troubled by his nightmares and insomnia,

8    and at the urging of his wife, started talking to some of the

9    other combat vets.  And they told him, you may have a brain

10   injury from the explosions, but go see the VA.

11        For those -- and you'll hear, if you're unfamiliar with the

12   VA, Veterans Administration provides services for veterans of

13   combat.  He clearly fit that criteria.

14        So, he went out to Merced, in February of 2011, because he

15   was having ringing in his ears, he was having insomnia, he had

16   some eyesight issues going on that he didn't know, you know,

17   did he need glasses, and he worried a little bit about, well,

18   maybe I've got something wrong where I need to get some

19   counseling, or some more counseling, or at least tell me what's

20   wrong with me.

21        From Merced he was referred down to Fresno, all in the

22   course of about three weeks, in February of 2011.  And during

23   that time he saw Dr. Shuman, who you are going to hear his

24   testimony by way of his deposition, because he could not

25   appear, and a nurse assistant by the name of nurse Jimenez,

1    again, by deposition because they are unavailable to appear,

2    and I want you to listen very closely to what they say.

3        You're going to hear from them that there was no reason for

4    them to tell Officer Acosta, Jairo Acosta, that he wasn't fit

5    for duty.  He was not at any time given information that he

6    shouldn't or couldn't do his job.  What he was told was, you

7    have post-traumatic stress disorder, we'd like you to come to

8    counseling, but you need to learn coping skills.

9        They gave him material for his coping skills with respect

10   to his nightmares, his insomnia, some anxiety he was

11   experiencing, and he started practicing those.  He practiced

12   them by speaking to the other combat vets, getting into, kind

13   of, a peer group, an informal peer group, with other guys that

14   had served in combat, and then he resumed his duties -- he just

15   continued his duties.

16       From February of 2011, through and including the date of

17   this shooting, he didn't have any incidents where he had to

18   fire his gun.  From that period of time, September of 2013, he

19   didn't have any complaints against him for excessive use of

20   force.  He did his job.  He made arrests.  He assisted people.

21   He responded to runs.  He backed up others.  He didn't have any

22   problems.  And at no time did the VA contact the Los Banos

23   Police Department to tell them there was an issue.

24       So, you're going to hear in the evidence, and listen to

25   Dr. Shuman, and listen to nurse Jimenez, this was a police

1    officer who was fully functional and perfectly suited to return

2    to duty, and he did return to duty, and he did his job as he

3    was trained to do, as he will testify.

4        Now, in the training he received, as you'll hear, not just

5    from Jairo but from an expert by the name of Roger Clark, who

6    is the plaintiff's expert, and from our expert, Steve

7    Papenfuhs, you will hear that there is a whole course of

8    training on how to try to act to help or control people as you

9    have to use force when you are required to use force.

10       And that takes us to the day of the call.  On the day of

11   the call, Jairo Acosta was on patrol duties, and he received a

12   report that a man reporting he had been assaulted would be in

13   front of Vine Street, his home address -- I dare not -- I think

14   it's 624, but I may be incorrect on the exact number -- and he

15   was supposed to meet him in front.  But it was put out as a

16   nonurgent call.  He was just a reportee, as a victim.

17       Jairo Acosta took about ten minutes to get there, because

18   the man wasn't at the site when he received the call, and was

19   told he'd be about ten minutes behind.  When Jairo pulled up,

20   he saw Mr. Tan Lam standing out on his sidewalk, and he

21   approached him and he asked him what was wrong.  And Mr. Lam,

22   who doesn't speak English, or very limited English, made

23   gestures, suggesting this, towards his head, which Jairo Acosta

24   took to mean, well, if it's an assault, this must mean he got

25   hit in the head.  So he looks at his lip, and he sees dried

1   blood on his lip, but it's dry, it's old.

2       So he asked him what happened.  And, unfortunately, the

3   language barrier was such that all he keep hearing was this,

4   swinging his hand, my head, my head.  So Jairo asked, well,

5   what do you want to do?  He says, my son.  And he says, come

6   with me.

7       So he takes Jairo and leads him into the garage.  And we're

8   looking at a rancher-style, one-level house.  We saw a diagram

9   of it.  I'm sorry, I don't have that right in front of me.

10  They go in through the garage, through a laundry room and into

11  a hallway.  And the first door on the right of the hallway is

12  the bedroom of Sonny Lam.  The bedroom of Sonny Lam, as you

13  will see when it shows up on your computer -- there we go --

14  this is looking into the bedroom from the doorway.  You're

15  looking into the bedroom from the hallway, standing at the

16  doorway, that is where Sonny Lam was situated.  He was sitting

17  in that chair, approximately ten feet from where the door

18  entrance threshold is.

19      He turns and faces Officer Acosta, and in the course of

20  approximately six minutes -- so, there is a period of time -- a

21  conversation starts.  Officer Acosta, Jairo, says, can I talk

22  to you?  He stands up and starts yelling at him, get out, get

23  out.  Tan Lam has walked in and he stood aside of Jairo.  He

24  says, I just want to talk to you.  And over the course of the

25  next four or five minutes, Jairo Acosta is trying to get Sonny

1   Lam to tell him what happened, and all Sonny Lam is doing is

2   yelling at him, screaming at him, and getting more agitated.

3       Jairo Acosta has gotten up maybe four feet from where Sonny

4   Lam is now standing, kind of arm's -- they can reach out and

5   touch each other if they both reach out.  And he's continuing

6   to try and encourage him to just come outside, come and talk to

7   me, I need to find out what's happening.  Sonny Lam says, no,

8   and he sits back down.  So Jairo Acosta goes up, puts his hand

9   on his shoulder to try and guide him to come out, at which

10  point Sonny stands up, slaps his hands away from him and starts

11  screaming at him, get out, get out.

12      About this time, Jairo gets on the radio, you'll hear it in

13  the transmission, and he asks for a roll-by.  So, in police

14  vernacular, a Code 4 means things are under control.  But an

15  officer, instead of going to a higher code to stress emergency,

16  will oftentimes, just as Jairo will explain, radio out, beat

17  one, or something similar, the neighboring beat, can you roll

18  by.  It's just a -- how to back another officer up.  Things

19  he'd learned in the academy, things he had learned and done on

20  the street.

21      This officer was an officer by the name of Borchardt, he

22  started rolling over there.  He continues, then, to start to

23  talk to Jairo -- Jairo is trying to talk to Sonny, and ask him

24  to come out, when suddenly Sonny turns his back on him, goes

25  over to the desk right in front of that chair, and he opens the

1    drawer, and Jairo Acosta sees three packs of cigarettes.  And

2    those cigarettes are sitting there, and the first thing Jairo

3    thinks, he's going to grab a smoke, it's a calming mechanism,

4    because that's what the soldiers did in Iraq.  If they came out

5    of something that had gotten their adrenaline up, a smoke would

6    be a way of calming down, he'll tell you that.  So, the first

7    thing in his mind, ah, he's just going to grab those smokes and

8    he's going to come out and walk outside with me.

9        Except, instead, he grabs red-handled scissors with a

10   four-inch blade, that when put together represents a stabbing

11   tool.  And he turns around and he goes like this, and he starts

12   walking at Officer Acosta.

13       Now, Officer Acosta does what police officers do; he

14   retreated.  Took his gun out, backed up to keep space, held his

15   gun out and said, stop, don't come any farther, words to that

16   effect.  I'll let Jairo explain that to you.  But he comes out

17   in a stance, as he's taught to do, gets his handgun out, which

18   is a .45 semiautomatic pistol.  This is one that isn't a

19   revolver like the old six guns in the westerns, this is a

20   magazine that comes from the -- through the handle and a single

21   barrel out.

22       And he gets out like this, only Sonny doesn't stop.  Sonny

23   keeps coming at him, and with his left hand reaches out and

24   grabs the gun and gets his hand on top of Mr. -- Officer

25   Acosta's hand and gun and tries to yank at it.

1       So Officer Acosta has got his other hand, he comes over and

2    he's trying to free it, when suddenly Sonny comes down and

3    stabs him right in the hand -- right in the forearm.

4       When he does that, they start wrestling.  He let's his arm

5    off, they're wrestling, he's pulling back, he's trying to break

6    free from him and he fires, fires his first shot.

7       That first shot struck Sonny in the right calf.  It was

8    what they call a through and through.  So, as it goes through,

9    it goes through the calf muscle, it hit the ground.  It hit the

10   ground in his bedroom.  And you'll see right in front of the

11   marker 4, that represents a bullet entry wound into the carpet.

12   Below the carpet was a concrete floor.  As a result, the

13   concrete floor caused it just to skid along.  Like skipping a

14   stone on the lake, it just skids on the top.  The importance of

15   that is that's where it stopped.

16      But if you look up in front, you'll see the first of the

17   blood signs.  The evidence in this case is about forensic

18   evidence.  The forensic evidence that tells, factually, where

19   they were when different events occurred.  And as a result is

20   an explanation of how Jairo Acosta takes his first shot after

21   he's already backed out of the door and he's in the hallway.

22      Now, blood starts a trail.  When you look at this trail,

23   and you see number three, four is where the bullet lodged on a

24   downward trajectory through and through his right leg.  The

25   blood drops are where an approximation he was first shot, and

1    they go out to the door threshold at number three.

2         During this time now, Jairo Acosta is coming out and his

3    gun jams.  On a .45 semiautomatic, you have what's called an

4    ejection port on the right side of the barrel; or the slide, in

5    technical terms.  When a round is fired, the casing that holds

6    the round ejects out of that side port.  If it doesn't, and it

7    jams, the gun can't fire again.

8         Now, here is Jairo Acosta, just fired at a man that stabbed

9    him in the arm, who is holding his gun as he's attempting to go

10   try and pull it away, and he's scared, and he's scared because

11   he believes that four-inch blade, the handle is in the man's

12   hand, so he's coming down like a punch, will come right here.

13   He's got a bulletproof vest on, but the ballistic vest only

14   covers your torso.  This man is five foot nine, he could easily

15   reach Jairo's neck; he's five foot eleven.  And he's fighting

16   for his life, really, to back out and try and clear his gun.

17   And he goes into what's called a tap, rack and roll.  Tap, rack

18   and roll is to try and hit the gun, turn it over, roll it, and

19   all this time he's trying to stay away from this man, because

20   he needs that casing that's lodged in that ejection port to get

21   out.

22        And he does get it out.  And as you can see when you look

23   here, a blood trail going up the hallway, because that's where

24   Jairo Acosta was going, trying to clear his jam, because this

25   man is still coming at him with those scissors.  He's been

1  shot, but it's a through and through in the calf muscle.  This

2  doesn't stop him from staying upright.

3      And Jairo Acosta gets to the corner of the corridor.  It's

4  an L-shaped corridor.  And when he gets there, he starts down

5  the other way, and he can feel this wall on his right, and then

6  he feels it give way, and he's still backing up, trying to

7  clear, when all of a sudden he gets it, clears it, ejects out,

8  and he fires again just as Sonny Lam is right there in the

9  corner where all the blood is.  And this time he shoots him in

10  the body torso, because that's where police officers are

11  trained to shoot.  If they have to use lethal force, there is

12  no such thing as shooting too low.  You'll hear Mr. Clark,

13  Mr. Papenfuhs both tell you, as police procedures experts,

14  that's TV.  Officers are trained to shoot to the body torso,

15  because in the highest of stress situations, when it's so tense

16  and so uncertain, it's very easy to miss.

