**FILED**

**Sep 25, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TAN LAM, as Successor-In-Interest to decedent Sonny Lam (aka Son Tung Lam), | No. 18-17404 |
| *Plaintiff-Appellee*, | D.C. No. 2:15-cv-00531-MCE-KJN |
| v. | |
| CITY OF LOS BANOS, a Municipal Corporation, | OPINION |
| *Defendant*, | |
| and | |
| JAIRO ACOSTA, Police Officer for the City of Los Banos, | |
| *Defendant-Appellant.* | |

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted May 12, 2020
San Francisco, California

Filed September 25, 2020

Before: Sidney R. Thomas, Chief Judge, and Michelle T.
Friedland and Mark J. Bennett, Circuit Judges.

Opinion by Chief Judge Thomas;
Dissent by Judge Bennett

---

# SUMMARY[*]

---

## Civil Rights

The panel affirmed in part and reversed in part the district court's (1) judgment for plaintiff following a jury verdict; and (2) denial of defendant's motion pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law in an action brought pursuant to 42 U.S.C. § 1983 and state law alleging that defendant, a police officer, used excessive deadly force when he shot plaintiff's son.

A jury specifically found that plaintiff's son, Sonny Lam, had stabbed Officer Acosta in the forearm with a pair of scissors prior to Acosta firing his first shot, that Acosta had retreated, and that Sonny did not approach Acosta with scissors before Acosta fired a fatal second shot.

The panel held that this case was largely controlled by deferential standards of review. The panel held that viewing the evidence in the light most favorable to plaintiff, as it was required to do at this juncture, the evidence sufficiently supported the jury's special findings that Sonny did not

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

approach Officer Acosta with scissors prior to Acosta firing the second shot. The panel therefore concluded that the district court did not err in denying Acosta's Rule 50(b) sufficiency of the evidence motion.

The panel held that the district court properly denied the Rule 50(b) motion on qualified immunity as to plaintiff's Fourth Amendment claim. The panel held that the law was clearly established at the time of the shooting that an officer could not constitutionally kill a person who did not pose an immediate threat. The law was also clearly established at the time of the incident that firing a second shot at a person who had previously been aggressive, but posed no threat to the officer at the time of the second shot, would violate the victim's rights. In sum, the trial evidence, construed in the light most favorable to plaintiff, did not compel the conclusion that Acosta was entitled to qualified immunity.

The panel held that there was insufficient evidence to support the jury's verdict in favor of plaintiff on his Fourteenth Amendment claim for loss of a familial relationship. The panel held that there was insufficient evidence showing that Acosta acted with a purpose to harm unrelated to a legitimate law enforcement objective. Because the record was devoid of this evidence and the jury found only that Acosta acted "with a purpose to harm," and not a purpose to harm unrelated to a legitimate law enforcement objective, plaintiff failed to show that Acosta committed a Fourteenth Amendment violation. Therefore, the panel reversed the jury's verdict for plaintiff on the Fourteenth Amendment claim and remanded to the district court for further proceedings.

The panel held that district court did not commit plain error in its admission of evidence that Acosta had experienced post-traumatic stress disorder ("PTSD").  The panel further noted that Acosta did not appeal the merits of the jury's decisions on the state law negligence claims.

Dissenting, Judge Bennett stated that Officer Acosta was entitled to qualified immunity on plaintiff's Fourth Amendment claim because plaintiff identified no clearly established law that would have put Officer Acosta on notice that his actions violated the Fourth Amendment.  Judge Bennett further stated that given the complete lack of evidence showing that Officer Acosta suffered from PTSD at the time of the 2013 incident in question, the district court plainly erred in allowing plaintiff to admit evidence of Officer Acosta's 2011 PTSD diagnosis.

## COUNSEL

Suzanne M. Nicholson (argued), Sacramento, California; Kevin P. Allen, Allen Glaessner Hazelwood & Werth LLP, San Francisco, California; for Defendant-Appellant.

Adanté D. Pointer (argued), Ayana C. Curry, and John L. Burris, Law Offices of John L. Burris, Oakland, California, for Plaintiff-Appellee.

Lee H. Roistacher, Daley & Heft LLP, Solana Beach, California, for Amici Curiae California State Association of Counties and League of California Cities.

James R. Touchstone and Denise L. Rocawich, Jones & Mayer, Fullerton, California, for Amici Curiae California State Sheriffs' Association, California Police Chiefs Association, and California Peace Officers' Association.

## OPINION

THOMAS, Chief Judge:

Sonny Lam died after he was shot twice inside his home by a City of Los Banos police officer. A jury specifically found that Sonny had stabbed the officer in the forearm with a pair of scissors prior to the first shot, that the officer had retreated after firing the first shot, and that Sonny did not approach the officer with scissors before the officer fired the fatal second shot. Sonny's father, Tan Lam, filed a complaint alleging violations of constitutional rights under 42 U.S.C. § 1983 and state law negligence claims. The officer appeals the jury verdict in Lam's favor on those claims.

Giving deference to the jury's findings and drawing all reasonable inferences in Lam's favor, *see Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003), we affirm the district court's judgment on the Fourth Amendment claim. On the Fourteenth Amendment claim, we reverse the district court's denial of the officer's renewed motion for judgment as a matter of law and remand to the district court for further proceedings.

I

A[1]

At the time of the incident, Tan Lam—then 80 years old—lived with his 42-year-old son, Sonny Lam, at Sonny's home in Los Banos, California. Sonny had Type 2 diabetes and a history of mental health issues that included symptoms such as "hearing voices." In the past, Sonny generally managed these mental health issues with medication, but he had stopped taking his medications, which caused his mental and physical health to deteriorate. At the time of this incident, Sonny was 5' 8", weighed 136 pounds, and was very frail. In the afternoon of September 2, 2013, Sonny became agitated, swearing at and unsuccessfully attempting to hit Lam, so Lam drove to a neighbor's house and asked her to call 911. Lam was under the impression that the police would make Sonny take his medication, and Lam testified that he had been advised by "an agency specialized in mental health" that the police could take Sonny to a "specialized hospital for treatment."

Officer Jairo Acosta was dispatched to investigate the call as a possible assault, and he met Lam outside Sonny's home. Lam told Acosta that Sonny had "lost his mind" before the two entered the home through the garage.[2] When Lam and

---

[1] The evidence at trial regarding the events described below conflicted on certain points. Consistent with our obligation to draw inferences in Lam's favor, we provide the version of events most favorable to Lam when recounting conflicting testimony, unless otherwise indicated.

[2] The layout of Sonny's home is relevant to putting the events at issue in context. The home was set up with an entrance through the garage, which opened into a laundry room. The laundry room opened into the

Acosta arrived outside Sonny's bedroom, Acosta pushed open the bedroom door and found Sonny sitting at his desk, unarmed and wearing nothing but basketball shorts. Sonny immediately started yelling at Acosta and Lam to get out of the room. Acosta approached Sonny and grabbed Sonny's shoulder to get Sonny to leave the room with him. Lam testified that when Sonny refused to leave his room, Acosta challenged Sonny, saying, "Beat me, beat me," as Sonny yelled, "No, no, no" and made punching motions through the air. Sonny then stood up and began pushing Acosta out of his room, forcing both Lam and Acosta into the main hallway. Lam retreated down the hallway into the turning point so that he was behind Acosta and could no longer see Sonny. Acosta radioed dispatch with a non-urgent request for back-up. Sonny did not have any weapon in his hands at this point.

According to Acosta, Sonny then went to a desk drawer and grabbed what Acosta thought was a knife, but turned out to be a pair of scissors. Acosta testified that he then pulled out his gun and took a step back as Sonny approached him with the scissors, and that he told Sonny to drop the scissors. Lam testified he did not hear Acosta give a warning. Sonny stabbed Acosta in the left forearm with the scissors, and Acosta then shot Sonny in the right calf, with the bullet passing through his leg.

After Acosta fired the first shot, Lam ran to Acosta and asked him why he shot Sonny, and Acosta replied that Sonny had a knife. Lam testified that he could not see any weapon, but Acosta yelled, "Go back, go back." Acosta retreated

---

main hallway, with Sonny's room immediately on the right. The main hallway stretched 16 feet before it turned at a 90-degree angle to the left, then continued into the kitchen and living room area.

down the hall, and took the time to clear his handgun, which had jammed, using a "tap, rack[,] and roll" technique.

Acosta continued backing down the hallway so that Lam was behind him. When Acosta was positioned near the turn of the hallway, he fired the second shot at Sonny, who was still in the main hallway. It is undisputed that Acosta did not provide a warning to Sonny before firing the second shot. The second shot hit Sonny in the chest at a downward angle, and he fell to the ground.

Lam rushed to Sonny, who was lying face-up on the floor, bleeding and screaming. Backup arrived shortly thereafter, and Sonny was handcuffed before being placed on a stretcher and taken outside while Lam was told to wait in the living room. Officer Teresa Provencio was the first officer to arrive after the shooting, entering through the garage and walking past Sonny and down the hallway. She did not see any scissors or other weapon near Sonny, nor did Acosta warn her that Sonny had been armed or that he had stabbed Acosta with the scissors. Officer Christopher Borchardt was the next to arrive on-scene, and Acosta reported to Borchardt that Sonny had stabbed him with scissors, and Acosta revealed a small puncture wound on his forearm. Borchardt testified that he observed a pair of scissors under Sonny's thigh, but the position of the scissors was never confirmed by photograph because Borchardt testified that he slid the scissors away from Sonny and that the scissors were then moved to a different room. Sonny was taken to the hospital, where he died during surgery.