17      He gets there, he ejects, he fires, Mr. Lam keeps coming,

18  starts struggling, staggers, goes back, falls down.

19      Why do we know the shooting took place there?  Because

20  you're going to hear the experts who are going to testify that

21  there are two shell casings in that corridor.  These two shell

22  casings, the 9 and the 10 on this photo, are where, when he

23  turns the corner right here, the right side of that gun is now

24  open, the casing clears and flies out, he fires again, the

25  other casing flies out, so they land in close proximity to each

1   other.

2       That evidence puts Jairo Acosta backing down the second

3   hallway, and all that blood establishes where Sonny Lam got

4   shot in the chest.  He staggers forward a couple more feet, he

5   leaves those footprints.  And they'll be explained by the

6   forensic experts that are coming in for both sides, but those

7   are two right feet because his left foot had a flip-flop on.

8   And then after he staggers, he starts retreating and he falls

9   down back in the corner where all the blood is.

10      During this time, Tan Lam had run around the corner, come

11  back momentarily, and run down the hallway to the living room

12  area.  When he was in the living room area, he couldn't see --

13  or even in the hallway, he couldn't see any of this, and he

14  testified he didn't see any of this.

15      About that time, and during this, Officer Acosta, Jairo,

16  had gotten out a Code 9, which is the highest level of response

17  for an officer.  And then he got out, shots fired.  Or, shots

18  fired then Code 9, all within a space of several seconds.  All

19  within a space from the first moment that he came at him with

20  the scissors to the end, which is about two minutes.  In two

21  minutes, all of this happened, after six to seven minutes of

22  trying to talk to him.

23      First officer on the scene was Teresa Provencio.  She runs

24  in, sees Officer Acosta holding him at gunpoint, Sonny Lam is

25  struggling on the ground, he's trying to get up.  Right behind

1  her is Officer Borchardt.  Officer Provencio goes down just to

2  make sure there is nobody else in the house, finds Tan Lam,

3  sees he's not a threat.  Meanwhile, Borchardt comes up, goes to

4  put handcuffs on him, which is standard policy and procedure,

5  and then he starts administering CPR.  He starts doing

6  lifesaving, as he's taught.  Safety first at officers'

7  training.

8       Once that's completed, the ambulance is showing up, more

9  officers are showing up, the scene is secured.

10      Officer Acosta goes outside.  He goes outside, gives what's

11  called a public safety statement; he's obligated to do that.

12  He's then taken to the side of a car by a detective who wants

13  to know what happened, and he tells him, I got stabbed.

14  That's -- it goes right through his shirt.  He goes, were you

15  injured?  He says, I don't know.  So they roll up the

16  shirtsleeve, and you'll see that he had broken skin from the

17  tip of the scissors.

18      He was then provided peer counseling, stayed at the scene

19  for about 25 minutes, taken down to the station and taken to

20  the hospital to be treated, and brought back to the station

21  where he was interviewed five hours later.  He gave a

22  comprehensive interview, that was video recorded, five hours

23  after the incident.  He was deposed three years later,

24  approximately.  He didn't remember as well as he remembered in

25  that video that you'll see if the plaintiff wants to play it.

1    If plaintiff's counsel plays it, you'll hear what he said five

2    hours afterwards.

3        And he'll testify in this trial to the best of his memory,

4    now five years after this.  But always remember, the evidence

5    of his testimony, his interview five hours afterwards.

6        Jairo Acosta went to work that day not expecting to shoot

7    anybody, and he'll tell you that.  He was prepared to protect

8    his life and the life of others, because that's what law

9    enforcement does.  Law enforcement is also called upon to go

10   where the need is, so he went to a scene to investigate an

11   assault.  He'll describe that to you.  And then after that, the

12   unpredictability of law enforcement led him into a situation

13   that he'll describe was tense, it was uncertain, it required

14   split-second decision making to a man armed with scissors, not

15   once but twice tried to come at him to stab him, and then he

16   used lethal force to protect his life.

17       The forensic evidence tells the story.  Experts will talk

18   about that forensic evidence.  Officer Acosta, Jairo Acosta,

19   will tell you his story.  Mr. Lam saw very little of this.

20       Thank you.

21           THE COURT:  Ladies and gentlemen, at this time I'm

22   going to give you the pre-instruction that I referred to.  And,

23   again, this is not intended to be a substitute for the more

24   detailed instructions you will receive at the end of the case.

25       Now that you are the jury in this case, it is my duty to

1  give you preliminary instructions on the law.  You must not

2  infer from these instructions, or from anything I may say or

3  do, as indicating that I have an opinion regarding the evidence

4  or what your verdict should be.

5      It is your duty to find the facts from all the evidence in

6  the case.  To those facts, you will apply the law as I give it

7  to you.  You must follow the law as I give it to you whether

8  you agree with it or not.  And you must not be influenced by

9  any personal likes or dislikes, opinions, prejudices or

10  sympathy.  That means that you must decide the case solely on

11  the evidence before you.  You will recall that you took an oath

12  to do so.

13      In following my instructions, you must follow all of them

14  and not single out some and ignore others.  They are all

15  important.

16      When a party has the burden of proof on any issue by a

17  preponderance of the evidence, it means you must be persuaded

18  by the evidence that the claim is more probably true than not

19  true.  You should base your decision on all of the evidence,

20  regardless of which party presented it.

21      The evidence that you are to consider in deciding what the

22  facts are consists of the following:

23      1.  The sworn testimony of any witness;

24      2.  The exhibits which are received into evidence; and

25      3.  Any facts to which the lawyers have agreed.

1      If that does occur, that is called a stipulation.  And if

2   there is a stipulation, I will let you know that this is based

3   upon an agreement between the attorneys, and you are to

4   consider any evidence that is to be admitted pursuant to

5   stipulation as having been proved here in court.

6      In reaching your verdict, you may consider only the

7   testimony and exhibits that are actually received into

8   evidence.  Certain things are not evidence, and you may not

9   consider them in deciding what the facts are.  I will now list

10   them for you.

11      1.  Arguments and statements by lawyers are not evidence.

12   The lawyers are not witnesses.  What they have said in their

13   opening statements, will say in their closing arguments, and at

14   other times during the trial is intended to help you interpret

15   the evidence but it is not evidence.  If the facts as you

16   remember them differ from the way the lawyers have stated them,

17   your memory of them will control.

18      2.  Questions and objections by lawyers are not evidence.

19   Attorneys have a duty to their clients to object when they

20   believe a question is improper under the rules of evidence.

21   You should not be influenced by the objection or by the Court's

22   ruling on it.

23      3.  Any testimony that has been excluded or stricken or

24   that you have been instructed to disregard is not evidence and

25   must not be considered when you are engaged in your

1   deliberation.

2       In addition, there may be sometimes testimony and exhibits

3   will be received only for a limited purpose.  If that occurs, I

4   will give you a limiting instruction and you must follow that

5   instruction.

6       4.  Anything you may have seen or heard when the court was

7   not in session is not evidence.  You are to decide the case

8   solely on the evidence received at the trial.

9       And, again, if I do instruct you that an item of evidence

10  has been admitted for a limited purpose, you must consider it

11  only for that limited purpose and for no other.

12      Evidence may be direct or circumstantial.  Direct evidence

13  is direct proof of a fact such as testimony by a witness about

14  what that witness personally saw, heard or did.  Circumstantial

15  evidence is proof of one or more facts from which you could

16  find another fact.  You should consider both kinds of evidence.

17  The law makes no distinction between the weight to be given to

18  either direct or circumstantial evidence.  It is for you to

19  decide how much weight to give to any evidence.

20      There are rules of evidence that can control what can be

21  received into evidence.  When a lawyer asks a question or

22  offers an exhibit into evidence, and a lawyer on the other side

23  thinks that it is not permitted by the rules of evidence, the

24  other lawyer may object.  If I overrule the objection, the

25  question may be answered or the exhibit received.  If I sustain

1    the objection, the question cannot be answered and the exhibit

2    cannot be received.  Whenever I sustain an objection to a

3    question, you must ignore that question and not speculate or

4    guess what the answer might have been.  There may be times that

5    I will order that evidence be stricken from the record and/or

6    that you are to disregard or ignore that evidence.  That means

7    that when you are deciding the case, you must not consider the

8    evidence that I told you to disregard.

9         In deciding the facts in this case you may have to decide

10   which testimony to believe and which testimony not to believe.

11   You may believe everything a witness says, or part of it, or

12   none of it.

13        Proof of a fact does not necessarily depend on the number

14   of witnesses who testify about it.

15        In considering the testimony of any witness, you may take

16   into account any or all of the following:

17        1.   The opportunity and ability of the witness to see or

18   hear or know the things testified to;

19        2.   The witness' memory;

20        3.   The witness' manner while testifying;

21        4.   The witness' interest in the outcome of the case and

22   any bias or prejudice;

23        5.   Whether other evidence contradicted the witness'

24   testimony;

25        6.   The reasonableness of the witness' testimony in light

1   of all the evidence; and

2        7.   Any other factors that you believe bear on

3   believability.

4        The weight of the evidence as to a fact does not

5   necessarily depend on the number of witnesses who testify about

6   it.

7        A few words about your conduct as jurors.  I want to

8   emphasize, again, that you must please keep an open mind

9   throughout the trial, and do not decide what your verdict

10  should be until you and your fellow jurors have completed your

11  deliberations at the end of the case.

12       Second, because you must decide the case based on only the

13  evidence received in the case, and on my instructions as to the

14  law that applies, you must not be exposed to any other

15  information about the case, or to the issues it involves during

16  the course of your jury duty.  So, therefore, until the end of

17  the case, or unless I tell you otherwise, do not communicate

18  with anyone in any way, and do not let anyone else communicate

19  with you in any way about the merits of the case or anything to

20  do with it.  This includes discussing the case in person, in

21  writing, by phone or electronic means via e-mail, text

22  messaging or any internet chatroom, blog, website or other

23  feature.

24       This applies to communicating with your fellow jurors until

25  I give you the case for deliberation, and it applies to

1    communicating with everyone else, including your family

2    members, your employer, the media or press and the people

3    involved in the trial.  Although, you may notify your family

4    and your employer that you have been seated as a juror in this

5    case.  But if you are asked or approached in any way about your

6    jury service, or anything about this case, you must respond

7    that you have been ordered not to discuss the matter and then

8    report that contact to the Court.

9         Because you will receive all of the evidence and legal

10   instruction you properly may consider to return a verdict, do

11   not read, watch or listen to any news or media accounts or

12   commentary about this case or anything to do with it.  Do not

13   do any research such as consulting dictionaries, searching the

14   internet, or using other reference materials, and do not make

15   any investigation or in any other way try to learn about the

16   case on your own.

17        The law requires these restrictions to ensure the parties

18   have a fair trial based on the same evidence that each party

19   has had an opportunity to discuss.

20        A juror who violates these restrictions jeopardizes the

21   fairness of these proceedings.  If any juror is exposed to any

22   outside information, please notify the Court immediately.

23        During your deliberations, you will have to make your

24   decision based on what you recall of the evidence.  You will

25   not have a verbatim transcript of the trial during your

1    deliberations.  I, therefore, urge you to play close attention

2    to the testimony as it is given.  If at any time you cannot

3    hear or see the testimony, evidence, questions or arguments,

4    let me know so I can correct the problem.