B

Lam filed a complaint against both the City of Los Banos and Acosta, alleging violations of constitutional rights under 42 U.S.C. § 1983 as well as state law claims. The district court granted summary judgment for the City on all claims. However, the district court concluded that there remained issues of triable facts on some of Lam's claims against Acosta, including his Fourth Amendment excessive use of force claim, his Fourteenth Amendment loss of familial relationship claim, his state law negligence and negligent infliction of emotional distress claims, and the question of qualified immunity. Among other issues, the court concluded that disputed material issues of fact existed as to whether (1) Acosta was aware that Sonny suffered from mental illness prior to entering Sonny's home; (2) Sonny was armed with scissors at any point; (3) Sonny stabbed Acosta with scissors; (4) Sonny attempted to take Acosta's gun; and (5) after being shot the first time, Sonny continued to pose a threat to Acosta.

Prior to trial, Acosta filed a motion *in limine* to exclude evidence of his 2011 post-traumatic stress disorder ("PTSD") diagnosis by a Veterans Affairs ("VA") psychologist and to exclude expert testimony related to that diagnosis. At the pretrial conference, the district court denied Acosta's motion to exclude all PTSD evidence and stated, "That's without prejudice though, because there is a lot of things that are involved in PTSD that may or may not be relevant as we move through. But for right now I'm denying it without prejudice." In response to subsequent comments made by Acosta's counsel about the challenge to the expert testimony, the district court reiterated that the motion *in limine* to

exclude PTSD evidence had been denied: "[I]t is going to wait. So the motion has been denied."

At trial, deposition testimony from Nurse Practitioner Mary Jimenez and Dr. Joseph Shuman—VA healthcare providers who personally examined Acosta in relation to his PTSD symptoms in February and June of 2011, respectively—was read to the jury. Jimenez's testimony reflected that Acosta had described experiencing difficulty making decisions, forgetfulness, irritability, poor frustration tolerance, and that he felt depressed and was easily angered. Dr. Shuman evaluated Acosta after Jimenez completed her evaluation, and he diagnosed Acosta with prolonged PTSD, meaning that Acosta had experienced PTSD symptoms for a period longer than 90 days. Similar to Jimenez's testimony, Dr. Shuman's testimony reflected that Acosta reported irritability, "difficulty concentrating that . . . contributes often to short term memory problems," hypervigilance, and an exaggerated startle response. Dr. Shuman's testimony noted that Acosta's PTSD symptom of "feeling as if the traumatic event was recurring" could potentially be triggered by certain on-the-job experiences, such as by clearing houses and drawing his weapon. Acosta's counsel did not object to this testimony at trial.

Lam's expert, Dr. Kris Mohandie, also testified at trial about how Acosta's PTSD would have affected his reactions to stressful situations that he encountered while on the job. Acosta raised an objection under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to Dr. Mohandie's testimony, on the ground that the testimony lacked foundation because Dr. Mohandie never personally examined Acosta. Acosta's objection was overruled.

At the close of the evidence, Acosta made a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), in which he attempted to renew his summary judgment motion.  The following exchange between Acosta's counsel and the district court took place:

> Counsel: So, as far as the Fourth Amendment claim slash Fourteenth Amendment claim of excessive force, I would renew our summary judgment as a 50(a) motion, orally.
>
> *******
>
> District Court: Just so I'm clear, are you making a Rule 50(a) [motion], or renewing the summary judgment [motion], 56, or both?
>
> Counsel: Because I'm not an expert on my FRCP, perhaps I should be better at, I was in a trial where a district court judge renewed the summary judgment sua sponte based on the last evidence that was presented just prior to trial starting.
>
> District Court: Just so we're clear, I'm not going to do that.
>
> Counsel: Okay.  So it's a 50(a) motion.

The district court then denied the motion.

The jury returned a verdict in Lam's favor on his Fourth Amendment, Fourteenth Amendment, and state negligence and negligent infliction of emotional distress claims

(apportioning 70% of the fault to Acosta). The jury awarded Lam $250,000 for Sonny's pain and suffering prior to his death, $2,000,000 for Lam's past and future loss of Sonny's love and companionship, and $500,000 for Lam's emotional distress, for a total award of $2.75 million. The jury also made the following findings in response to special interrogatories:

> (1) Sonny stabbed Acosta with a pair of scissors;

> (2) Sonny did not grab Acosta's gun prior to Acosta firing the first shot;

> (3) Acosta retreated from Sonny after firing the first shot; and

> (4) Sonny did not approach Acosta with scissors before Acosta fired his gun the second time.

After the judgment was entered against him, Acosta timely filed a Rule 50(b) renewed motion for judgment as a matter of law or, in the alternative, a Rule 59 motion for a new trial. Acosta asserted that judgment as a matter of law was warranted on his federal claims because his use of force was objectively reasonable, he lacked the requisite purpose to harm required for a Fourteenth Amendment due process violation, and he was entitled to qualified immunity. The district court denied the motion. It concluded that there was sufficient evidence to support the jury's award in Lam's favor and that Acosta was not entitled to qualified immunity. On the qualified immunity issue, the district court stated,

> Given [the jury's special findings], even if the
> Court could determine that Officer Acosta
> was entitled to qualified immunity regarding
> the first gunshot, the jury found with respect
> to the second shot that Officer Acosta was
> retreating and was no longer being
> approached with scissors. There is simply no
> way given the factual determinations reached
> by the jury that the Court can determine
> Officer Acosta is entitled to immunity with
> regard to the second gunshot.

Acosta timely appealed, arguing that the district court
erred in denying Acosta's Rule 50(b) motion because
insufficient evidence supported the jury's special finding that
Sonny did not approach Acosta with scissors before Acosta
fired the second shot, and the jury's finding that Acosta acted
with a purpose to harm unrelated to a legitimate law
enforcement objective. Acosta further argued that his use of
force was reasonable and, even if there was a constitutional
violation here, he is entitled to qualified immunity. He also
contends that the district court erred in admitting the evidence
related to his PTSD diagnosis. Aside from his evidentiary
challenge to the PTSD evidence, Acosta did not appeal the
merits of the jury verdict on the state law claims.

## II

The district court properly held that there was sufficient
evidence to sustain the jury's special verdict finding that
Sonny did not approach Acosta with scissors prior to the
second shot and thus the district court properly denied
Acosta's Rule 50(b) motion on that claim.

We review the district court's denial of Acosta's Rule 50(b) motion de novo, drawing all reasonable inferences in Lam's favor, *see Reese v. County of Sacramento*, 888 F.3d 1030, 1036 (9th Cir. 2018), and we take special care not to reweigh the evidence in our consideration, *see Lam v. City of San Jose*, 869 F.3d 1077, 1085 (9th Cir. 2017) ("Our role is not to overturn the verdict merely because the jury could have reached the opposite conclusion based on the evidence."). We may not make credibility determinations, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990), and we "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Josephs v. Pac Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006)). Drawing all reasonable inferences in Lam's favor, we conclude that there was sufficient evidence to support the jury's special finding.

Acosta specifically challenges the jury's fourth special finding—that Sonny did not approach Acosta with scissors before Acosta shot him the second time. We reject Acosta's argument that this finding is unsupported by the evidence in the record. The special interrogatory asked whether "Sonny Lam approach[ed] Officer Acosta with scissors before Officer Acosta fired his gun the second time," to which the jury answered "NO." Both parties agree that Sonny "approach[ed]" Acosta prior to the second shot, but they disagree on the manner in which Sonny approached Acosta**.**

After carefully examining the record, we conclude that the jury did not contravene the weight of the evidence in

making the special finding that Sonny did not have scissors as he approached Acosta before the second shot. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.").

First, Tan Lam was present for the events in question as a percipient witness.[3]  According to Lam, when Acosta and Sonny started struggling in the bedroom, he backed away three to four meters outside the bedroom.  Lam testified that, after he heard the first shot, he ran to Acosta and asked him why he shot Sonny.  Acosta told him that Sonny had a knife. Lam then tried to run over to see what happened, but Acosta told him to go back.  Lam was standing behind Acosta when Acosta fired the second shot, and after that shot Lam ran to Sonny and saw him lying face up.  Crucially, Lam testified that he saw police "turn[] [Sonny] upside down, face down, and . . . handcuff[] him"—but that he did not see a pair of scissors near Sonny.  In fact, Lam did not see a pair of scissors until after police had left the home.

Second, consistent with Lam's testimony that he did not observe a pair of scissors near Sonny after the second shot, Officer Provencio—who was the first officer to arrive on the scene and walked right past Sonny—testified that she did not observe a pair of scissors near Sonny.  The testimony from

---

[3] Acosta, citing *Gregory v. County of Maui*, 523 F.3d 1103 (9th Cir. 2008), contends that the jury should not have credited Lam's testimony because he was standing behind Acosta when the shooting took place. This argument is unavailing. Whereas the purported witnesses in *Gregory* were not even inside the building in which the deadly force incident occurred, *see id.* at 1106 n.3, Lam was within several yards of Acosta and Sonny during the shooting.

Lam and Provencio is sufficient to support the jury's finding that Sonny did not have scissors prior to the second shot.

Third, Acosta gave inconsistent accounts of whether Sonny advanced on him with the scissors, and the jury was entitled to take those inconsistencies into consideration. At trial, Acosta gave two different versions of which hand Sonny used to hold the scissors. His officer-involved-shooting interview, conducted just a few hours after the event, contradicted his trial testimony. In addition, he told the interviewers that Sonny had dropped the scissors after the first shot. At trial, he testified that Sonny had never dropped the scissors. He told interviewers that Sonny had fallen to the ground after the first shot, but at trial he claimed Sonny did not fall after the first shot. At trial, he had difficulty remembering what he said to arriving officers or the sequence of events. In short, Acosta's testimony was significantly impeached by his prior inconsistent statements and his inconsistent testimony at trial.