5        If you wish, you may take notes to help you remember the

6    evidence.  If you do take notes, please keep them to yourself

7    until you and your fellow jurors go to the jury room to decide

8    the case.  However, while taking notes, please do not let the

9    taking of notes distract you from the ongoing trial.  When you

10   leave, your notes should be left in the jury room.  No one will

11   read your notes and they will be destroyed at the conclusion of

12   the case.

13       Whether or not you take notes, you should rely on your own

14   memory of the evidence.  Notes are only to assist your memory.

15   You should not be overly influenced by your notes or those of

16   your fellow jurors.

17       There may be languages other than English used during this

18   trial.  The evidence to be considered by you is only that

19   provided through the official court interpreters.  Although

20   some of you may know the language that is used, it is important

21   that all jurors consider the same evidence, and that will be

22   what is stated by the court interpreter.  You must accept the

23   English interpretation given by the interpreter and disregard

24   any different meaning.

25       As you have seen here today, from time to time it may be

1    necessary for me to speak to the attorneys outside of your

2    hearing, either by having a conference at the bench, when the

3    jury is present in the courtroom, or by simply calling a

4    recess.  Please understand that while you are waiting, we are

5    working as diligently as possible to not keep you waiting.  The

6    purposes of these conferences is not to keep relevant

7    information from you, but generally to decide how certain

8    evidence will be treated under the rules of evidence and to

9    avoid any confusion and error.

10       And, as I said earlier, I am going to keep the number of

11   conferences to an absolute minimum.  And it may happen that

12   there may be a request to approach by one of the attorneys, and

13   I may deny that request at the time.  If I do deny it, please

14   do not consider that denial as any indication of my opinion of

15   the case or what your verdict should be.

16       As you are observing right now, I am using a laptop

17   computer here on the bench, which I use to take notes, keep

18   track of exhibits, time, and other matters during the course of

19   the trial.  In observing my use of the computer, you're not to

20   consider in any way my actions or movements to suggest how you

21   should decide any questions of fact, or, more importantly, that

22   I may be attaching any particular significance to the testimony

23   of any witness or any item of evidence.  If my using the

24   computer during the trial seems to indicate how you should

25   decide any questions of fact, or that I may be attaching any

1  significance to the testimony of any witness, or any item of

2  evidence, you must disregard my actions and form your own

3  opinion.

4      Now, the way the trial will take place, you've already

5  heard the opening statements of both the plaintiff and the

6  defendant.  And, remember, an opening statement, in and of

7  itself, is not evidence.  You were shown demonstrative evidence

8  here in the form of pictures.  Those pictures have not been

9  admitted into evidence as of this time, it was simply used to

10  help you understand what each party believes the evidence will

11  show as we go through the trial.

12      Plaintiff will now begin to present evidence, and counsel

13  for the defense will be able to cross-examine that witness.

14  Then the defendant may present evidence, it's up to the

15  defendants to choose, and counsel for the plaintiff may then

16  cross-examine any defense witnesses.

17      After all the evidence has been presented, I will instruct

18  you on the law that applies to the case and the attorneys will

19  make their closing arguments.  It is at that time that you will

20  go to the jury room to deliberate on your verdict.

21      That will conclude my pre-instructions.  At this time we

22  will now begin with the presentation of evidence on behalf of

23  plaintiff.

24          MR. POINTER:  Yes, Your Honor.  The plaintiff calls

25  nurse practitioner Jimenez.  We're going to read that

1    deposition into the record, Your Honor.

2              THE COURT:  Yes.  There is going to be, I understand,

3    several times, or at least a couple of times, that the actual

4    person who is giving the testimony is not available and will

5    not be able to be here on the witness stand.  What we are going

6    to do in place -- and I'll tell you that a deposition, if

7    you're not aware, is the taking of testimony from a witness who

8    is under oath, the same as they would be if they were in this

9    courtroom here, so you are to take the testimony here as sworn

10   testimony.

11       The procedure that I'm going to follow is that there will

12   be someone who will sit in the witness chair, in the witness

13   box, who will read the response, which would be of the actual

14   witness, there will be a person who will be reading the

15   questions, so that there will be an actual dialogue between the

16   two of you.

17       During the time that this is happening, counsel, I'm going

18   to tell you that the court reporter will not be taking down the

19   back and forth as it has already been placed into deposition

20   format.

21       Is that understood?

22             MR. ALLEN:  Stipulated, Your Honor.

23             MR. POINTER:  Yes, Your Honor.

24             THE COURT:  All right.  Thank you.

25       All right.  If you'd go ahead and produce your reader, or

1    whoever you want.

2              MR. POINTER:  Yes.  Your Honor, do you have a copy?

3    I want to make sure the Court has a copy.

4              THE COURT:  No, I don't.

5              MR. POINTER:  I have a copy.

6              THE COURT:  What binder is it in?  I probably have it

7    behind me.  Do you have an exhibit number?

8              MR. POINTER:  Yes, Your Honor.  This is Exhibit 9,

9    Your Honor.

10             THE CLERK:  Can we have your name for the record?

11   Please state and spell your name for the record.

12             MS. CRAVANAS:  My full name?

13             THE CLERK:  Yes, please.

14             MS. CRAVANAS:  Just first and last?

15             THE CLERK:  Yes.

16             MS. CRAVANAS:  Briana Cravanas; B-R-I-A-N-A,

17   C-R-A-V-A-N-A-S.

18             THE CLERK:  Thank you.

19             MR. POINTER:  Starting from page 6.

20       (Reading.)

21             THE COURT:  Excuse me, counsel.  What page are you

22   on?

23             MR. POINTER:  Page 17.  I'm sorry, Your Honor.

24             THE COURT:  This doesn't have the highlights.

25             MR. ALLEN:  Your Honor, you can have my copy.  This

1    is part of our meet and confer, there were a few extra that

2    were added.

3                THE COURT:  Thank you.

4                MR. POINTER:  Sorry about that, Your Honor.  Begin

5    again, Your Honor, on page 17, line 16.

6                THE COURT:  Yes.

7         (Reading.)

8                MR. ALLEN:  Objection.

9                THE COURT:  What is the basis of the objection?

10               MR. ALLEN:  Motion in limine, Your Honor.

11               THE COURT:  I don't believe it's going to go to that

12    portion, if I'm looking.

13               MR. ALLEN:  Item 14.

14               THE COURT:  Except it looks like it's going to stop

15    at sleep.

16               MR. ALLEN:  Thank you, Your Honor.  That's what I'm

17    working off mine.

18               THE COURT:  Okay.

19               MR. ALLEN:  Thank you.

20        (Reading.)

21               MR. POINTER:  At that time, Mr. Allen takes over the

22    examination.

23               THE COURT:  Yes.

24               MR. ALLEN:  Your Honor, before we go any further,

25    there are objections there.  Do you want me to read to the

```
 1    objection and then you'll rule upon them?

 2               THE COURT:  In the transcript?

 3               MR. ALLEN:  They're in the transcript, Your Honor.

 4               THE COURT:  Where are they?

 5               MR. ALLEN:  Page 35, lines -- it would be the

 6    question at 7, on page 35, through line 17.

 7               THE COURT:  What line beginning?

 8               MR. ALLEN:  So, the questions start at page 34, line

 9    19, and at page 35 there is a question at line 7 with a series

10    of objections starting at line 11.  Very short cross by me.

11               THE COURT:  It will be sustained.

12               MR. ALLEN:  May I reserve for argument at the

13    conclusion of the day?

14               THE COURT:  Yes.

15               MR. ALLEN:  Page 34, line 19.

16        (Reading.)

17               THE COURT:  All right.  Thank you.  That takes us

18    right to 3 o'clock.  We'll take our afternoon recess at this

19    time.  Return in 20 minutes.

20        Ladies and gentlemen, please remember the admonition

21    regarding discussing the case and forming opinions.  Thank you.

22        We're in recess.

23        (Recess taken, 3:05 p.m. - 3:27 p.m.)

24               THE COURT:  We're outside the presence of the jury.

25    Is there -- what is the issue?
```

1              MR. ALLEN:  Your Honor, I would like to raise some

2     Daubert as to the foundation, not the expertise, of

3     Dr. Mohandie, and two of his three opinions that he prepared in

4     his written report.

5              THE COURT:  Is this going to happen right now?

6              MR. ALLEN:  Yes, sir.  Make it real quick.

7              THE COURT:  Hurry up.  I don't want to keep the jury

8     waiting any more.

9              MR. ALLEN:  Understood.  I call Kris Mohandie to the

10    stand, Your Honor.

11         (The Witness, KRIS MOHANDIE, is sworn.)

12             THE WITNESS:  I do.

13             MR. ALLEN:  Your Honor, for purposes of this

14    examination, I'm stipulating to his credentials and his

15    expertise in the field of psychology and police practices for

16    purposes of working with police departments.

17             THE COURT:  All right.

18             THE CLERK:  Please state and spell your full name for

19    the record.

20             THE WITNESS:  It's Dr. Kris Mohandie; Kris with a K,

21    K-R-I-S, last name M, as in Mary, O-H-A-N, as in Nancy, D, as

22    in David, I-E.  Dr. Kris Mohandie.

23             MR. ALLEN:  For purposes of examination, Your Honor,

24    this is an examination under Daubert to the foundation of two

25    of the three opinions that officer -- Dr. Mohandie prepared in

1  his report.

2                    VOIR DIRE EXAMINATION

3  BY MR. ALLEN:

4  Q.  The first opinion is that there is evidence that Officer

5  Acosta may have -- may have some anger management, frustration

6  tolerance and impulse control problems, which could lead him to

7  escalate field encounters.

8       The foundation of that opinion, Dr. Mohandie, was that

9  Officer Acosta, three and a half years prior to the incident,

10  used profanity to a person on the street; is that correct?

11  A.  Correct.

12  Q.  And the second foundation to that opinion was that

13  approximately two and a half years later, and still 16 months

14  before this incident, he responded to a house where he thought

15  a shot had been fired, or a rock had been thrown at his car,

16  and when the people did not open the door, he kicked the door

17  five to ten times; is that correct?

18  A.  Yes.

19  Q.  And it was your opinion that it evidenced, in the first

20  case, some bad judgment or heat of the moment, representing an

21  anger issue, and the second one, two and a half years later, he

22  lost his temper and low frustration because he kicked a door in

23  an event that was, to him at least, pursuit of a suspect or

24  some investigation and they weren't responding to his attempts

25  to get in, correct?

1   A.   Something to that effect, yes.

2   Q.   Right.  You don't know anything more about that incident

3   but for what you learned in that IA investigation, correct?

4   A.   True.

5   Q.   You didn't talk to Officer Acosta to find out anything

6   about this, correct?

7   A.   True.

8   Q.   Wasn't explored in his depo at any great length, was it?

9   A.   I don't recall that, no.

10  Q.   In the first incident, on the profanity, again, you didn't

11  talk to him about it?

12  A.   No.

13  Q.   You don't know anything else about it but for what the IA

14  talked about, his use of profanity?

15  A.   Right.  And the discipline he received.

16  Q.   And the discipline.  But the discipline is independent.

17  You didn't talk to the IA investigators about how they reached

18  that conclusion that -- was it because he violated the code of

19  conduct with profanity, or was it because of anger, did you?

20  It wasn't in the IA report, was it?

21  A.   True.

22  Q.   All right.  So to the extent -- what other incidents

23  besides those two incidents in the three-and-a-half-year period

24  would suggest that he had anger issues or temper issues prior

25  to this shooting?