In sum, we cannot say that, in this case, "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Go Daddy Software, Inc.*, 581 F.3d at 961 (quoting *Josephs*, 443 F.3d at 1062). Viewing the evidence in the light most favorable to Lam, which we must do at this juncture, the evidence sufficiently supports the jury's special findings. We are not permitted to make credibility determinations in reviewing a denial of a Rule 50(b) evidence sufficiency motion. *Lytle*, 494 U.S. at 554–55. And, indeed, we "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150–51. Applying these standards, we conclude that the district court did not err in

denying Acosta's Rule 50(b) sufficiency of the evidence motion.

### III

The district court did not err in denying Acosta's Rule 50(b) motion challenging the jury's verdict on Lam's Fourth Amendment claim. Acosta argues that Lam failed to establish a Fourth Amendment violation because Acosta's use of force was objectively reasonable and that, even if there were a constitutional violation, he is entitled to qualified immunity.

### A

The district court properly rejected Acosta's argument that the jury improperly found that Acosta's use of deadly force was unreasonable. We evaluate Fourth Amendment excessive use of force claims for objective reasonableness, asking "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "[B]ecause questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury." *Barnard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013) (quoting *Cameron v. Craig*, 713 F.3d 1012, 1021 (9th Cir. 2013) (quoting *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994))). Given the jury's special findings that Acosta had retreated from Sonny after firing the first shot, and that Sonny did not have scissors as he approached Acosta before the second shot, the district court did not err in concluding that Sonny's constitutional rights were violated as a result of Acosta's objectively unreasonable use of deadly force.

B

The district court also did not err in denying Acosta's Rule 50(b) motion for judgment as a matter of law based on his assertion of qualified immunity, a decision we review de novo.[4] *Reese*, 888 F.3d at 1036. "Qualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017) (citing *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)). In evaluating a renewed qualified immunity motion under Rule 50(b) after a jury trial, we analyze the motion based on the facts established at trial, *see Reese*, 888 F.3d at 1036, viewing the evidence in the light most favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, *see Barnard*, 721 F.3d at 1075.

"Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). We ask two questions when determining whether an officer is entitled to qualified immunity: "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017) (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)).

---

[4] We reject Lam's contention that Acosta waived the issue of qualified immunity by failing to raise it in his Rule 50(a) motion. The factual arguments Acosta made in support of his Rule 50(a) motion are the same arguments underlying Acosta's asserted claim to qualified immunity.

1

In considering whether a constitutional violation occurred, our analysis includes three steps: First, we consider the type and amount of force inflicted to establish the severity of the intrusion on the individual's Fourth Amendment rights; second, we consider the government's interest in the use of that force; and third, we weigh the "gravity of the intrusion on the individual against the government's need for that intrusion." *See Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (citation omitted).

a

As to the type and amount of force inflicted, Acosta employed deadly force when he shot Sonny. *See Bryan v. MacPherson*, 630 F.3d 805, 825 n.6 (9th Cir. 2010) ("'Lethal force' is force that creates a substantial risk of death or serious bodily injury.") (citing *Smith v. City of Hemet*, 394 F.3d 689, 705–07 (9th Cir. 2005) (en banc)). The Supreme Court has recognized that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). In short, the use of deadly force against Sonny was the greatest degree of force possible, and therefore the most severe intrusion on his Fourth Amendment rights.

b

We next consider the government's interest in the amount of force used, and we must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case.'" *Bryan*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir.

1994)). When evaluating the government's interest, the most important factor is whether the person posed an immediate threat to the safety of the officer or another. *See id.* (explaining that other, less important factors that we consider are "the severity of the crime at issue" and whether the person "is actively resisting arrest or attempting to evade arrest by flight" (quoting *Graham*, 490 U.S. at 396)). "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Id.* (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)).

Here, objective evidence supported the conclusion that Sonny was not a threat to Acosta between the first and second shot. It is undisputed (and the jury so found) that Acosta backed down the hallway after the first shot. Additionally, Acosta not only had time to speak to Lam, but also had time to clear his jammed handgun using a "tap, rack[,] and roll" technique. Further, there was testimony about the bullet trajectory that suggested that Sonny was not fully upright when he was shot the second time. Finally, the jury found that, in the moments before the second shot, Sonny was not approaching Acosta with scissors. Because the weight of the evidence indicates that Sonny did not pose an immediate threat to Acosta or anyone else between the first and the second shot, this factor favors Lam. *Cf. Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

*Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992) (per curiam), *overruled on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001), involved facts analogous to those here.

*Hopkins* compels us to conclude that Sonny did not pose an immediate threat to Acosta or Lam between the first and second shot. In *Hopkins*, according to the officer, the decedent grabbed the officer's baton and "us[ed] it to hit the officer ten or twenty times over his head, back, shoulders and arms." *Id.* at 886.[5]  The officer shot the decedent "six times at a range of three to four feet," injuring but not killing the decedent.  *Id.* at 883.[6]  The officer moved away from the decedent after firing that round of shots, and the decedent "followed at a brisk pace," though he no longer had the baton in his hands. *Id.* at 887.  The officer "yelled at [the decedent] to stop and leave him alone," but apparently the decedent continued to advance. *Id.*  The officer then shot the decedent four times, *id.*, and the decedent died after the second round of shots, *id.* at 884.

We held, based on this version of events, that only the first use of deadly force could be justified because the decedent was "allegedly beating" the officer. *Id.* at 887.  We could not "say as a matter of law that [the officer] acted reasonably" when he fired the second round of shots because "it was far from clear that [the officer] reasonably feared for his life." *Id.*  At the time the officer fired those shots, the decedent "had been wounded and was unarmed," and the officer "had already called for help; he needed only to delay [the decedent] for a short period of time"—which he could

---

[5] Medical evidence undercut the officer's story, indicating that the officer "was hit only once or twice with the baton." *Hopkins*, 958 F.2d at 886.  Additionally, an eyewitness contradicted the officer's version of events. *Id.* at 884.

[6] The officer alleged that he warned the decedent before opening fire, but his version of events was contradicted by a percipient eyewitness. *Hopkins*, 958 F.2d at 883–84.

have done by evading the decedent or "attempt[ing] to subdue him with his fists, his feet, his baton or the butt of his gun." *Id.*

Here, as in *Hopkins*, though Acosta's first shot—fired after Sonny had stabbed him with scissors—was likely an objectively reasonable use of force, Acosta's second shot was not an objectively reasonable use of force. When Acosta fired the second shot, Sonny no longer posed an immediate threat: Sonny was injured and was not approaching Acosta with scissors, and Acosta was retreating from Sonny. Acosta could have retreated further, even out of the house, and waited for backup. Indeed, he had already radioed for backup, which was on the way.

We may also consider "the availability of less intrusive alternatives to the force employed, [and] whether proper warnings were given" before the officer used deadly force. *Glenn*, 673 F.3d at 872. Less intrusive alternatives to the deadly force were available to Acosta. He had a baton and pepper spray on his person, and he could have held his fire "unless and until [Sonny] showed signs of danger." *See Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017). "To endorse [Acosta's] chosen course of action"—firing a fatal shot when Sonny no longer posed an immediate threat—"would be to say that a police officer may reasonably fire repeatedly upon an unarmed, wounded civilian *even when alternative courses of action are open to him*." *Hopkins*, 958 F.2d at 887.

Finally, though the parties dispute whether Acosta warned Sonny before the first shot, it is undisputed that he did not warn Sonny before firing the second shot. Between the first and the second shot, Acosta was able to tell Lam that Sonny

"had a knife," direct Lam to "go back," retreat down the hallway, and clear his gun.  Thus, "there was 'ample time to give that order or warning and no reason whatsoever not to do so.'"  *Bryan*, 630 F.3d at 831 (quoting *Deorle*, 272 F.3d at 1284).

c

In short, Sonny had an undeniable Fourth Amendment interest in his own life, *Garner*, 471 U.S. at 11, and Acosta's use of deadly force in firing the second shot was objectively unreasonable in light of the facts that Sonny did not pose an immediate threat, alternative methods of force were available to Acosta, and Acosta did not warn Sonny before firing the second shot.  Accordingly, the district court properly concluded that Acosta violated Sonny's Fourth Amendment right.

2

Moving to the second prong of our qualified immunity analysis, we recognize that even where an officer violates a constitutional right, the officer will be granted qualified immunity if the use of force was rooted in a reasonable belief that, under the law at the time of the incident, the use of force was lawful.  *See Bryan*, 630 F.3d at 832.  The district court did not err in concluding that Acosta was not entitled to qualified immunity regarding the second shot he fired because the law was clearly established that an officer may not shoot a previously armed person who no longer posed a threat.

a

We analyze the clearly-established prong of our qualified immunity inquiry by "considering the jury's factual findings in the special interrogatories and construing the evidence regarding the remaining factual disputes most favorably to" Lam. *Jones v. Treubig*, 963 F.3d 214, 228 (2d Cir. 2020). Therefore, we must reject Acosta's argument that one piece of physical evidence—namely, the trail of bloody footprints—compels the conclusion that Acosta is entitled to qualified immunity. Although Acosta testified that Sonny was "walking towards" him, the jury was entitled to "disbelieve" his "self-serving testimony," *see Baker v. Delta Air Lines, Inc.*, 6 F.3d 632, 645 (9th Cir. 1993) (quoting *Uffelman v. Lone Star Steel Co.*, 863 F.2d 404, 409 (5th Cir. 1989)), particularly because other parts of Acosta's testimony were inconsistent or weak, and evidence in the record supports the jury's finding. *See generally Smith*, 394 F.3d at 701 (explaining that in excessive use of force cases, the jury's role in making factual and credibility determinations is exceptionally important).