1   A.   Those would be two instances of behavior in the field that

2   demonstrate, to me, strong evidence that there are anger,

3   temper, low frustration tolerance issues, and that would be

4   consistent with how other psychologists would see that, that

5   work in the field of police psychology.

6   Q.   Isn't it true that in your field, as a psychologist, that

7   the paramount means of determining whether someone has anger

8   issues or other issues is to examine them?

9   A.   That's one method.  But part of when you are looking at

10  issues of potential work fitness issues, and that kind of

11  thing, the usual reason for a referral, or for looking at that

12  as a potential problem, is because of behavior that's

13  demonstrated out in the field, which is what happened here.

14  Q.   Is there a trigger point in any of the material that you

15  rely upon that one incident, or two incidents, or three

16  incidents, or ten incidents over a period of three and a half

17  years, just reading a record, without any further information

18  from the people involved, is enough to trigger something as

19  a -- you're diagnosing him with an anger management issue for

20  these two incidents; is that correct?

21  A.   I'm saying that those are evidence of anger management and

22  impulse control, low frustration tolerance.

23       And is that a diagnosis with a DSM-5?  No.  Those are

24  behaviors, and those are the descriptions that other police

25  psychologists would say would reflect that, and that's what I'm

1   saying.

2   Q.  Last question on this point.

3       Have you referred officers who have shown, over a

4   three-and-a-half-year -- well, let's go from 2/4/10 through

5   5/26/12, that's almost 28 months, those are the only two

6   incidents they've had, have you referred them for anger

7   management, EAP, employment assistance program, or otherwise,

8   based on a use of profanity and two and a half years later a

9   kicking of a door?

10  A.  Absolutely.

11  Q.  Okay.  Thank you.

12      On your second opinion, Officer Acosta has been diagnosed

13  in the recent past, relative to this fatal shooting, with

14  symptoms of post-traumatic stress disorder, as well as symptoms

15  consistent with alcohol abuse disorder.  There is no evidence

16  these issues were ever treated or resolved, but there is

17  evidence it may have impacted his decision making in response

18  to certain incidents.

19      Those are the two incidents you referred to above?

20  A.  Yes.

21  Q.  So, in two incidents that are over a course of three and a

22  half years before the shooting, and a diagnosis of PTSD, that

23  you believe that he had PTSD at the time?

24  A.  I believe that that supports -- it's consistent with PTSD,

25  yes.

1   Q.   Was he unfit for duty at the time of the shooting?

2   A.   That's a question.  I believe it needed to be assessed, and

3   that's what my opinion is, is that he was -- there is no

4   evidence he was referred either to EAP and/or for a work

5   fitness evaluation so that that could be further assessed.

6   Q.   That's a criticism of the City of Los Banos Police

7   Department, correct?

8   A.   It's also a criticism of the officer, who, according to the

9   procedures or the policies in effect at Los Banos, if you

10  believe you have a mental issue that could impact your job, you

11  have an obligation to tell somebody and address it.

12  Q.   What are you referring to?

13  A.   Policy statement from Los Banos that I have.

14  Q.   And which one is that?

15  A.   If I could refer to my --

16  Q.   Please.

17  A.   Yes.  Policy 1032.

18  Q.   What does it say?  Can you quote that part about the mental

19  health issue?

20  A.   Yes.  There are two parts under Section 1032.2 under

21  employee responsibilities.

22  Q.   And?

23  A.   The first under B is, Each member of this department shall

24  perform his or her respective duties without physical,

25  emotional and/or mental constraints.

1        And, under D, Any employee who feels unable to perform his

2    or her duties shall promptly notify a supervisor.

3        So those would be the two that I believe are related to his

4    responsibilities.

5    Q.   All right.  So, on the second one, if he didn't believe he

6    was incapacitated, he would not have to report that, correct?

7    A.   I would take it a little wider than that.  If he believes

8    it's impacting his job duties, I think that a responsible

9    officer would have stepped forward and said something about it.

10   Q.   What evidence is there that anybody told him he had a

11   mental health problem that prohibited him from doing his job?

12   A.   I believe that he thought he had a mental health problem,

13   according to the records, that he believed he had PTSD.  In his

14   own deposition, he testified he believed he has PTSD.

15   Q.   And that PTSD is something that's common in law

16   enforcement, isn't it?

17   A.   It can be, yes.

18   Q.   And officers with PTSD go to work every day, don't they?

19   A.   Some do, some don't, depending if it's affecting them out

20   in the field.  And if they're engaging in behaviors that are

21   problematic, ideally they should get treated before going out

22   in the field.

23   Q.   Dr. Shuman examined him and he did not feel he was unfit

24   for duty; is that correct?

25   A.   I don't believe Dr. Shuman did a formal work fitness or a

1    return to duty evaluation at all.

2    Q.  Did you do one?

3    A.  No, I didn't.

4    Q.  You haven't examined him?

5    A.  Have not.

6    Q.  You've never spoken with this man to know how he feels,

7    what he was reporting that was related to his PTSD, or

8    determining -- to determine whether or not he was fit for duty

9    on September 2nd?

10   A.  True.

11            MR. ALLEN:  No further questions.

12        Submitted, Your Honor.

13            THE COURT:  Daubert standard is that the trial judge

14   is to be a gatekeeper in determining what -- if there's been

15   any particular scientific expert testimony that precedes from a

16   scientific knowledge that has not been necessarily proven

17   and/or tested.

18        The factors to which the Court will look to is whether the

19   method can or has been tested, the known potential rate of

20   error, whether methods have been subjected to peer review,

21   whether there is standards controlling the techniques,

22   operation, and the general acceptance of the method within the

23   relevant committee.

24        Just so I'm clear, Doctor, you're a psychologist?

25            THE WITNESS:  Yes.  I'm a clinical police and

 1    forensic psychologist.

 2             THE COURT:  How long have you been a psychologist?

 3             THE WITNESS:  I've been licensed in the state since

 4    1989, and board certified in police and public safety

 5    psychology since, I think, 2011.

 6             THE COURT:  All right.  And the techniques that

 7    you're using, are they generally accepted techniques within

 8    your particular profession?

 9        Is there anything that's unique about a scientific

10    methodology that has been -- that you're utilizing to come up

11    with your opinions that has not been tested and peer reviewed?

12             THE WITNESS:  I don't believe so, no, Your Honor.

13             THE COURT:  This is just general being a

14    psychologist?

15             THE WITNESS:  Generally being a psychologist, but a

16    police psychologist, and familiar with the protocols within

17    police departments around these issues.

18             THE COURT:  I understand.

19        I don't find there is any reason for a Daubert motion.

20    This information is within the standard practice of a person

21    who is a psychologist, and I don't believe there needs to be

22    further testing.

23        I think that what happens here is just going to be a

24    rigorous cross-examination, after there's been direct

25    examination, and the jury can make a determination as to what

 1   weight they wish to give, if any, to this witness' testimony.

 2           MR. ALLEN:  Thank you, Your Honor.

 3       And, also, I would bring up one thing.  I asked to reserve

 4   time at the end of the day.  I'll waive that, Your Honor.  I'm

 5   satisfied with the way things went.

 6           THE COURT:  Very well.  Thank you.

 7       Bring the jury in, please.

 8           THE WITNESS:  Would you like me to remain here, Your

 9   Honor?

10           THE COURT:  This is the first witness?

11           MR. POINTER:  Yes.

12           THE COURT:  You can stay there.

13           THE WITNESS:  Thank you, Your Honor.

14       (Jury present, 3:40 p.m.)

15           THE COURT:  All right.  For the record, the jury has

16   returned to the courtroom.

17       Ladies and gentlemen, once again, for the second time

18   today, I apologize for the late start, but there was an issue

19   that I needed to address that deals with this particular

20   witness who is going to be the next witness you're going to

21   have to hear, and I had to make a ruling on that.  So, that's

22   why.  But I will make sure that I will keep you on time as much

23   as possible while I do this, and also informed as to what's

24   happening.

25       You can be seated.

1      Having been a juror myself on several occasions, I

2  understand what it's like to be waiting and not understand

3  what's going on.  So I will try to keep that in mind, and I

4  will give you my word on that.

5      All right, counsel, your next witness, please.

6          MR. POINTER:  Thank you, Your Honor.  Plaintiff calls

7  Dr. Kris Mohandie to the stand.

8          THE COURT:  And, Doctor, you are on the stand, and

9  based upon our prior conversations, you are still under oath.

10     You do understand that?

11         THE WITNESS:  Yes, Your Honor.  Thank you.

12         THE COURT:  Thank you.  If you don't see us swearing

13  him in, he's just been sworn in outside of your presence.

14     Go ahead.

15         MR. POINTER:  Thank you, Your Honor.

16                      DIRECT EXAMINATION

17  BY MR. POINTER:

18  Q.  Can you tell us -- describe what your educational degrees

19  are?

20  A.  Yes.  I have a bachelor's degree in behavioral science from

21  Cal Poly Pomona, earned in 1984.  A master's degree in clinical

22  psychology from the California School of Professional

23  Psychology, earned in 1987.  And a PhD in clinical psychology

24  from that same institution, earned in 1989.  California School

25  of Professional Psychology is an American Psychological

1    Association accredited school in psychology.

2        And then I became licensed in 1991.  I think I may have

3    testified earlier that it was 1989.  '89 is when I got my PhD,

4    '91 is when I became licensed in the state.

5    Q.  Thank you.

6        Can you describe what -- your career path in terms of

7    internships and employment to date?

8    A.  Yes.  My first internship was at a place called Community

9    Services Programs in Anaheim, through the Anaheim Police

10   Department, doing juvenile diversion counseling for first-time

11   offenders.  That was '86-'87.

12       '87-'88, I worked in a community-based mental health center

13   in Pomona, working with severely mentally ill people, as well

14   as outpatient.  So, day treatment, outpatient, psychiatric

15   emergency team with people that needed to be evaluated for

16   danger to self, others, whether they need to be 5150'ed, which

17   is the code for involuntarily hospitalization in the state of

18   California.

19       And then, '88-'89, I worked in an internship, before I got

20   my PhD, with developmentally disabled kids and adults with

21   behavior problems.

22       Immediately upon graduating, I went to work with the Los

23   Angeles Police Department in their behavioral science unit,

24   where I was from 1989 through 2003.

25       Upon becoming independently licensed in '91, I continued to

1   work in a private practice until, ultimately, in 2003 I left

2   the LAPD to work in full-time private consulting through my

3   company, Operational Consulting International.

4      I continue to, present day, work with some law enforcement

5   agencies, including Pasadena Police Department.  And in the

6   past have worked with the FBI and some other agencies.

7   Q.  Thank you.

8      Given you mentioned that you worked with law enforcement

9   agencies, can you describe your experience, if any, in terms of

10  working directly with police officers?

11  A.  I've counseled and assessed literally thousands of officers

12  across my career, after shootings, or just for the normal

13  troubles of life that everybody has, or other traumatic events.

14     About 60 to 70 percent of the officers I would see would

15  come in self-referred, and then another -- the 20 to 30 percent

16  would be ordered in for they've been in a shooting or they're

17  having performance or behavioral concerns.  That's at the LAPD.

18  That's kind of what it's like with other agencies I've

19  consulted with as a consulting psychologist.

20     So, I would do counseling, I would also do consultation to

21  various investigative or operational entities like the

22  negotiation team, actually going out in the field with

23  incidents or in-progress to help the team assess the person,

24  figure out strategies to deal with them, and so forth.

25     And then I would do some lecturing and other kinds of

1    consultations.