It is undisputed that the first shot hit and went through Sonny's leg. The jury could have reasonably inferred from this fact that Sonny stumbled down the hallway after being injured by the first shot Acosta fired. Indeed, the bullet trajectory evidence showing that the second shot entered Sonny's body at a "pretty steep," "downward trajectory" was consistent with Sonny not having been upright when the fatal shot was fired.

In sum, the trial evidence, construed in the light most favorable to Lam, does not compel the conclusion that Acosta was entitled to qualified immunity.

b

As to our consideration of applicable law, it has long been clearly established that an officer could not use deadly force on an unarmed, nonthreatening suspect and any belief to the contrary was not reasonable.  As the Supreme Court plainly put it in *Garner*: "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  471 U.S. at 11–12.  Beyond that level of generality, as forceful as it is, we must decide whether, at the time this shooting occurred, it was apparently unlawful for a police officer to shoot a mentally ill man in deteriorating health in his own home, who—though previously armed—was incapacitated and no longer posed a threat.  We conclude that it was.

*Hopkins* is instructive and clearly established that Acosta's second shot violated the Fourth Amendment at the time of the incident.  Here, as in *Hopkins*, an officer's initial shot was in response to an armed person who had injured him.  *See* 958 F.2d at 886.  Further, when the person—by then wounded and unarmed—approached the officer, in both instances the officer shot again, despite being in no imminent danger.  *Id.* at 887.  Although the officer in *Hopkins* apparently had a minute or two to regroup between the first and second round of shots, *see id.* at 883, while the events here unfolded more rapidly, such a distinction is not ultimately meaningful because Acosta nonetheless had time to reevaluate whether Sonny posed an immediate, significant threat between the first and second shots.  *Hopkins* should have made it clear to Acosta that it was unreasonable to shoot Sonny a second time while he stumbled down the hallway toward Acosta—without any weapon, without making any threatening gesture, and after being severely wounded by the

first shot.  Thus, *Hopkins* put Acosta on notice that firing the second shot was unlawful.

Because it was clearly established that shooting a non-threatening suspect would violate the suspect's constitutional rights, Acosta failed to meet his burden of showing that he is entitled to qualified immunity.  Our conclusion is further supported by two other lines of precedent.

First, though Acosta makes much of the fact that Sonny was armed with scissors immediately prior to the first shot, our precedent has long made clear that the suspect's possession of a weapon at some point in the incident does not provide an officer with carte blanche to use deadly force. Take, for example, our decision in *Deorle*.  In *Deorle*, plaintiff Deorle began behaving erratically so his wife placed a 911 call because he had "lost control of himself" and she was "[i]n search of someone to help her with her distressed husband."  272 F.3d at 1276.  When police arrived, Deorle refused to let them in the home without a warrant and exited the home while hurling verbal abuse at the officers.  *Id.*  He also brandished a hatchet, carried an unloaded crossbow, and screamed at an officer that he would "kick his ass."  *Id.* at 1276–77.  One officer ordered Deorle to put down the bow, and he did so, but then he began walking toward the officer, who fired a "beanbag round" at Deorle's face without warning, seriously injuring him.  *Id.* at 1277–78.

We reversed and remanded the district court's grant of summary judgment on qualified immunity grounds for the officer's excessive use of force.  We explained that, despite the plaintiff's having previously armed himself and verbally threatening the officer, the plaintiff "present[ed] no objectively reasonable threat" at the time the officer deployed

the force, and "[e]very police officer should know that it is objectively unreasonable to shoot" in such a situation. *See id.* at 1285; *see also, e.g.*, *George v. Morris*, 736 F.3d 829, 838–39 (9th Cir. 2013) (reviewing our caselaw, which has made clear "that the fact that the 'suspect was armed with a deadly weapon' does *not* render the officers' response per se reasonable under the Fourth Amendment," and holding that summary judgment for the officers was inappropriate given evidence that the suspect was pointing a gun away from the officers when they shot him) (quoting *Glenn*, 673 F.3d at 872)); *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002) (en banc) (concluding that "[t]he only circumstance[] in this case favoring the use of force was the fact that plaintiff had earlier been armed" and that "[plaintiff's] earlier use of a weapon, that he clearly no longer carried, is insufficient to justify the intrusion on [his] personal security").

Second, precedent forecloses Acosta's argument that he is entitled to qualified immunity because "Sonny had *already* stabbed Acosta with scissors" at the time of the second shot. At the time of the incident, caselaw had made clear that an officer violates the Fourth Amendment by shooting a person who had previously injured someone but no longer posed an immediate threat.

The reasoning from *Zion* is persuasive.  *See* 874 F.3d at 1075–76.  The shooting in *Zion* occurred 22 days after the shooting at issue here, and *Zion* was decided after the shooting at issue here.  Nonetheless, we may still look to *Zion* to help us discern whether Acosta's use of force violated clearly established law.  When a case involves analogous conduct that occurred around the same time as the underlying incident in the matter before us, and the case holds that the

conduct at issue there violated clearly established law, then that case may indicate that the claim for qualified immunity presently before us should likewise be rejected. *See Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 & n.\*\*\* (9th Cir. 1991) (applying a later-decided case that involved an event occurring in the same time period as the incident in question). Thus, although *Zion* had not been decided before this shooting, the events underlying our decision in *Zion* occurred in the same timeframe as the events at issue here, and so it is relevant as to what a reasonable officer would have known was unlawful at the time Sonny was shot. *See id.* at 325.

In *Zion*, police were called after the decedent "bit his mother and cut her and his roommate with a kitchen knife." 874 F.3d at 1075. When an officer responded to the scene, the decedent "ran at him and stabbed him in the arms." *Id.* Subsequently, another officer shot nine rounds at the decedent in quick succession, after which the decedent fell to the ground. *Id.* The officer then approached the prone decedent and fired nine more shots at him. *Id.*

Reversing and remanding the district court's grant of summary judgment in favor of the defendants, we held that if a jury were to find that the decedent "no longer posed an immediate threat" between the first round of shots and the second round of shots, *id.* at 1076, then the officer would have been "on notice that [firing the second round of shots] would be clearly unlawful," *id.* (quoting *Saucier*, 533 U.S. at 202). We may look to the same law on which we relied in *Zion* to reach the conclusion that an officer violates a clearly established right when he shoots an incapacitated suspect who no longer poses a threat, even if the suspect previously had a weapon and stabbed an officer. *See id.* at 1075; *see also id.*

at 1076 ("We have cases holding that the use of deadly force against a non-threatening suspect is unreasonable." (citing *Garner*, 471 U.S. at 11–12; *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997))).

Not only is *Zion*'s analysis of the law persuasive, it is in accord with the decisions of our sister circuits. *See, e.g.*, *Estate of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 668–70 (4th Cir. 2020) (officers not entitled to qualified immunity in 2013 incident where they fatally shot suspect after he ceased to pose a threat, when he had previously hit and stabbed an officer); *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1175 (10th Cir. 2020) (officer not entitled to qualified immunity in a 2012 incident when he fatally shot a person whom police suspected had been an active shooter after suspect no longer posed a threat); *Harris v. Pittman*, 927 F.3d 266, 281 (4th Cir. 2019) (qualified immunity denied as to officer's second shot in 2012 incident after the officer had already wounded and disabled the suspect with the initial shot); *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (officer not entitled to qualified immunity when he fired fatal shots after suspect was no longer a danger following the suspect's initial assault on the officer); *Meyers v. Baltimore Cnty.*, 713 F.3d 723, 735 (4th Cir. 2013) (qualified immunity denied when officers continued to tase suspect who had been involved in a family dispute after he was no longer a threat); *Brockington v. Boykins*, 637 F.3d 503, 507 (4th Cir. 2011) (qualified immunity denied as to subsequent shots fired at a wounded suspect).

In sum, the district court properly denied the Rule 50(b) motion on qualified immunity as to Lam's Fourth Amendment claim. The law was clearly established at the

time of the shooting that an officer could not constitutionally kill a person who did not pose an immediate threat.  The law was also clearly established at the time of the incident that firing a second shot at a person who had previously been aggressive, but posed no threat to the officer at the time of the second shot, would violate the victim's rights.  The facts as found by the jury adequately supported the conclusion that a Fourth Amendment violation had occurred.  The district court was correct in denying qualified immunity as a matter of law.

C

In short, the district court did not err in denying Acosta's Rule 50(b) motion challenging the jury's verdict on Lam's Fourth Amendment claim.  The district court properly concluded that sufficient evidence supported the jury's conclusion that Acosta's use of deadly force was unreasonable, and the district court properly held that, given the jury findings, Acosta was not entitled to qualified immunity.

IV

The district court erred in denying Acosta's Rule 50(b) motion on Lam's Fourteenth Amendment due process claim because there was insufficient evidence in the record to support a constitutional violation.