2        And I'd regularly consult with management about employee

3    concerns, and how to deal with issues involving employees that

4    might be demonstrating problems.

5    Q.  When you say employment concerns, or employee concerns, can

6    you describe what that means, please?

7    A.  It can be an officer, for example, that is having personal

8    problems that the supervision becomes aware of, or they start

9    having personnel complaints that suggest that there might be a

10   question about whether they should be out in the field.  It

11   could be difficulties getting along with coworkers, what we

12   call mouth beefs, where they're getting in trouble for saying

13   things they shouldn't be saying to citizens, or maybe even

14   excessive force complaints, or other kinds of behavior, or just

15   they're unhappy, they seem like they're miserable and having

16   normal things that everybody deals with in life from time to

17   time.

18   Q.  And are you currently doing that line of work?

19   A.  Yes.  I occasionally still see people through some of my

20   consultations with smaller law enforcement agencies.

21   Q.  Thank you.

22       And, Doctor, do you have any professional licenses?

23   A.  Yes.  I'm licensed -- first I was -- became licensed in

24   California, March 1991, but I'm licensed in four other states.

25   I also have a board certification in police and public safety

1  psychology by the American Board of Professional Psychology,

2  that I earned in 2011, I think it was.

3  Q.   And do you have any specialty as it relates to psychology?

4  A.   Clinical psychology, police psychology, forensic

5  psychology, I practice in all of those arenas.

6       Clinical to do with helping people, assessing, that kind of

7  thing, normal treatment issues.

8       Police psychology doing those same things but in police

9  environments, as well as other kinds of consultations that I've

10 testified about already.

11      And in forensic psychology, coming to cases like this, or I

12 do a fair amount of work in the criminal case arena as well.

13 Q.   Great.  And I understand that you're board certified in

14 police and public safety psychology.

15 A.   Yes.

16 Q.   What year did you earn that?

17 A.   I think it was -- if I can check my resumé real quick, I

18 think it was 2011, but let me just double-check.

19      2011.

20 Q.   And do you rely upon that training in terms of counseling

21 and assisting officers?

22 A.   Yes.  As well as testimony I might give related to police

23 psychology or consultations that I do.  It's part of -- it's

24 a -- it's a standard set of competencies that we're supposed to

25 have in order to sit for the examination process, which is both

1   written and oral.

2   Q.  And, so, given that I'm hearing that you regularly assess

3   and treat police officers, or persons with mental illness, what

4   concerns have you -- have you -- strike that.

5       Given that you regularly assess police officers, and treat

6   people with mental illness, what do you do to stay up-to-date

7   on the literature or the state-of-the-art of your profession?

8   A.  I'm a member of some professional organizations where we

9   share information and ideas and publications.  Like, the

10  International Association of Chiefs of Police has a police

11  psychology subsection, I'm a member of that.  The Society for

12  Police and Criminal Psychology, I'm a member of that group.

13      And so these groups will share information not only at

14  conferences but through publications that are disseminated

15  among its members.

16      I also do a fair amount of reading.  I've done some

17  publication and research of my own.  And I communicate with

18  colleagues in conferences, professional settings, read

19  publications, books, attend some continuing education as well.

20  Q.  Are your publications peer reviewed?

21  A.  I have about 37 publications.  I'd say about half of them

22  are probably peer reviewed.

23  Q.  What's the significance of being peer reviewed?

24  A.  It means that a group of people have blindly looked at what

25  you've written, at a particular journal, as you submitted it,

1    it gets farmed out to reviewers who then take a look at it and

2    determine whether it meets certain appropriate benchmarks for

3    inclusion or not within the publication.

4    Q.  And you mentioned that you've responded in the field to

5    assess, intervene in different scenarios; is that true?

6    A.  Yes.

7    Q.  What training or education did you receive in order to

8    perform those tasks?

9    A.  Well, the founder of police psychology was my first mentor.

10   He founded the unit of behavioral sciences at LAPD, first unit

11   of its kind in the world to have an in-house police

12   psychologist, in 1968, I think it was, and that's who hired me.

13       So, I got to learn from the guy that was the grandfather of

14   police psychology.  So, Martin Reiser took me under his wing

15   and mentored me.  And then I had other supervisors there that

16   would, you know, help me navigate cases that we would have, I'd

17   have to be supervised by them.  So there is that kind of

18   mentoring process that takes place.

19       There would be in-house trainings that we would attend,

20   trainings with other police psychologists that were out there.

21       And then I had another mentor who was from San Francisco

22   Police, Dr. Chris Hatcher, who also helped me.  A number of

23   people within the field that would mentor.

24       Then, of course, on-the-job, doing a lot of work, and

25   reading everything that had been written, as much as I could

1    get my hands on.  Obviously, I have not read everything that's

2    ever been written, but as much as I could that's available, I

3    would seek it out and read it.

4    Q.  In the course of your duties as a police psychologist, are

5    you familiar with POST?

6    A.  Yes.

7    Q.  Can you explain what that is?

8    A.  Post is Peace Officer Standards and Training, and it's a --

9    it's California's agency, if you will, that is state supported,

10   that develops training for police, develops guidelines and

11   standards.  And that's what POST is.  They certify training

12   curricula for police officers, but they also generate

13   guidelines for how you select officers to become police

14   officers.  So, there is a lot of different things that POST

15   does.

16        And I've contributed to some of those curricula on

17   different subjects; not the screening one, but other ones.

18   Q.  And are you -- I understand you mentioned that you've

19   performed as -- doing threat assessments?

20   A.  Yes.

21   Q.  Can you describe what that is?

22   A.  Threat assessment is a broad area that's dedicated to

23   helping identify potential threats; that might be for workplace

24   violence, it might be for stalking, various problems.  And it

25   could be terrorist threats.  It could be a lot of different

1     things.

2         Within a police and public safety agency, it might be as

3     varied as internal risks for workplace violence among even law

4     enforcement to people that might -- officers that might pose a

5     risk, to working in schools, like I've done in the past, to

6     help keep schools safe from threats that might be posed there.

7         So, it's a lot of different areas.  Basically, the issue,

8     though, is assessing potential threats towards a particular

9     target.

10    Q.  So, is it fair to say much of your work has been devoted to

11    understanding and assessing threats?

12    A.  A lot of it, yes.

13    Q.  Dangerousness of a person to themself and others?

14    A.  Yes.

15    Q.  Now, have you qualified as an expert in federal court

16    before?

17    A.  I have.

18    Q.  Can you give me an approximate times?

19    A.  Well, I've -- I -- I've testified 22 times in civil cases,

20    not all of those were in federal court.  So, I'd say probably

21    at least three-quarters of those were probably federal court,

22    in one jurisdiction or another.  And then I've testified, I

23    think, 70 times in criminal cases, and a handful of those were

24    in federal court.  So, there's been, probably, 20 or so times,

25    not counting depositions, where I've testified and qualified as

1    an expert in federal courts.

2    Q.  Have you also testified and qualified as an expert in other

3    states other than California?

4    A.  Yes.  Multiple states.  Alaska, Nebraska, Nevada, Texas,

5    Colorado, among several, and then once in Canada.

6    Q.  Thank you.

7          MR. POINTER:  Your Honor, I'd ask that Mr. Mohandie

8    be qualified and allowed to provide opinions as an expert

9    witness in police psychology and threat assessment.

10         THE COURT:  Any objection?

11         MR. ALLEN:  No objection.

12         THE COURT:  Will be so identified.

13     Ladies and gentlemen, when a person has been deemed as an

14    expert, that means that they're allowed to provide opinions as

15    to certain things which may not be allowed on a nonexpert

16    witness.

17     Go ahead, counsel.

18         MR. POINTER:  Thank you, Your Honor.

19    Q.  BY MR. POINTER:  Mr. Mohandie, I retained you on this case;

20    is that right?

21    A.  You did.

22    Q.  And did you review any materials in terms of preparing your

23    opinion or the conclusions you intend to give in this case?

24    A.  I did.

25    Q.  Can you give us a brief description of those materials that

1    you reviewed?

2    A.   Sure.  In a nutshell, there were a number of police

3    reports, there was an autopsy, there were psychological or

4    mental health or treatment records pertaining to the defendant,

5    the officer, there were -- I think there was a 911 call audio,

6    there were about, probably, I want to say, close to ten

7    depositions, there was some policies that I looked at

8    pertaining to the City of Los Banos.

9        If I could refer to my report, there may be other items.

10       I used the DSM-5, DSM-IV, which are the diagnostic manuals

11   that pertain to rendering mental health diagnoses, as part of

12   my foundational ideas.

13   Q.   Doctor, what is the DSM-IV and 5?

14   A.   The DSM-IV-TR, Diagnostic and Statistical Manual, Training

15   Revision, Version 4, was the diagnostic text that's agreed upon

16   by mental health professionals, published by the American

17   Psychiatric Association.  But psychologists, psychiatrists,

18   social workers all use it to have an agreed upon language for

19   rendering diagnoses of people's problems.  And it will track

20   the latest research on what's associated with those disorders,

21   risks, prevalence, you know, symptoms, and it has behavioral

22   criteria for them. That one was in effect until about 2013, it

23   was published in 2000.

24       The DSM-5 is the most recent revision that came out in

25   2013, and it has updates.  Because every ten or so years they

1   revise it because there's new research, that then becomes

2   incorporated through a process of peer review, multiple task

3   forces.  It's a pretty rigorous process.  But it's a working

4   document that's constantly being revised.  And that's,

5   basically, what it is.

6   Q.  And what significance, if any, did the DSM-IV-TR have to

7   this particular matter?

8   A.  Well, there was a diagnosis that had been assigned to the

9   officer, Officer Acosta, of PTSD.  And so the -- in 2011 was

10   when that diagnosis was given, so that would have fallen under

11   the old DSM-IV-TR.

12      The DSM-5 is relevant because there's new information

13   about, you know, what we know about PTSD, and its since been

14   updated.  I'm familiar with both.  I have copies of both.

15   Q.  And you mentioned that you reviewed some mental health

16   records of the defendant; is that right?

17   A.  Yes.

18   Q.  What significance, if any, did those records have to you in

19   terms of the conclusions you reached in this case?

20   A.  I believe that it supported my conclusions and concerns

21   about -- about Officer Acosta, yes.

22      It -- there were documents -- there was documentation about

23   him having had PTSD, reported having PTSD, post-traumatic

24   stress disorder, and there are some associated features that go

25   with PTSD that have to do with potential for aggression, verbal

 1   outburst, lack of impulse control and frustration tolerance

 2   that can be concerns that need to be assessed further, as far

 3   as whether that officer should be, you know, doing what they're

 4   doing, or get treatment, and, you know, maybe not be doing what

 5   they're doing, or have it scaled down until there is some sort

 6   of healing that takes place.

 7   Q.  And so the information contained within those mental health

 8   records, are they consistent with your understanding as it

 9   relates to the DSM-IV and the symptoms a person may have if

10   they have PTSD?

11   A.  Yes.

12   Q.  Can you elaborate on that?

13   A.  Well, there was -- there was some material in there

14   documented about there being anxiety.  I believe there was

15   something to do -- something, possibly, in there about anger

16   and irritability.  And those are, kind of, classic sequelae,

17   symptoms that are associated with post-traumatic stress that's

18   untreated.

19   Q.  And as it relates to the breadth of information that you

20   reviewed in this case, is that consistent with the type of

21   information you are familiar with in terms of reviewing for

22   cases dealing with officers and officer-involved shootings?