As a parent, Lam had "a Fourteenth Amendment liberty interest in the companionship and society of [Sonny]." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Therefore, the question is whether substantial evidence supports the jury's verdict that Acosta's conduct in shooting Sonny and depriving Lam of his Fourteenth Amendment

interest "shocks the conscience." *Id.*  This standard differs from a Fourth Amendment inquiry.  Thus, there may be a Fourth Amendment violation because of an unreasonable use of force, but the circumstances may not rise to the level of a Fourteenth Amendment "shock the conscience" violation. *Zion*, 874 F.3d at 1077.

Our inquiry begins by asking "whether the circumstances are such that actual deliberation" by Acosta before his use of force was "practical." *Wilkinson*, 610 F.3d at 554 (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).  If actual deliberation was not practical, we cannot conclude that Acosta violated the Fourteenth Amendment unless substantial evidence indicates that he acted "with a purpose to harm *unrelated to legitimate law enforcement objective*s." *Id.* (emphasis added).

Here, precedent compels us to conclude that actual deliberation sufficient for Acosta to develop a purpose to harm unrelated to a legitimate law enforcement objective was not practical before Acosta shot Sonny the second time. *See, e.g.*, *S.R. Nehad v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019) (applying the purpose to harm standard where there was "some evidence that a suspect posed no danger" but where there was "no evidence that [the officer] fired on [the suspect] for any other purpose than self-defense, notwithstanding the evidence that the use of force was unreasonable"); *Zion*, 874 F.3d at 1077 (applying the purpose to harm standard when "the two volleys [of shots] came in rapid succession"); *Wilkinson*, 610 F.3d at 554 (explaining that the purpose to harm standard applies where a situation evolves quickly and forces an officer to respond quickly). Even where an officer has the time to "consider what he was doing before he acted," *Porter*, 546 F.3d at 1139—as Acosta

did here—we must apply the heightened purpose to harm standard because "'deliberation' for purposes of the shocks the conscience test is not so literal a concept," *id.*

"The purpose to harm standard is a subjective standard of culpability" and an officer "violates the due process clause if he used force with only an illegitimate purpose in mind." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (citing *Porter*, 546 F.3d at 1140). An officer acts with a legitimate purpose when he acts with the objectives of arrest, self-defense, or the protection of the public in mind, *see id.* at 454, while he acts with an illegitimate purpose if he acts with the objectives to "bully a suspect or get even," *Wilkinson*, 610 F.3d at 554 (internal quotation marks and citation omitted).

There are insufficient facts in the record to show that Acosta acted with a purpose to harm unrelated to a legitimate law enforcement objective.[7] The jury found that Sonny had stabbed Acosta with scissors prior to the first shot, so Acosta acted with the legitimate purpose of self-defense in firing the first shot. On the second shot, Acosta told Lam that Sonny

---

[7] Though the evidence does not show that Acosta acted with a purpose to harm unrelated to a legitimate law enforcement objective, that does not mean that his use of force was objectively reasonable. The "purpose to harm" inquiry is independent of the reasonableness inquiry, and our conclusion on this issue does not foreclose our conclusion above. *See, e.g., S.R. Nehad*, 929 F.3d at 1139 ("Although objective reasonableness is one means of assessing whether conduct meets the shocks the conscience standard, an unreasonable use of force does not necessarily constitute a Fourteenth Amendment substantive due process violation.") (internal quotation marks, alteration, and citation omitted); *Zion*, 874 F.3d at 1077 ("Whether excessive or not, the shootings served the legitimate purpose of stopping a dangerous suspect.").

"had a knife" and yelled for Lam to get back, evidencing that he still perceived Sonny as a threat. Although there was a short time interval between the shootings, there was no evidence that Acosta acted with the sort of malicious or vengeful intent required to satisfy the heightened purpose to harm standard. *See Porter*, 546 F.3d at 1141; *see also Zion*, 874 F.3d at 1075–77 (holding that there was no Fourteenth Amendment violation when an officer fired a second round of shots at an individual who had already been shot "nine times at relatively close range," had already "dropped to the ground," and was "making no threatening gestures"). Because the record is devoid of this evidence and the jury found only that Acosta acted "with a purpose to harm," and not a purpose to harm unrelated to a legitimate law enforcement objective, Lam failed to show that Acosta committed a Fourteenth Amendment violation. Therefore, we reverse the jury's verdict for Lam on the Fourteenth Amendment claim and remand to the district court for further proceedings.[8]

---

[8] It is not clear that reversal on the Fourteenth Amendment claim requires reducing the jury's award of damages. "Sometimes, a jury's verdict may stand on a legally viable theory even if a legally defective theory also was presented." *Webb v. Sloan*, 330 F.3d 1158, 1166 (9th Cir. 2003). The jury here awarded Lam $2,000,000 in "damages for [the] past and future loss of Decedent Sonny Lam's love, companionship, comfort, care, assistance, protection, affection, society, and moral support." And separately from Lam's Fourteenth Amendment claim, his state law negligence claim alleged that he had "sustained pecuniary loss resulting from the loss of comfort, society, attention, services, and support of his son." We leave it to the district court to determine on remand whether the $2,000,000 portion of the jury award can remain in full in light of Lam's state law negligence claim.

V

Finally, Acosta challenges the district court's admission of evidence that he had experienced PTSD. Specifically, Acosta argues that his PTSD diagnosis was irrelevant because it was more than two years old at the time of the incident and that any probative value of the diagnosis was substantially outweighed by its potential to unfairly prejudice the jury. Acosta also argues that the expert testimony regarding his diagnosis amounted to improper character evidence.

As a general rule, we review the district court's evidentiary decisions under the deferential abuse of discretion standard, and we will not reverse "unless the ruling is manifestly erroneous." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–42 (1997) (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658 (1879)). Here, in addition to our general deference to the trial court's evidentiary decisions, Acosta faces a much higher hurdle because he failed to preserve his objection to the evidence for appeal. He raised the matter in a pre-trial motion *in limine*, which the district court denied without prejudice to renewal at trial. However, Acosta did not renew his objection to the PTSD evidence at trial. Additionally, though Acosta objected to the expert testimony at trial, his primary objection was that the requirements for admitting expert testimony under *Daubert* were not satisfied, and he did not raise the improper character evidence objection he now attempts to raise on appeal.

A party may preserve an objection for appeal by raising the objection solely in a motion *in limine* "where the substance of the objection has been thoroughly explored during the hearing on the motion *in limine*, and the trial court's ruling permitting introduction of evidence was

explicit and definitive." *Palmerin v. City of Riverside*, 794 F.2d 1409, 1413 (9th Cir. 1986). If, however, there is an indication that the objection "might be subject to reconsideration," or if the disputed evidence is introduced in an unforeseen way at trial that casts doubt on the applicability of the court's *in limine* ruling, then we do not treat the district court's *in limine* ruling as definitive, and the party must renew the objection to preserve it for appeal. *See id.*; *see also Jerden v. Amstutz*, 430 F.3d 1231, 1236 (9th Cir. 2005) ("The requirement of timely and specific objections 'serves to ensure that the "nature of the error [is] called to the attention of the judge, so as to alert him [or her] to the proper course of action and enable opposing counsel to take corrective measures."'" (quoting *United States v. Gomez-Norena*, 908 F.2d 497, 500 (9th Cir. 1990) (quoting Advisory Committee's Note to Rule 103(a), 56 F.R.D. 183, 195 (1972)) (first alteration in original))).

Acosta concedes he did not object to the PTSD evidence at trial, which he needed to do in order to preserve the objection given the district court's language that it denied the motion *in limine* "without prejudice" because there were "a lot of things that are involved in PTSD that may or may not be relevant." The district court's explanation and denial without prejudice put Acosta on notice that the ruling was "subject to reconsideration," so the ruling was not definitive. *See Palmerin*, 794 F.2d at 1413.

Acosta was presented with numerous opportunities to object. References to the PTSD diagnosis were made in voir dire, the opening statement, the testimony of VA Nurse Practitioner Mary Jimenez, the testimony of expert clinical psychologist Dr. Kris Mohandie, the testimony of treating VA Clinical Psychologist Dr. Joseph Shuman, and in Acosta's

own testimony.  Far from objecting, Acosta's attorney made multiple references to the PTSD evidence during his opening and closing statements and conducted vigorous cross-examination about it.  He also did not object to Lam's counsel's closing argument discussing the issue, nor does he claim on appeal that the argument was unfair or constituted misconduct.[9]

"By failing to object to evidence at trial and request a ruling on such an objection, a party waives the right to raise admissibility issues on appeal." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996).  Thus, because Acosta did not properly renew his objection to the admission of the PTSD evidence at trial, he has waived his right to appeal the district court's evidentiary rulings.

Nonetheless, we may review the evidentiary rulings for plain error.  *See Gomez-Norena*, 908 F.2d at 500; Fed. R. Evid. 103(e).  Plain error requires an error that is plain or obvious and that it is so prejudicial that it affects the party's substantial rights such that review is necessary to prevent a miscarriage of justice.  *Draper v. Rosario*, 836 F.3d 1072, 1085 (9th Cir. 2016).  An error creates a miscarriage of justice if it "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *C.B. v. City of*

---

[9] We are not persuaded by Acosta's argument that any objection at trial to the PTSD evidence would have been futile because the PTSD evidence was "the very first piece of evidence presented to the jury" and so there were no new "facts" that could have caused the district court to reconsider its *in limine* ruling.  This argument misunderstands the district court's language in ruling on the motion *in limine*; if anything, the district court's language suggested that in the absence of additional facts, it was inclined to exclude the evidence, as Acosta had urged it to do, had he made a contemporaneous objection at trial.