23   A.  Yes.

24       I forgot to mention, also, I looked at some disciplinary

25   material as well.

1   Q.  And those disciplinary records that you -- or the materials

2   that you reviewed, did you notice anything in there that was

3   consistent with the PTSD diagnosis?

4   A.  Could be.  The -- there were two things.  There was a loss

5   of verbal control with a citizen in 2010, which could be

6   consistent with that.  And then, in 2012, there was an incident

7   of -- there was an incident of kicking in a door in what

8   appeared, to me, to be a loss of emotional control or

9   frustration tolerance, and relatively unprovoked aggression.

10  Q.  You mentioned the incident wherein Officer Acosta lost

11  verbal control, you say he cursed at a citizen?

12  A.  Citizens.  I think it was multiple citizens, from what I

13  recall.

14  Q.  Do you recall, in the course of the incident, whether or

15  not a citizen alleged that Officer Acosta actually pulled his

16  gun while she was asking for his badge number?

17  A.  I don't recall that.

18  Q.  If I were to show you a document, do you think it might --

19  show you the -- show you the report regarding this incident, do

20  you think it might refresh your recollection?

21  A.  Absolutely.

22          MR. ALLEN:  I object, Your Honor, unless I see what

23  he's referring to.

24          THE COURT:  Always show opposing counsel.

25          MR. POINTER:  Sure.  It's Exhibit 21.

1           THE COURT:  Counsel, I assume that since you have

2     seen what counsel is referring to that you --

3           MR. ALLEN:  I do, Your Honor.  Thank you.

4           THE COURT:  Thank you.

5           MR. POINTER:  May I approach, Your Honor?

6           THE COURT:  Yes.

7           MR. POINTER:  Thank you.

8     Q.  BY MR. POINTER:  Doctor, I'm going to ask you to take a

9     look at that, and I'll direct your attention to -- I believe

10    it's the second page of that exhibit.

11    A.  Yes, I see it.  It's actually on what appears to be the

12    third page of the report.

13    Q.  Does that refresh your recollection that the --

14    A.  Yes.

15    Q.  -- that the citizen complained?

16    A.  Yes.

17    Q.  And so what significance did you see in that as it relates

18    to this gun pull?

19    A.  Seems to be consistent with overreaction and part of low

20    frustration tolerance.  It could also represent -- one of the

21    characteristics of -- or behaviors or symptoms of --

22          MR. ALLEN:  I'm going to object.  Calls for

23    speculation.

24          THE COURT:  Overruled.

25          THE WITNESS:  One of the characteristics of symptoms

1    of post-traumatic stress disorder is an exaggerated startle

2    response.  And with police officers, that becomes concerning,

3    because one of the ways that can manifest itself is if they too

4    quickly go to gun when there are other options available to

5    them.

6    Q.  BY MR. POINTER:  And you mentioned that you also reviewed

7    another incident wherein Officer Acosta had kicked a door?

8    A.  Yes.  Five to ten times.  Yes.

9         Go ahead.

10   Q.  And kicking -- he also did other things to the door; is

11   that right?

12   A.  I don't recall what those are.  That's what stood out in my

13   mind, was there was a perception the person had either thrown

14   something, or done something to his vehicle as it passed by,

15   and his response was to become, what sounds like, pretty

16   aggressive with the door of the building where he believed

17   people were still there.

18   Q.  And is -- this building, it was a home, correct?

19   A.  It was a residence.

20   Q.  Was there anybody home?

21   A.  I don't believe there was.

22   Q.  And do you recall whether or not he hit the door with

23   something other than just his foot that he was kicking it with?

24   A.  I actually don't recall.  I was really -- it was really

25   noteworthy to me that he kicked it five to ten times, because

1   that's not -- to me, that doesn't -- that's not -- it's not an

2   appropriate response.

3   Q.  Do you recall whether or not he actually damaged that door?

4   A.  I believe he did damage the door.

5   Q.  Do you recall whether or not he told the citizens that he

6   had damaged their door, or left any notification that he had

7   done that?

8           MR. ALLEN:  Objection.  Calls for speculation.

9   Hearsay.

10          THE COURT:  Overruled.

11          THE WITNESS:  I don't recall that.

12  Q.  BY MR. POINTER:  Did he notify his department that he had

13  damaged the citizen's door?

14  A.  I don't recall that either.  I was really focused on the

15  behavior.

16  Q.  Do you recall that it was actually a rock that hit his car?

17  A.  That's -- I believe it was a rock.

18  Q.  And do you recall what year that took place?

19  A.  2012.

20  Q.  And do you know if Officer Acosta was actually disciplined,

21  meaning these allegations were found to be true, by his

22  department?

23          MR. ALLEN:  Objection.  Relevance, Your Honor.

24          THE COURT:  Overruled.

25          MR. ALLEN:  403.

1            THE COURT:  Overruled.

2            THE WITNESS:  Yes, I believe he was.

3    Q.  BY MR. POINTER:  On both incidents, correct?

4    A.  True.

5    Q.  Now, you testified earlier that you -- you have an

6    extensive experience providing expert opinion in courts, right?

7    A.  I didn't say extensive, I just listed them.  That's your

8    take on it.

9    Q.  Yes.

10        And you've testified in officer-involved shooting cases

11   before, correct?

12   A.  Yes.

13   Q.  Now, can you describe for us how many -- approximately how

14   many times you've testified in cases involving an officer being

15   accused of misconduct?

16   A.  I'm not sure what you mean.

17            MR. ALLEN:  Vague.

18            THE WITNESS:  Sorry.

19            THE COURT:  That's sustained.

20   Q.  BY MR. POINTER:  You've been retained pretty frequently by

21   officers to defend them in cases where they've been accused of

22   misconduct, correct?

23   A.  I guess it -- that's one -- I -- I was a little bit lost in

24   the question.  But I guess what you're saying, or asking me, is

25   whether when I've been retained in cases they -- yes, they're

1    accused of misconduct, that's what's leading to the lawsuit is

2    an allegation of a violation of civil rights, in the civil

3    cases that I've been retained in, which have been numerous.

4    Q.   In those civil cases, you've been retained by both

5    defendants as well as plaintiffs, right?

6    A.   True.

7    Q.   And can you give us the percentage of those cases wherein

8    you've been retained by the defendant in a civil case?

9    A.   85 to 90 percent of the time.

10   Q.   And in officer-involved shooting cases, can you tell me how

11   many times you've been retained by the defendant officer versus

12   the plaintiff?

13   A.   I'd say about the same.  90 percent.  85-90 percent of the

14   time.

15   Q.   So, 85 to 90 percent of the time on behalf of the defendant

16   officer?

17   A.   Yes.

18   Q.   Now, how many times have you testified on behalf of a

19   plaintiff in a civil case wherein it was an officer-involved

20   shooting?

21   A.   Just this one.

22   Q.   So, this is the first time you've taken a case where you've

23   been willing to give testimony on behalf of a plaintiff in an

24   officer-involved shooting case?

25   A.   There is a lot of different layers to that question.  But

 1   this is the first time I've testified in a case while retained

 2   by a plaintiff in an officer-involved shooting case.

 3       The willingness part, I'm always willing to look at cases.

 4   So, I -- that's the part that I was --

 5   Q.  I understand that a person may present cases to you, but

 6   then you decide whether or not you're willing to -- to provide

 7   testimony on the case; is that right?

 8   A.  True.  There is some of that.

 9   Q.  Now, Dr. Mohandie, I'm going to ask you some hypotheticals.

10   A.  Okay.

11   Q.  I'm going to ask you to assume some facts.

12       I'm going to ask you to assume that you have a patrol

13   officer that self-reports to his doctor that he's experiencing

14   the following symptoms, and that they are severely impacting

15   his social life, his marriage, and his work.

16           MR. ALLEN:  Objection.  Argumentative.  Lacks

17   foundation.

18           THE COURT:  Overruled.

19   Q.  BY MR. POINTER:  And I'm going to ask you to assume that

20   this officer has told his doctor that he's experiencing very

21   severe feelings of being anxious and being tense.

22       What significance would that have to you as it relates to

23   assessing this officer's fitness for duty?

24   A.  Well, it raises the question as to whether he is fit for

25   duty, and certainly provides a reason that maybe he should be

1   assessed for it, and certainly should be treated for his level

2   of anxiety.

3        If you're so anxious that you're labeling it as severe, you

4   know, ideally, a police officer who is functioning out in the

5   field, he or she should be free of unnecessary anxiety.  I

6   mean, when you take in an officer at the front end, you're

7   looking for people that are free of anxiety, that have strong

8   coping, that are flexible.  There is a lot of different areas.

9   And you don't want somebody that is highly anxious out there.

10       Now, if it's treatable, get it treated.  If it's a

11  temporary reassignment, be temporarily reassigned until you get

12  that under control.  But you don't want somebody that's already

13  having compromised coping, and up to here with their stress and

14  anxiety, in an occupation that demands the ability to, kind of,

15  roll with very difficult situations.

16  Q.  Now I'm asking you to keep those facts in mind and add to

17  that.

18  A.  Okay.

19  Q.  This same patrol officer has told his doctor that he's

20  experiencing very severe feelings of being irritable, and

21  feelings of easily overwhelmed, causing him to experience a

22  very severe degree of frustration intolerance.

23       What concerns would you have about that police officer

24  performing his duties in the field?

25  A.  That -- that he or she is going to be very easily provoked,

1    that they're not going to have the patience or the decision

2    making to respond flexibly to situations, and to deescalate

3    when deescalation is necessary, that the person is -- is

4    already having their cup runneth over and they haven't even

5    gotten to the situation yet.

6    Q.  Now I want you to keep the previous facts in mind and add

7    to that, that this particular officer has been diagnosed with

8    prolonged PTSD.

9              MR. ALLEN:  Objection.  Lacks foundation.

10             THE COURT:  Overruled.

11   Q.  BY MR. POINTER:  That this officer has been diagnosed with

12   prolonged PTSD, and that he did not follow his doctor's

13   treatment plan.

14        What concerns would that have with you in terms of the

15   officer's ability to deal with those symptoms he's feeling?

16   A.  It's been a chronic course, is what "prolonged" means, and

17   it hasn't gone away or abated on its own.  It needs to be

18   treated.  Therefore, without treatment, the symptoms are likely

19   to continue.  And there are a lot of different situations that

20   could be triggers for overreaction, oversensitivity, impulsive

21   reactions instead of being able to flexibly assess and decide

22   what to do in a situation.  There is going to be a lot more

23   reactivity.  You just don't want that.

24   Q.  For an officer experiencing those symptoms, do you have a

25   conclusion or opinion that you've arrived at as it relates to

1   whether or not they have a duty to report those symptoms to

2   their employer, to their supervisor?

3   A.   I think they do.  I think if there -- I think if -- you

4   know, most agencies, and certainly -- will have policies in

5   place saying, if you think there is something that's keeping

6   you from doing your job in a safe manner, or effective manner,

7   you have an obligation to report it and do the right thing.

8   Q.   What do you base that conclusion or that opinion on?

9   A.   I base it upon what I've known with a multitude of law

10  enforcement agencies, and, specifically, the City of Los Banos

11  has that.

12  Q.   And keeping those facts in mind as it relates to this

13  patrol officer telling his doctor that he is suffering from

14  these symptoms, what, if any, obligation or duty -- strike

15  that -- ability does that doctor have to communicate that to

16  the patrol officer's employer?