*Sonora*, 769 F.3d 1005, 1019 (9th Cir. 2014) (en banc) (quoting *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 36 (1st Cir. 2006)). Plain error is not only a high standard to meet in non-evidentiary challenges, but poses an even higher burden in evidentiary appeals. As a result, "[a]ppellate decisions reversing a judgment in a civil case for plain error in applying Rules of Evidence are very rare." 1 C. Mueller & L. Kirkpatrick, *Federal Evidence* § 1:22 (4th ed. 2013).

Under Federal Rules of Evidence 401 and 402, relevant admissible evidence includes evidence having "any tendency to make a fact more or less probable" so long as "the fact is of consequence in determining the action." In this case, one of the key questions for the jury to decide was what weight to afford Acosta's testimony regarding what happened—making relevant whether Acosta testified credibly about the events that unfolded, and whether his recollection could be challenged. "[W]here what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible." *Boyd v. City & County of San Francisco*, 576 F.3d 938, 944 (9th Cir. 2009) (citing *Graham*, 490 U.S. at 399 n.12 (factfinder may consider outside evidence "in assessing the credibility of an officer's account of the circumstances that prompted the use of force")); *see also United States v. Kohring*, 637 F.3d 895, 910–11 (9th Cir. 2011) (explaining that "[e]vidence of a witness's psychological history" may be admissible on the issue of credibility if the witness's condition "may have affected her ability to perceive or to recall events or to testify accurately" (quoting *United States v. Sasso*, 59 F.3d 341, 347–48 (2d Cir. 1995))).

In this case, much of the PTSD evidence could reasonably be considered relevant to ascertaining Acosta's credibility as

the evidence went to his ability to accurately perceive and recall the incident in question. For instance, Jimenez testified that Acosta suffered from "forgetfulness." Similarly, treating psychologist Dr. Shuman testified that Acosta had not completed his course of treatment. Dr. Shuman further testified that, based on Acosta's own self reporting, Acosta's PTSD diagnosis meant that certain situations could be triggers for a PTSD episode, and listed clearing houses and drawing weapons as such situations. He testified that if such triggering events occurred, Acosta could experience "intense psychological distress" and "hypervigilance." Dr. Mohandie testified that when trigger situations arose, a person with PTSD could experience "overreaction, oversensitivity, impulsive reactions instead of being able to flexibly assess and decide what to do in a situation." Dr. Mohandie also testified that for individuals with prolonged PTSD, symptoms are likely to continue without treatment. To the extent this testimony indicated that Acosta's PTSD may have caused him to misperceive reality and consequently overreact to certain situations, it was probative of his credibility.

These descriptions of Acosta's self-reports were relevant as they bore directly on his credibility, which was properly before the jury. In rejecting Acosta's argument that the evidence of his PTSD diagnosis was irrelevant because he had been diagnosed two years before the incident in question and "there [was] no evidence that Acosta suffered from PTSD" at the time he shot Sonny, we join our sister circuits who have deemed admissible evidence of a witness's psychological condition even when there was an interval of several years between the contested diagnostic evidence and the events to which the witness testified. *See, e.g.*, *United States v. Love*, 329 F.3d 981, 985 (8th Cir. 2003) (holding that a diagnosis of impaired memory five years earlier was

not too remote to be admissible); *United States v. Smith*, 77 F.3d 511, 516–17 (D.C. Cir. 1996) (indicating that evidence of severe depression about two years earlier could be admissible).

Thus, it was not "obvious" or "plain" error for the district court to admit the evidence. *See Draper*, 836 F.3d at 1085. Because the admission of the evidence was not obviously erroneous, the fact that Acosta's PTSD diagnosis was more than two years old went to the weight of the evidence rather than to its admissibility. In addition, the PTSD evidence was contested by Acosta and others, and Acosta's attorney conducted significant cross-examination on those issues. The issue was fully and fairly aired before the jury. There was no "manifest error" in admitting the evidence.[10]

And, even assuming, *arguendo*, that the PTSD evidence was admitted in error, the admission did not constitute a "miscarriage of justice," such that plain error reversal is warranted. The admission of relevant evidence, on its face, did not "impair[] the fairness, integrity, or public reputation of judicial proceedings." *C.B.*, 769 F.3d at 1019. In the context of the trial, the critical issues were the ones resolved by the jury in its verdict. As the jury was properly instructed, under applicable federal and state law, a police officer may not fatally shoot an unarmed, nonthreatening suspect who was not attempting to flee. Here, from the cumulative evidence, the jury concluded that Acosta retreated from Sonny after firing the first shot, and that Sonny did not

---

[10] We are also unpersuaded that our decision will discourage officers from seeking mental health treatment. The district court informed Acosta that it was likely to reconsider its ruling *in limine* regarding the PTSD evidence if Acosta objected at trial, and he failed to do so.

approach Acosta with scissors before the officer fired the fatal shot. Those conclusions were amply supported by evidence in the record that had no relation to the PTSD diagnosis. Admission of the evidence therefore did not constitute a miscarriage of justice seriously impairing the fairness, integrity, or public reputation of the judicial proceeding. *See C.B.*, 769 F.3d at 1019.

## VI

In sum, this case is largely controlled by our deferential standards of review. There was sufficient evidence to support the jury verdict. In light of the jury verdict, the district court did not err in denying Acosta qualified immunity on Lam's Fourth Amendment claim. The district court did not commit plain error in its evidentiary rulings. And Acosta did not appeal the merits of the jury's decisions on the state law negligence claims. We affirm the judgment of the district court on these claims.

However, we conclude that there is insufficient evidence to support the jury's verdict in favor of Lam on his Fourteenth Amendment claim for loss of a familial relationship with Sonny. We therefore reverse the district court's denial of Acosta's Rule 50(b) motion on that claim and remand to the district court for further proceedings. Lam is awarded costs on appeal.

**AFFIRMED in Part, REVERSED in Part; REMANDED.**

BENNETT, Circuit Judge, dissenting:

I respectfully dissent for two reasons. First, Officer Jairo Acosta is entitled to qualified immunity on Plaintiff-Appellee Tan Lam's Fourth Amendment claim because Lam identifies no clearly established law that would have put Officer Acosta on notice that his actions violated the Fourth Amendment. Second, given the complete lack of evidence showing that Officer Acosta suffered from post-traumatic stress disorder ("PTSD") at the time of the 2013 incident in question, the district court plainly erred in allowing Lam to admit evidence of Officer Acosta's 2011 PTSD diagnosis.[1]

## I.  Relevant Background

### A.  The Incident[2]

On September 2, 2013, Lam asked his neighbor to call the police because his son, Sonny Lam ("Sonny"), had tried to slap him. Officer Acosta responded to the call and arrived at Lam's home. Lam told Officer Acosta that Sonny had "lost his mind." Lam then escorted Officer Acosta into his home, and they went into Sonny's bedroom. Sonny was sitting on a chair. Officer Acosta grabbed Sonny's shoulder and tried to pull him out of the room. Sonny, still sitting in the chair, said, "no, no," and made punching motions in the air. According to Lam, Officer Acosta responded by saying to

---

[1] Although I believe that a new trial is warranted as to all claims, I agree with the majority's reversal of Lam's Fourteenth Amendment claim.

[2] I recite the relevant facts, giving deference to the jury's findings and drawing all reasonable inferences in Lam's favor. *See A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 459 (9th Cir. 2013).

Sonny, "beat me, beat me."  Sonny then stood up and pushed Officer Acosta out of the bedroom.  Officer Acosta and Sonny got into a struggle outside the bedroom door, and Lam moved away from them, about ten feet down the hallway. Sonny had nothing in his hands during this struggle with Officer Acosta.

Sonny then grabbed a pair of scissors and stabbed Officer Acosta on his forearm near his wrist, and Officer Acosta shot Sonny in the leg.  Officer Acosta retreated from Sonny in the confined hallway, and Lam ran toward Officer Acosta after the shot to find out what had happened.  Officer Acosta told Lam that Sonny "had a knife," he "yelled, go back, go back," and he cleared his handgun because it had become jammed. In the meantime, Sonny continued to advance toward Officer Acosta, although with no scissors.  Right after Lam stepped back as instructed by Officer Acosta, he heard Officer Acosta fire a second shot.  That shot hit Sonny in the chest in a downward angle, and Sonny fell to the ground.[3]  Sonny was taken to the hospital and died during surgery.

---

[3] Even drawing all reasonable inferences in Lam's favor, the evidence shows that Sonny continued to advance toward Officer Acosta after the first shot.  The bullet hole from the first shot that went through Sonny's leg was found in Sonny's bedroom floor, confirming that Sonny was in or near his bedroom at the time of the first shot.  Lam testified that Sonny was lying on the ground in front of Lam's bedroom after the second shot. Since the two bedrooms were about ten feet apart according to a diagram of the home introduced into evidence, Sonny moved about ten feet down the hallway toward Officer Acosta before the second shot.  While the jury made the special finding that Sonny did not approach Officer Acosta with scissors before Officer Acosta fired his gun the second time, the jury never found that Sonny did not approach Officer Acosta after the first shot; it only found that Sonny did not approach him with scissors.