17  A.   That doctor -- I'll speak for psychologists and

18  psychiatrists.  We have rules that we have to follow in terms

19  of privilege and confidentiality, and unless that person is an

20  immediate danger to themselves or others, we are -- or we have

21  permission of the officer to disclose that, we're not going to

22  be able to say, hey, you know, so and so doesn't seem to be

23  functioning well, it's probably not a good idea for them to be

24  at work.  That would be a breach of that duty, unless we felt

25  it was, like, imminently dangerous.  And that is a very low

1    bar.  I mean, very low bar.

2        Or, arguably, that's a very high bar in order to be able to

3    convey information, and we're looking for something better than

4    that in terms of an officer being able to go out and do his or

5    her best work out in the field, which is what the job demands.

6    Q.  When you say "imminent," do you mean it's about to happen,

7    or something that's in the near future?

8    A.  Right.  They would qualify for 5150, or they've already --

9    or they've articulated that they're going to hurt somebody.

10   You're just -- that's -- that is a lot different than whether

11   they're qualified to go out there and do their job in a safe

12   manner on an ongoing basis and make good decisions.  Those are

13   two different areas.

14   Q.  In your review of Mr. -- of Officer Acosta's records in

15   this case, did you see anything in those records that indicated

16   that his symptoms have subsided or that they have been cured?

17   A.  No.  There is no indication that he'd been treated, or that

18   there had been any closing of the loop from the recommendation

19   to continue treatment, and that he had pursued that.  There was

20   nothing there, nor anything like that.

21   Q.  And, finally, I know -- you haven't actually sat down and

22   examined Officer Acosta, correct?

23   A.  True.

24   Q.  In the course of your work as a police psychologist

25   specialist, do you routinely review records and give

1    recommendations?

2    A.   Yes.  And field phone calls from management and supervisors

3    about what should be done.  Or people calling up and saying,

4    what do you think?  Getting those kinds of consultations all

5    the time, sure.

6    Q.   So, information you received from a third-party, be it an

7    employer, supervisor, a doctor or a coworker --

8    A.   Concerned coworker, all the time.

9    Q.   -- that's information that you would consider in terms of

10   making your assessment, correct?

11   A.   True.

12          MR. POINTER:  Thank you.

13       No further questions, Your Honor.

14          THE COURT:  Cross.

15          MR. ALLEN:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17   BY MR. ALLEN:

18   Q.   Good afternoon, again, Dr. Mohandie.

19   A.   Good afternoon.

20   Q.   I will try to keep it short so we can be done at 4:30,

21   which is what we promised the jury.

22       I want to make sure that I'm clear.  Isn't it true that for

23   many years, according to your deposition, you have treated law

24   enforcement officers who have come back from combat who

25   suffered from PTSD?

1   A.   True.  Not just combat, but officers that have had PTSD

2   from their job as a police officer.

3   Q.   I wanted to go there.

4        What is post-traumatic stress disorder?

5   A.   It's a series of symptoms in which a person has experienced

6   something outside the range of normal human experience, that

7   has -- I'm paraphrasing from the DSM --

8   Q.   Thank you.

9   A.   -- that has led them to have a series of definable symptoms

10  that are consistent with the DSM-5; anxiety, irritability,

11  avoidance responses, reacting with little provocation,

12  exaggerated startle response.

13       There is a series of symptoms, for which you have to have a

14  certain number in order to qualify for post-traumatic stress

15  disorder condition.

16  Q.   The very nature of first responders, such as law

17  enforcement, is they frequently see, in the course of their

18  everyday duties, very traumatic events; isn't that correct?

19  A.   I'd say that's true.  Sure.

20  Q.   I mean, auto accidents with children hurt or killed,

21  parents, stabbings, shootings, spousal abuse, they suffer

22  through the range of human misery in the course of their job;

23  would you agree to that?

24  A.   They're exposed to a lot of traumatic, and potentially

25  traumatic, events.

1   Q.  Not every officer who suffers from PTSD is incapacitated

2   or, in fact, needs to self-report their irritability or anxiety

3   that they may be suffering at home in a marriage because it

4   doesn't necessarily incapacitate them when they go to work; is

5   that correct?

6   A.  That's true.  I mean, there is a number of officers that

7   I've seen that have functioned, and are able to, kind of, keep

8   it under wraps, and are seeking treatment and working it

9   through.  Sure.

10  Q.  Yeah.  And one of the forms of treatment is peer

11  counseling, isn't it?

12  A.  It can be.  If you've got something, though, that's more

13  severe, I'd say that you -- that can be a part -- like, an

14  adjunct, or piece of the treatment, but if you've got a more

15  severe condition, you should probably have something more than

16  peer counseling.  I'm not saying that peer counseling is not

17  helpful, it is.

18  Q.  In fact, in the VA system -- are you familiar with the VA

19  system and what they recommend?

20  A.  I know that they do some peer counseling, particularly with

21  combat vets who have had similar experiences, because it takes

22  away some of the stigma, sure.

23  Q.  Do you know what Officer Acosta did in the way of peer

24  counseling with other combat vets that are law enforcement

25  officers?

1   A.   Do not know that.

2   Q.   Okay.   You did not do an examination of Mr. Acosta; is that

3   correct?

4   A.   True.

5   Q.   And then the -- and I don't want to get this wrong, but as

6   a board certified psychologist, you stand by certain standards

7   that are put out by the American Academy of -- what is your --

8   what is your board certification, the organization you --

9   A.   Okay.   So, there are several different codes that I abide

10  by.   Obviously, the law in the state of California --

11  Q.   Right.

12  A.   -- which is the law.   And then there is the American

13  Psychological Association Code of Ethics.   The Forensic

14  Specialty Guidelines put out by the American -- the Forensic

15  Psychology Group.   And then the -- I'm not sure what the

16  American Board of Professional Psychology has as far as police

17  psychology board certification.   I would say that we'd probably

18  be reverting back to the Forensic Specialty Guidelines and the

19  APA's Code of Ethics.

20  Q.   Can you cite to any one of those where it says that it's

21  all right for a board certified psychologist to render their

22  own diagnosis of somebody without examining them first?

23  A.   I think that what it says is if you are rendering a

24  diagnosis without directly examining somebody, that it would be

25  based upon enough information to arrive at it, as well as with

1    the qualification that you've been transparent that you have

2    not directly examined the person.

3    Q.  And I will say, you've been very transparent in this case.

4        When we took your deposition, you said you had not examined

5    him and you are relying upon the VA records, and you're relying

6    upon the two IA records that you have cited to.  Correct?

7    A.  Yes.  And his own statement that he believes he has PTSD.

8    Q.  And his own statement.  I don't think there's been any

9    dispute that he's been diagnosed with PTSD, and he has said

10   that, that he feared he had PTSD of some kind.

11       But I want to go back, then, to your support.

12       Your support is an incident where he used profanity, Go to

13   the fucking police department.  And he, according to -- now,

14   according to the complaint, he un-holstered his weapon, that

15   document you reviewed, right?

16   A.  True.

17   Q.  You don't know what, actually, Officer Acosta said about

18   that incident, whether he did or he didn't, or why he did, if

19   he did?

20   A.  Right.  I just know it was sustained because of the

21   discourteous aspect of the behavior.

22   Q.  It wasn't sustained, to your knowledge, because he

23   un-holstered his weapon, according to the complaint; is that

24   right?

25   A.  I don't recall that being part of the opinion about why it

1    was sustained.

2    Q.  And you've been around policemen a lot?

3    A.  I'd say so.

4    Q.  And would it be fair to say that what we see in the R-rated

5    movies is that police officers do use a lot of profanity?

6    A.  I'd say that there is that in the movies, and that's what

7    you see in the movies.  But today, especially the last ten or

8    fifteen years, in law enforcement, we expect more, and we

9    expect more professionalism, and there is a higher bar that's

10   put out there for officers in terms of their conduct.

11   Q.  Which is why they may have given him a reprimand for

12   discourteousness.  But I want to go to the point that officers

13   still use profanity on the street, whether or not they should

14   be, in a given moment, right?  Unless you haven't experienced

15   it.  Maybe you haven't experienced that.

16   A.  You know, I've experienced it.  I mean, absolutely.

17   Q.  I mean, you've experienced officers in a situation, and

18   maybe they get a little, you know, going, and they believe it's

19   more serious, and sometimes they just drop that F-bomb like

20   that, right?

21   A.  They do.  But this felt qualitatively different, what I

22   read, in terms of this particular incident, which is why

23   somebody went to all the trouble to file a complaint against

24   him.

25       And the -- if you read the complaint, to me it looked like

1    there was a little bit more than a cop doing what sometimes

2    they do as they're trying to get things done out there.

3    Q.   That's my point, you're speculating when you said it felt

4    like, because you really don't know what happened in the

5    incident other than he used profanity, and that was the

6    sustained complaint, correct?

7    A.   It was sustained.  And it looked very angry and aggressive.

8    I've seen a lot of complaints in my day, as I've reviewed them,

9    as people --

10            MR. ALLEN:  Move to strike, Your Honor.

11    Nonresponsive.

12            THE COURT:  Sustained.

13    Q.  BY MR. ALLEN:  So we have that one incident where he used

14    profanity.  In-between that incident he goes, for reasons he

15    has yet to tell the jury, which he'll tell them tomorrow why he

16    goes to the VA, for what he suspects is a mild traumatic brain

17    injury, or some form of TBI, and, in fact, complains about some

18    things he believes were related to the TBI, then he was

19    diagnosed with PTSD, right?

20    A.   True.

21    Q.   So, he's getting self-help, and you don't know what he's

22    doing or even how he got there, do you?

23    A.   True.

24    Q.   I mean -- right.

25            And so he doesn't go back.  We know that he had a follow-up

1    he didn't follow up on.  You don't know why, though, do you?

2    A.  No.

3    Q.  Okay.  And then it's another, almost -- let's see, February

4    of '11 to May of '12, he then has an incident.  And I was

5    looking at your report, you mentioned that he thought he had

6    been shot at, or it was a rock?

7    A.  Right.

8    Q.  Okay.  And what you know of that one is that he went up to

9    the door, they didn't open, but you don't know why he decided

10   to kick the door, do you?

11   A.  Well --

12   Q.  I'm asking you, do you know why, from what you reviewed, he

13   kicked the door?

14   A.  He thought somebody was home.  But it was an aggressive,

15   angry response.  That's how I would label that, an aggressive,

16   angry response.

17   Q.  Fair enough.  That's your profession, as a psychologist, to

18   take that and interpret it that way, right?

19   A.  True.

20   Q.  Yet you don't know what he explained why he decided to do

21   that?

22   A.  I didn't look at the tapes, or anything like that, from the

23   investigation, no.

24   Q.  All right.  And, subsequently, he was reprimanded for

25   damaging a door.

1         Do you know why it was a reprimand for damaging a door and

2    not for something else?

3    A.  No.

4    Q.  Other --

5    A.  No.

6    Q.  -- conduct that was unnecessary?

7    A.  No.

8    Q.  Okay.  And I'm curious, do you know how many times he was

9    involved in a felony arrest between the time of this incident

10   in 2010 through the VA visit?

11   A.  No.

12   Q.  Do you know how many times he was involved in a felony

13   arrest from the VA visit through the May '12 incident?

14   A.  No.

15   Q.  How many times was he, during the time of January of -- or

16   let's just take the VA visit through the May visit, was he --

17   did he have an allegation of excessive use of force lodged

18   against him?