## B. The PTSD Evidence

Officer Acosta is an Iraq war veteran and was discharged from the Army in 2006.  Before trial, Officer Acosta moved in limine to exclude as irrelevant and unduly prejudicial evidence that he had been diagnosed with PTSD in 2011, more than two years before the shooting.  He emphasized that Lam failed to show that the evidence was relevant, as Lam presented no evidence that he suffered from PTSD at the time of the shooting.  Lam argued that the evidence was relevant because it showed that Officer Acosta acted unreasonably during the incident, and it was relevant to Officer Acosta's credibility because he had not disclosed his PTSD diagnosis to his employer.  Lam, however, pointed to no evidence showing that Officer Acosta suffered from PTSD during the incident.  The district court denied the motion to exclude the PTSD diagnosis "without prejudice," noting that "there [are] a lot of things that are involved in PTSD that may or may not be relevant as we move through."[4]

At trial, Lam's central theory was that Officer Acosta acted unreasonably because of his PTSD.  Indeed, Lam's counsel began his opening statement by highlighting that Officer Acosta's PTSD caused him to act irrationally: "You will hear testimony through the course of this trial that prior to the shooting, defendant, Police Officer Acosta, was

---

[4] I disagree with the majority's contention that this statement "suggested that in the absence of additional facts, [the court] was inclined to exclude the evidence . . . had [Officer Acosta] made a contemporaneous objection at trial."  Maj. Op. at 36 n.9.  Indeed, the fact that the court allowed Lam during his opening statement to refer to Officer Acosta's PTSD (before any additional facts had been admitted) reveals the opposite—that the court was inclined to admit the PTSD evidence without any additional facts.

diagnosed with a mental health issue, a condition which interfered with his ability to do his job. . . . The result of [his PTSD] was that he ignored his training and shot my client's mentally ill son in their own home."

Lam introduced, without further objection by Officer Acosta, substantial evidence related to Officer Acosta's PTSD diagnosis. Portions of the deposition testimony of two Veterans Affairs ("VA") healthcare providers were read to the jury. The jury learned the following through this evidence.

Mary Jimenez, VA nurse practitioner, examined Officer Acosta in February 2011. At that time, Officer Acosta self-reported various symptoms he had been experiencing, including sensitivity to noise, forgetfulness, feeling anxious or tense, being easily annoyed and angered, and feeling easily overwhelmed. He also reported that his symptoms had interfered with his work in the prior 30 days. Nurse Jimenez, in consultation with a physiatrist, concluded that Officer Acosta suffered from PTSD.

VA Dr. Joseph Shuman, a clinical psychologist, examined Officer Acosta in June 2011. Dr. Shuman diagnosed Officer Acosta with "prolonged PTSD," meaning the symptoms of PTSD had lasted longer than three months. Dr. Shuman's notes revealed that Officer Acosta's "triggers" included "clearing houses [and] drawing his weapon." And that these "triggers" can cause him to "re-experience[] the trauma" and are "intensely distressing psychologically." Dr. Shuman testified that Officer Acosta reported "irritability, outbursts of anger which he thinks stems from being repeatedly exposed to potential danger from IEDs in Iraq," and his notes described Officer Acosta as hypervigilant, meaning he "has

a tendency to scan his . . . environment for threats and to be more on guard against a potential threat than a person might ordinarily be." Dr. Shuman met with Officer Acosta once.

Lam also called an expert clinical psychologist, Dr. Kris Mohandie, who provided testimony related to Officer Acosta's PTSD diagnosis based on his review of Officer Acosta's medical records, disciplinary records, and other materials. Dr. Mohandie never examined Officer Acosta. Dr. Mohandie testified that a prolonged PTSD diagnosis means that the "symptoms are likely to continue" without treatment, but he never opined on whether Officer Acosta suffered from PTSD at the time of the incident. He also testified that an officer who is experiencing symptoms like the symptoms that Officer Acosta reported in 2011 would have a duty to disclose those symptoms to his employer.

Lam presented no evidence at trial showing that Officer Acosta suffered from PTSD or experienced any PTSD-related symptoms at (or even around) the time of the incident. Despite the complete lack of evidence, Lam argued extensively during closing that Officer Acosta was suffering from PTSD on the day of the incident and that it caused him to overreact to the situation: "Officer Acosta knew it was dangerous to go about performing his duties as a police officer when he was carrying these demons; demons which he brought with him back from the time that he served our country in Iraq"; Officer Acosta's "judgment may be clouded because of the horrors that he experienced at war"; Officer Acosta's PTSD symptoms "are all characteristics and feelings, demons, . . . that were inside of him that he was taking with him every day to work"; Officer Acosta reported "outbursts of anger" and "he brought those feelings with him

into the Lam family household"; and "Officer Acosta showed up that day with his demons with him."

## II. Analysis

### A. Officer Acosta is Entitled to Qualified Immunity

An officer is entitled to qualified immunity if his conduct did not violate clearly established law. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "[C]onduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that *every* 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 741 (internal alterations omitted and emphasis added) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[T]he clearly established right must be defined with specificity" and not "at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam). Indeed, the Supreme Court has repeatedly reminded our court of the requirement to define clearly established law with specificity. *See, e.g.*, *id.* at 503 ("Under our precedents, the [Ninth Circuit's] formulation of the clearly established right was far too general."); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." (quotation marks omitted) (quoting *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015))).

"Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the

factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152 (alterations omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). And the plaintiff bears the burden of identifying "sufficiently specific constitutional precedents to alert [an officer] that his particular conduct was unlawful." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017). This means that Lam must "identify a case where an officer acting under similar circumstances as Officer [Acosta] was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam).

Lam fails to meet this burden, as he does not identify a single case in which an officer acting under similar circumstances as Officer Acosta was found to have violated the Fourth Amendment. And under the Supreme Court's teachings, similar circumstances means similar to what happened here—a one-on-one confrontation, in a confined space, in which a suspect used a deadly weapon to wound a police officer, was not disabled by a first shot, and the deadly shot was fired very shortly after the first.

Lam first argues that Officer Acosta violated clearly established law because *Tennessee v. Garner*, 471 U.S. 1 (1985), established "that the use of deadly force against a non-threatening unarmed suspect is unreasonable." But the Supreme Court has already explained that *Garner* "lay[s] out excessive-force principles at only a general level" and therefore, *Garner* "do[es] not by [itself] create clearly established law outside 'an obvious case.'" *White*, 137 S. Ct. at 552 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Because Lam does not argue that this is an obvious case, his reliance on *Garner* is misplaced.

Even if Lam had argued that this is an obvious case, the argument would have been unavailing given the circumstances. The events unfolded and escalated quickly. Consistent with Lam's warning that Sonny had "lost his mind," Sonny acted erratically by punching into the air and pushing Officer Acosta out of the room. Sonny then grabbed a deadly weapon and, using deadly force, stabbed Officer Acosta. He could have killed Officer Acosta. Officer Acosta retreated, but he was in a very tense situation. He had just been attacked with deadly force, he was in a confined hallway (and was presumably unfamiliar with the home's layout), his handgun had jammed, and Sonny continued to move toward him, although with no scissors. In that moment, Officer Acosta had to make an immediate judgment call—stop Sonny or wait and see what he would do next, which could again include a felonious assault with a deadly weapon.[5] Officer Acosta decided to fire a second shot. These facts differ significantly from the facts in cases in which this court has found obvious constitutional violations. *See, e.g.*, *Harris v. Roderick*, 126 F.3d 1189, 1203–04 (9th Cir. 1997) (sniper safely hidden on a hill shot a retreating suspect who had not threatened the officers in any way).

The remaining cases Lam relies on are equally unhelpful. Two cases, *Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017), and *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013), were decided after the events here occurred, so they could not have given Officer Acosta notice that his

---

[5] *See* Cal. Penal Code § 245(a)(1), (c). The fact that Sonny moved without scissors does not mean that an officer under these circumstances would have known for certain that Sonny did not have ready access to the scissors or some other weapon (even viewing the evidence in the light most favorable to Lam).

actions would violate clearly established law.  *See Kisela*, 138 S. Ct. at 1154 ("[A] reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious.").  Moreover, these cases, as well as the rest of the cases Lam cites, are all materially different on the facts. *See Lopez*, 871 F.3d at 1010–13 (evidence supporting that the suspect did not threaten officers when he was carrying a weapon that looked like an AK-47, pointed down at the ground, had displayed no aggressive behavior, and turned around after an officer shouted "drop the gun"); *Hayes*, 736 F.3d at 1235 (evidence supporting that the suspect was complying with an officer's orders "when he raised the knife and posed no clear threat at the time he was shot without warning"); *Glenn v. Washington Cnty.*, 673 F.3d 864, 867–69 (9th Cir. 2011) (three responding officers confronted the suspect outside his home and the suspect had not threatened anyone with the knife or brandished it before the officers fired); *Ellis v. Wynalda*, 999 F.2d 243, 245 (7th Cir. 1993) (officer confronted a suspect, the suspect tossed a jacket and mesh bag toward the officer and ran away, and the officer shot the suspect in the back); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (evidence supporting that the suspect did not reach for a gun before being shot, did not point the gun at the officers before being shot, and was not facing them when he was shot).  None of these cases involved a suspect who had attacked and injured an officer with a deadly weapon moments before the officer used deadly force.[6]

---

[6] Lam also cites *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017).  But this case is of no use in showing that Officer Acosta's conduct violated clearly established law because it was decided after the events here occurred.  *See Kisela*, 138 S. Ct. at 1154.  The majority relies on

The majority discusses two other cases, only one of which Lam cites, to support its position that the law was clearly established, *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992), and *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001). But, like all of the other cases that Lam points to, these cases are materially different on the facts.

In *Hopkins*, the suspect attacked the officer in a parking lot, and the officer responded by firing several shots. 958 F.2d at 883, 886. The officer retreated by "cross[ing] a major thoroughfare, reach[ing] a gas station and put[ting] a car between himself and his assailant." *Id.* at 887. The unarmed suspect continued to follow the officer, and the officer fired several more shots at close range. *Id.* at 883, 887. Significantly, the "second use of force occurred several minutes" after the first shooting. *Id.* at 886.