19   A.  I don't think there were any.

20   Q.  Okay.  And from May of 2012, up to the date of the incident

21   on September 2, 2013, how many felony arrests did he make?

22   A.  I have no idea.

23   Q.  How many misdemeanor arrests?

24   A.  I don't know.

25   Q.  How many times did he take his gun out?

1   A.   I don't know.

2   Q.   Did he shoot anybody in that period of time?

3   A.   I don't believe he did.

4   Q.   How many times did he search a house during that period of

5   time?

6   A.   No idea.

7   Q.   How many times did he make, one-on-one, at 2 o'clock in the

8   morning, a felony car stop by himself and had to arrest

9   somebody?

10   A.   I do not know.

11   Q.   There is a distinction between your work as a forensic

12   expert and your work when you're working for LAPD and doing

13   your clinical work; is that correct?

14   A.   Yes.

15   Q.   All of the forensic -- we have a number of forensic experts

16   testifying here, I don't think you're any different, you're

17   being paid for your work?

18   A.   True.

19   Q.   And you did your best to gather that amount of information

20   necessary to support your opinion for today?

21   A.   True.

22   Q.   But within that effort, did you talk to or hear from any

23   coworker that had a complaint against Officer Acosta during the

24   timeframe from the 2010 complaint for using profanity through

25   the shooting?

1   A.  No.

2   Q.  Did you see anything in any of his records that coworkers

3   had any problems with him?

4   A.  No.

5   Q.  Did you see anything in any of his records that his

6   supervisors had a problem with him?

7   A.  No.

8   Q.  Just trying to think of the other things you talked about

9   that you would look for.  Let me see.  Let me make sure I get

10  them all.

11      No difficulties with coworkers.  No excessive force

12  complaints.

13      You didn't interview any of his supervisors, did you?

14  A.  No.

15  Q.  You didn't talk to Dr. Shuman, the doctor that was involved

16  who did -- Dr. Shuman and Ms. Jimenez, who took his interview

17  at the VA?

18  A.  No.

19  Q.  The hypotheticals posed by Mr. Pointer included certain

20  adjectives.  Had you seen those adjectives in the context of

21  those hypotheticals in any medical records?

22  A.  I'm losing you in the question.  I'm sorry.

23  Q.  I'll withdraw that question.  I'm sorry.

24      You talked about doctors have a right -- have to respect

25  their client's right of privacy.

1    A.   Yes.

2    Q.   And, as I understand this, because they did not feel he was

3    a 5150 -- would you explain to the jury what that is?

4    A.   5150 is the code section, Welfare and Institutions Code, in

5    the state of California, that if a person is deemed, by virtue

6    of a mental disorder, to be a danger to themselves, others, or

7    gravely disabled, that's what allows the person to be

8    considered for an involuntary hospitalization for up to 72

9    hours.

10   Q.   Okay.  And neither nurse Jimenez nor Dr. Shuman felt it

11   necessary to alert anybody that he was a danger to himself or

12   others on the diagnosis of the PTSD?

13   A.   True.

14   Q.   And, in fact, Dr. Shuman went into more discussion on that,

15   that he did not see a number of different -- or he ruled out a

16   number of different issues with Officer Acosta; is that right?

17   A.   True.

18   Q.   And he didn't tell Officer Acosta he should report back to

19   Los Banos that he, Dr. Shuman, had concerns about his mental

20   health, did he?

21   A.   No.

22   Q.   He didn't instruct him, I would like you to go back and

23   tell them that I diagnosed you with PTSD?

24   A.   No.

25   Q.   Didn't tell him, why don't you go back and at least check

1   in with your employment -- EAP, employment assistance program?

2   A.   Yes.

3   Q.   He didn't do that either?

4   A.   No.

5   Q.   And based on your thorough review of all the materials you

6   were provided by the plaintiffs in this case, he didn't have

7   any excessive force complaints subsequent to that VA from the

8   time period up to the shooting, correct?

9   A.   True.

10   Q.   And he didn't have any other shootings?

11   A.   True.

12           MR. ALLEN:   No further questions, Your Honor.

13           MR. POINTER:   Your Honor, quick redirect.

14                   REDIRECT EXAMINATION

15   BY MR. POINTER:

16   Q.   Now, Doctor, you were asked a number of questions about

17   that internal affairs situation where Officer Acosta cursed at

18   a citizen, right?

19   A.   Yes.

20   Q.   And you looked at the record, and it showed that someone

21   says that Officer Acosta pulled a gun during that incident.

22           MR. ALLEN:   Objection.   Hearsay.

23           THE COURT:   Sustained.

24   Q.   BY MR. POINTER:   Do you recall who the witness was in that

25   incident?

 1    A.  No.

 2    Q.  If you were to look at the record, would that refresh your

 3    recollection?

 4    A.  Yes.

 5              MR. ALLEN:  Objection.  Relevance.

 6              THE COURT:  What's the relevance of this?

 7              MR. POINTER:  Well, counsel has gone on saying it was

 8    just verbal, he was cursing, and that the citizen made the

 9    complaint.  I think if the doctor -- which he couldn't identify

10    who it was.  The doctor is going to look at these records and

11    tell the jury, you know, what really took place here.

12              THE COURT:  Objection is sustained.

13    Q.  BY MR. POINTER:  Now, you looked at the -- at the records,

14    and you saw that Officer Acosta pulled the gun on somebody,

15    right?

16              MR. ALLEN:  Objection.  Lacks foundation.  Relevance.

17              THE COURT:  Foundation.  Sustained.

18    Q.  BY MR. POINTER:  A moment ago when I was asking you

19    questions, you reviewed those records, right, Doctor?

20    A.  Yes.

21    Q.  In those records, it says that Officer Acosta pulled a gun

22    on a citizen, right?

23              MR. ALLEN:  Objection.  Lacks foundation.

24              THE COURT:  Overruled.

25              THE WITNESS:  Yes.

1   Q.  BY MR. POINTER:  Do you recall who it was that said that?

2   A.  I think it was a family member.

3   Q.  If you were to review those records, would it give you more

4   certainty as it relates to who said that?

5   A.  Yes.

6            MR. ALLEN:  Objection.  Relevance.

7            THE COURT:  Sustained.

8   Q.  BY MR. POINTER:  You mentioned -- you were asked questions

9   as it relates to -- Mr. Allen asked you that none of Officer

10  Acosta's coworkers made any complaints about his conduct,

11  right?

12  A.  Right.

13  Q.  Would it refresh your recollection -- do you -- do you --

14  you reviewed the records regarding this cursing incident?

15  A.  Right.

16  Q.  Do you recall that it was actually a community service

17  officer that was riding --

18           MR. ALLEN:  Objection.  Relevance.

19  Q.  -- that said that he pulled a gun on a citizen --

20           THE COURT:  Relevance.  Sustained.  Sustained.

21  Q.  BY MR. POINTER:  You understand it was a community service

22  officer that said that Officer Acosta pulled his gun, correct?

23  A.  Yes.

24  Q.  Now, you reviewed the records of this case, some of those

25  records were produced by my office, and other of these records

1    came from the defendant himself, right?

2    A.   I think, ultimately, they had to, yes.

3    Q.   Yes.  Nowhere in those records did you see anything about

4    the defendant engaging in peer counseling, did you?

5    A.   No.

6    Q.   This is the first time you've heard this today, right?

7    A.   True.

8    Q.   You read the officer's deposition, correct?

9    A.   Yes.

10   Q.   Asked him questions about his PTSD, and his time at the

11   Veterans Administration, correct?

12   A.   Yes.

13   Q.   At no time during the course of the deposition, until

14   today, have we heard that he did some alternative treatment

15   such as peer counseling, correct?

16   A.   True.

17   Q.   Now, you were also asked questions about the rock throwing

18   incident, and asked questions about why was it that Officer

19   Acosta had kicked the door.  Do you remember those questions

20   from counsel?

21   A.   Yes.

22   Q.   And I believe you answered -- you said you didn't know why

23   he had kicked the door?

24   A.   Right.

25   Q.   Would it refresh your recollection to look at Exhibit 21,

1    page 69, as to what the defendant -- I will just direct -- do

2    you have -- I'm sorry.

3    A.   I don't think I have it.

4          MR. ALLEN:  Your Honor, if I could just have a moment

5    to see the exhibit?

6          MR. POINTER:  May I approach, Your Honor?

7          THE COURT:  You may.  You're going to be a little bit

8    longer on this examination?

9          MR. POINTER:  No.  I have, like, two questions and

10   I'm done.

11         THE COURT:  Okay.

12         MR. POINTER:  Thank you, Your Honor.

13         THE WITNESS:  Okay.

14   Q.   BY MR. POINTER:  Does that refresh your recollection as to

15   what the defendant said why he kicked that door?

16   A.   He said he was pissed off.

17   Q.   And, finally, you were asked a number of questions about

18   how many shootings Officer Acosta had been involved in, right?

19   A.   Right.

20   Q.   How many claims of excessive force he had been involved in,

21   right?

22   A.   Right.

23   Q.   How many people has he killed?

24   A.   Right.

25   Q.   How many people has he killed?

1          MR. ALLEN:  I didn't -- objection.  Argumentative.

2    403.

3          THE COURT:  403.  Relevance.  Sustained.

4          MR. POINTER:  No further questions.  Thank you.

5          MR. ALLEN:  No further questions, Your Honor.  Thank

6    you.

7          THE COURT:  All right.  It's 4:30, and that means

8    that we're going to end for the day.  So, you may step down and

9    you are excused.

10       I'm going to assume that unless I hear otherwise, whenever

11   I excuse someone, they are excused for the remainder of the

12   trial.

13         MR. ALLEN:  No objection, Your Honor.

14         MR. POINTER:  Yes, Your Honor.

15         THE COURT:  Thank you, very much.

16       Ladies and gentlemen, you're going to be released from your

17   first day as a sitting juror, and this is the time when friends

18   and family want to know all about what's happening today, what

19   kind of case is it, how did it go, what's going on.  This is

20   the time that, at least the first day, my experience is to just

21   say, I can't talk about it right now, and I'll let you know as

22   soon as we're all done.

23       Are there any questions about the timing?

24       We'll be starting tomorrow at 9 o'clock a.m. and we'll be

25   on the normal schedule as I gave you earlier today.

1        Yes, sir?

2              JUROR:  If, in any case, something slips out, what do

3   I do?  I don't say it's going to happen, but if something -- if

4   I say something, what do I have to do?

5              THE COURT:  If you say something, you should just let

6   me know.  But I would just request that if it were to, as you

7   say, slip out, don't slip and have a complete conversation that

8   goes on.

9              JUROR:  No.  Just --

10             THE COURT:  Things do come out, but I'm concerned

11  about having a conversation and you give your opinion about

12  what's going on, the witnesses, the attorneys, the judge, or

13  whatever else.  You have to wait until you're discharged before

14  you can do that.

15             JUROR:  Okay.

16             THE COURT:  Any other questions?

17      All right.  Thank you very much, ladies and gentlemen.  We

18  will see you tomorrow at 9:00 a.m.

19      Court is adjourned for the day.

20                   (Proceedings adjourned, 4:37 p.m.)

21                            ---oOo---

22  I certify that the foregoing is a correct transcript from the

23  record of proceedings in the above-entitled matter.

24                        /s/ Kimberly M. Bennett
                          KIMBERLY M. BENNETT
25                        CSR No. 8953, RPR, CRR, RMR