In *Deorle*, at least thirteen officers responded to a 911 call, surrounded Deorle's home, and were waiting for negotiators to arrive at the scene. 272 F.3d at 1276. One officer, who had been at the scene for forty minutes, "simply fired at Deorle when he arrived at a spot [the officer] had predetermined." *Id.* at 1275, 1281–82. Before the shooting, Deorle had been "emotionally disturbed" but he "was unarmed, had not attacked or even touched anyone, had

---

*Zion*, reasoning that two cases cited in *Zion* show that the law was clearly established at the time of the incident here. Maj. Op. at 28–29. The two cases cited in *Zion* are *Garner*, 471 U.S. 1, and *Harris*, 126 F.3d 1189. As discussed above, however, *Garner* "do[es] not by [itself] create clearly established law outside 'an obvious case,'" *White*, 137 S. Ct. at 552 (quoting *Brosseau*, 543 U.S. at 199), and Lam does not argue that this is an obvious case. And the facts in *Harris* are not at all similar to this case, and so *Harris* did not clearly establish that Officer Acosta's actions were unlawful. *See Harris*, 126 F.3d at 1203.

generally obeyed the instructions given him by various police officers, and had not committed any serious offense." *Id.* at 1275.

The differences between *Hopkins* and *Deorle* and this case "leap from the page." *Kisela*, 138 S. Ct. at 1154 (quoting *Sheehan*, 135 S. Ct. at 1776). Neither case involved a solo officer in a confined space who, after having just been stabbed with a deadly weapon, had to make a quick judgment call on whether he should risk his life by waiting and seeing what would happen next or use deadly force.[7]

In sum, Lam identifies no clearly established law showing that *every* reasonable officer in Officer Acosta's position would have known that it was a Fourth Amendment violation to fire the second shot. Officer Acosta is therefore entitled to qualified immunity on the Fourth Amendment claim.

## B. The District Court Plainly Erred in Admitting the PTSD Evidence

The admission of the PTSD evidence is subject to plain error review because Officer Acosta failed to object below.[8]

---

[7] The majority cites several out-of-circuit cases to support its conclusion that Officer Acosta's actions violated clearly established law. Maj. Op. at 29. But clearly established law in our circuit "must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction."

[8] I am sympathetic to Officer Acosta's contention that his motion in limine preserved his objections, as the district court necessarily rejected his primary contention—that absent evidence he was suffering from PTSD at the time of the shooting, nothing about PTSD could come into evidence. And, of course, Lam started down the PTSD road in his opening statement

"In the civil context, '[p]lain error review requires: (1) an error, (2) the error is plain or obvious, (3) the error was prejudicial or [a]ffects substantial rights, and (4) review is necessary to prevent a miscarriage of justice.'" *Draper v. Rosario*, 836 F.3d 1072, 1085 (9th Cir. 2016) (alterations in original) (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002)).

The district court erred in admitting the PTSD evidence. Officer Acosta's 2011 self-reported symptoms and PTSD diagnosis alone were irrelevant to his ability to perceive and react reasonably more than two years later. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Put another way, with no evidence that he suffered from the same or similar symptoms in or around September 2013, his two-year-old diagnosis fails to show that it is more or less probable that he had trouble perceiving or reacting reasonably to events at the time of the incident.[9]

---

and introduced his PTSD evidence with no showing that Officer Acosta was suffering from PTSD at the time of the shooting. Nonetheless, the district court denied the motion "without prejudice" (though without a reasoned explanation for the denial), and so Officer Acosta needed to object at trial to avoid plain error review.

[9] The majority appears to conclude that the PTSD evidence was relevant to Officer Acosta's ability to accurately perceive and recall the incident. Maj. Op. at 37–38. But this wrongly assumes that Officer Acosta suffered from PTSD at the time of the incident. There was no evidence that Officer Acosta suffered from PTSD at the time of the incident.

Lam contends that Officer Acosta's failure to report his diagnosis to his employer in 2011 bears on his credibility. But even if the PTSD evidence were slightly relevant to Officer Acosta's credibility, it would be improper to admit the evidence if there were "even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992). Here, there was substantially more than a "modest likelihood of unfair prejudice" or "a small risk of misleading the jury." *Id.* Indeed, the record shows that Lam did not merely use the PTSD evidence to implicate Officer Acosta's credibility. Rather, Lam used the evidence to improperly urge the jury to find that Officer Acosta acted unreasonably at the time of the incident because he was then suffering from PTSD: "Officer Acosta showed up that day with his demons with him," and "Officer Acosta knew it was dangerous to go about performing his duties as a police officer when he was carrying these demons; demons which he brought with him back from the time that he served our country in Iraq."

The error was plain. Before trial, Officer Acosta's motion in limine notified the district court that the PTSD evidence was irrelevant because Lam had produced no evidence that Officer Acosta suffered from PTSD at the time of the incident. Though the district court denied the motion, it questioned the relevancy of the evidence. Lam then presented no evidence during trial showing that Officer Acosta suffered from PTSD at the time of the incident. Even so, Lam repeatedly told the jury that Officer Acosta suffered from PTSD on the day of the incident and that his PTSD had caused him to act unreasonably. Thus the record reveals that Officer Acosta put the court on clear notice that the evidence was irrelevant, the court expressed uncertainty about its relevancy, Lam admitted no evidence showing that Officer

Acosta suffered from PTSD at the time of the incident, and Lam clearly used the evidence for that improper purpose. These circumstances show that the error was obvious.**[10]**

The third plain error factor is satisfied because Officer Acosta was prejudiced, as there is a "reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262 (2010). First, the district court acknowledged that this was a close case: "[T]he evidence seems to be pointing – to go one way or the other, but that's up to the seven jurors . . . ." Second, the PTSD evidence as presented by Lam was (improperly) compelling, as according to Lam's counsel, it showed that the events at Lam's home triggered Officer Acosta's PTSD, causing him severe psychological distress and to overreact to the situation. Lam essentially argued that it was Officer Acosta's PTSD that

---

[10] Relying on two out-of-circuit cases, the majority appears to hold that evidence of Officer Acosta's PTSD was admissible because it bore on his credibility, regardless of whether he suffered from PTSD at the time of the incident. Maj. Op. at 38. The cases the majority cites, however, do not support its holding. Indeed, in *United States v. Love*, 329 F.3d 981 (8th Cir. 2003), the court considered certain factors including "whether the witness suffered from the condition at the time of the events to which the witness will testify," before concluding evidence of the witness's psychological condition had been improperly excluded. *Id.* at 984–85. The court in *United States v. Smith*, 77 F.3d 511 (D.C. Cir. 1996), never determined whether the evidence was admissible but suggested that it could be admissible if the witness's medical records "indicated a relevant, *ongoing* problem." *Id.* at 517 (emphasis added). Significantly, the court noted that "mental illness is not *necessarily* admissible as impeachment evidence" and a court must "consider the medical history of the specific witness in question so as to render an informed decision regarding the relevance of that history." *Id.* at 516. Thus, contrary to the majority's view, these cases do not support that evidence of a witness's psychological condition, which could bear on the witness's credibility, is per se admissible.

caused him to fatally shoot Sonny. Indeed, Lam made sure to remind the jury during closing that Officer Acosta's PTSD was triggered by house searches and drawing his weapon, the very "two things that Officer Acosta did on September 2nd of 2013." Third, Lam focused on the PTSD evidence throughout trial to show that Officer Acosta acted unreasonably. Lam referred to Officer Acosta's PTSD at the very beginning of his opening statement, he admitted substantial evidence at trial that highlighted Officer Acosta's PTSD, and he stressed again and again during closing that Officer Acosta suffered from his PTSD "demons" on the day of the incident. Though there was no evidence Officer Acosta suffered from PTSD on the day of the shooting, Lam used the PTSD evidence to demonize Officer Acosta—both literally and rhetorically. Given that this was a close case, that the PTSD evidence was compelling, and that Lam's main theory was that Officer Acosta unreasonably shot Sonny because of his PTSD, there is, at the very least, a "reasonable probability that the error affected the outcome of the trial." *Id.*

Finally, review is necessary to prevent a miscarriage of justice, as "the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *C.B. v. City of Sonora*, 769 F.3d 1005, 1019 (9th Cir. 2014) (en banc) (quoting *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 36 (1st Cir. 2006)). Officer Acosta's PTSD diagnosis and symptoms were irrelevant to his actions on the day of the incident, and the court should have never allowed the evidence to be admitted. Lam, however, used this irrelevant evidence to support his central theory; indeed it was a crucial building block, and thus the evidence tainted the entire trial. It is a serious injustice to allow a party to use wholly irrelevant, improperly compelling evidence, to secure a jury verdict.

Under the circumstances, I believe that this is a case in which we should correct the error to prevent a miscarriage of justice.[11]

## III.    Conclusion

For the reasons stated above, I respectfully dissent. I would find that Officer Acosta is entitled to qualified immunity on the Fourth Amendment claim and that the admission of the PTSD evidence was plain error requiring a new trial as to all claims.

---

[11] As pointed out in an amicus brief filed in support of Officer Acosta, allowing the district court's error to stand will likely discourage officers from seeking mental health treatment. *See* Brief of California State Sheriffs' Assoc. et al. as Amici Curiae, Dkt No. 17 at 11–18. Officers should be allowed to seek the treatment they need without fear that a plaintiff in a civil suit could freely use a years-old diagnosis against them without even showing it is relevant to the issues at trial.